

Nicole Albrecht Wheeler
Petra Albrecht
Richard Wheeler
11064 Mississippi Ave.
Los Angeles, CA
90025
310-293-1847

# UNITED STATES DISTRICT COURT FOR THE CENTRAL DISTRICT OF CALIFORNIA

Nicole Albrecht Wheeler, Petra Albrecht,

Richard Wheeler-

**Plaintiffs vs**

(8) Unknown Named Agents of ICE,

(Immigration and Customs Enforcement)

FOD- David Jennings, AFOD- Arturo

Trevino, Supervisor Andre Quinones,

Deportation Officer Nelly Mckenna,

Sandra D. Anderson. SACJ- Director

Christina Holland, Supervisor Jaime

Manriquez. J.A. Musick- Deputy Patricia

Holliday. Otay- Unit Manager Billie

Handsbur.   **Defendant(s)**

Case No.: LA CV16 066

**COMPLAINT**

Plaintiffs bring this complaint pursuant to Bivens v. Six Unknown Agents, 403 U.S. 388 (1971)

**DEMAND FOR JURY TRIAL**

## Jurisdiction

This court has jurisdiction under 28 U.S.C. § 1331, because the allegations herein below raise federal questions.

## Venue

1. Venue is proper pursuant to 28 U.S.C. § 1391 because the defendants, who are federal government officials, or contracted by federal government, reside in _Central District_, and because the plaintiffs have a residence in this district. In addition, numerous witnesses to the factual allegations below have a residence in this district.

1

## **Parties**

2. Plaintiff- Nicole Albrecht Wheeler, a 34 year old female and German citizen, the daughter of Plaintiff, Petra Albrecht, the sister of minor, J A , and wife of Plaintiff, Richard Wheeler, was at all times material to this complaint a resident of this district, also residing at 17153 Palisades Circle, Pacific Palisades, CA 90272, until her unlawful physical removal from the her home and the United States.

3. Plaintiff- Petra Albrecht, a 55 year old female and German citizen, the mother of minor, J A , and Plaintiff Nicole Albrecht Wheeler, until her unlawful and forcible ouster from the United States, was at all times material to the allegations below, a resident of this district, with a physical address of 17153 Palisades Circle, Pacific Palisades, CA . 90272.

4. Plaintiff, Richard Wheeler, a 52 yr old male and U.S. citizen, the husband of Plaintiff, Nicole Albrecht Wheeler, son in-law of Plaintiff, Petra Albrecht, and brother in-law to minor, J A , who resides in the U.S at 11064 Mississippi Ave, Los Angeles, CA 90025.

5. **Defendants** (8 Unknown and Named Federal ICE Agents) are employed at 300 North Los Angeles Street, Los Angeles, CA 90012

6. ICE Field Office Director- David Jennings, is employed at 300 North Los Angeles Street, Los Angeles, CA 90012

7. ICE Assistant Field Office Director- Arturo Trevino, is employed at 300 North Los Angeles Street, Los Angeles, CA 90012

8. ICE Supervisor Andre Quinones, is employed at 300 North Los Angeles Street, Los Angeles, CA 90012

2

9.  Deportation Officer Nelly McKenna , is employed at 300 North Los Angeles Street, Los Angeles, CA 90012

10. Chief Counsel / Los Angeles- Sandra D. Anderson is employed at 606 S. Olive Street, 8th floor, Los Angeles, CA 90014.

11. SACJ- Director Christina Holland, is employed by the City of Santa Ana, CA. Po Box 22003, Santa Ana, CA 92701

12. SACJ- Supervisor Jaime Manriquez, is employed by the City of Santa Ana, CA. Po Box 22003, Santa Ana, CA 92701

13. James A. Musick- Deputy Patricia Holliday- is employed by the Orange County, CA. Sherriff's Department. 13502 Musick, Irvine, CA 92618

14. Otay- Unit Manager Billie Handsbur is employed by Corrections Corporation of America, employed in San Diego, CA 7488 Calzada De La Fuente, San Diego, CA 92231

## Statement of Facts

15. The following is an outline of egregious actions / misconduct, constitutional and regulatory violations by federal agents in their "individual capacities" from Immigration and Customs Enforcement, (ICE), Department of Homeland Security, and "individuals" under ICE supervision in their contracted facilities. Violations are also noted by other involved agencies such as, Department of Children & Family Services (DCFS), LAPD, and the California Dependency Court.

3

16. On 9/2/2011, the Jewish Albrecht Family, mother Petra, daughter Nicole and son, J     A       entered the U.S. in Los Angeles on the Visa Waiver Program, and lived in the U.S. without incident. The family fled Germany, after the Jugendamt, a branch of the German government threatened to separate the family, and stayed in the U.S. out of fear of persecution, torture and retribution from Germany, due to their failure to abide by Germany's policies compelling attendance in government schools, as both, Petra and Nicole were involved with J       homeschooling- in violation of German law. See <u>Romeike v. Holder (6th Cir 2013)</u> -Landmark case, allowing German homeschoolers to remain in the US, after lost asylum- awarded Indefinite Deferred Status by the Department of Homeland Security, and still present in the US. Also, the German Jugendamt has been criticized by the United Nations and The European Convention on Human Rights and Fundemental Freedoms – ECHRFF- (rights to fair trials) for it's human rights violations against families.

17. In 2013 the Albrecht's began to be systematically victimized by their Neighbors, Alexandra Paul and husband Ian Murray in Los Angeles. After Nicole turned down unwanted sexual advances from both, the neighbors leveled several unfounded accusations against Nicole, wherein they branded her a stalker, and had her arrested in May 2014, in retaliation for filing a police report and a restraining order, that she had sought against Mr. Murray for threating her life and, to which Ms. Paul was subpoenaed as a witness. The neighbors prevented the adjudication of said restraining order (due to timed arrest and witness tampering) and initiated a court case against Nicole

for alleged restraining order violation (date to appear in court September 4, 2014) to take the focus away from the crime Mr. Murray committed against Nicole. This enabled the neighbors to further harass and victimize Nicole and her family.

18. On August 27, 2014, the criminal behavior from the neighbors culminated into an email from Alexandra Paul to ICE, stating the Albrecht's were illegal aliens, were stalking her and have violated restraining orders over two dozen times (unfounded), one day after she was served a temporary restraining order for assault with a deadly weapon, attacking the Albrecht's via road rage (date to appear in court 09/16/14). The sole purpose of her contact with ICE was to have the entire family deported, as she may have faced criminal charges. Alexandra Paul contacted ICE and put the wheels in motion to misuse the immigration enforcement process as a way of ensuring Nicole and  family and would no longer be available as witnesses against Ms. Paul and her husband Mr. Murray, for both the September 4, 2014 and September 16, 2014 hearings.

19. On September 4, 2014, at approximately 7:30 am, as the Albrecht's were on their way to court to testify in a pre-trial hearing, resulting out of the accusations against Nicole,  (8) Unknown, Named federal officers from (ICE) acting in their "individual capacities" under color of federal law, in cooperation with LAPD (TMU) and DCFS acted on a tip from Alexandra Paul to conduct a warrantless, without consent or exigent circumstances "raid" and targeted non dangerous immigrants, at 17153 Palisades Circle, Pacific Palisades, CA 90272.  ICE and LAPD used

excessive display of force, when they forced their way into the Albrecht home, unlawfully with guns drawn, as if apprehending wanted murderers, rather than potential administrative immigration law violators.

The agents purposefully and unnecessarily held them at gunpoint, including a 78-year-old senior and an eleven-year-old minor, who was terrified when agents forced their way into the bathroom with guns drawn as other agents conducted a warrantless, non-consensual sweep of the home.

20. They did not show warrants before entering nor did they ask for permission, as federal officers' individual conduct (ICE) is <u>governed by federal regulations</u>, which impose additional limitations on federal agents even beyond those mandated by the constitution and INA, which were all blatantly violated. Also, the 4th Amendment and federal regulation, bars home raids absent consent, exigent circumstances or a judicially issued warrant.

21. Due to the tip launched by Alexandra Paul, 8 days prior to the arrest, the agents pre-planned the raid in SWAT style commando, and knew their whereabouts prior to the arrest, and failed to get a warrant, which precludes a finding of exigent circumstances, justifying a warrantless search, using unreasonable force, threats and intimidation. Petra and Nicole were immediately handcuffed, taken into custody and placed in a van for several hours, without air, water, or to be able to use a bathroom.

22. It should be known that an administrative warrant <u>(was issued 8 hours after the home invasion and arrest, at 3:31 pm and served to Nicole and Petra Albrecht at 5:20pm at the LA ICE Field Office),</u> which is administrative

6

in nature and does not grant the same authority to enter dwellings, as
a judicially approved search or arrest warrant, and was insufficient to
justify such a home invasion. In addition, an administrative warrant (if
it were actually shown) would require consent to enter from the occupants,
which this was not done.

23. As a result of the violations by ICE, the neighbors contacted ICE, and
recruited them in a successful attempt at witness tampering to avoid
charges. Nicole missed (3) court dates due to the prevented adjudication by
Ms. Paul and Mr. Murray (obstruction of justice and witness tampering)
and (2) restraining orders were dismissed as a result.

24. Petra Albrecht and Nicole Albrecht Wheeler, both, who overstayed their
visas, were arrested and placed in immigration detention for 16 ½ months,
under consistent patterns of abuse and medical neglect in different facilities.

25. Department of Children and Family Services separated 11-year-old J
A.        (a key witness) from his family, <u>without a warrant</u>, preventing
him from residing with willing and able relatives to care for him, in the
residence, and at another residence. J        was integrated in several
community activities (most inspirational Junior Lifeguard, and
successful Karate student) was put in a Latino foster family for 3 months, far
away from family and community ties.

26. The child was dragged through dependency court proceedings, to which he
was never the proper subject (no abuse & neglect). DCFS acted contrary to
the best interest of the child, severely disconnecting the child's relationship

with his family, not considering emotional ties with them. Child was forbidden to communicate in his native language German with his family (only language mother speaks). Neither DCFS, nor ICE did arrange any form of contact/ visitation and isolated the child from the family. DCFS fabricated negative evidence and fraudulent statements. These actions were detrimental to the child's health and mental well-being (alienation).

27. During the entire dependency court proceedings, Petra's parental and procedural rights were completely ignored and violated.
In violation of their own Parental Interests Directive, FOD, David Jennings, and AFOD, Arturo Trevino, acting in their "individual capacity", prevented Petra from appearing in dependency court, violating her due process rights to defend, "be present" and represent herself to retain custody over her child. Petra was not informed about the hearings in the beginning, and received no information regarding her child. The family became victims of misconduct and discrimination.

28. Illegal extradition of minor, J          A
On December 17th, 2014, Petra's minor child, J          A          was extradited back to Germany, both against his will, and against the law, as a final decision had not been reached on his application for asylum, withholding of removal, and protection under the United Nations Convention Against Torture, which remains pending with the United States Citizenship and Immigration Services (USCIS) to this day, receipt #ZLA1400174260. Jayson is protected under the 1967 United Nations Protocol Relating to the Status of Refugees, domestic laws and international treaty laws. Both international

8

treaty law and domestic laws uphold the right of a refugee / asylum applicant to *non-refoulement*, or, returning the child back to the country or authority he seeks asylum against (rogue agency- Jugendamt). As a result of this asylum application, jurisdiction over J          A          , asylum application had already been taken out of the hands of the California dependency court at the time of the ruling. As a result, the decision against J          returning him to Germany against his will while he had a pending asylum application, was unlawful, as federal law in the U.S. supersedes any extradition conducted by a U.S. state court, per "the Doctrine of Federal Preemption", from the Supremacy Clause in the U.S. Constitution. Jayson was also protected under a second asylum application, that of his mothers, since J          is a minor. SEE EXHIBIT A- Letter to DHS Secretary Jeh Johnson.

29. After written and verbal pleas from attorneys and family were ignored, including to Sandra D. Anderson, ICE / DHS Chief Counsel of Los Angeles, ICE- FOD, David Jennings, and AFOD, Arturo Trevino, egregiously disregarded and knowingly violated "The Doctrine of Federal Preemption", in addition to the 1967 United Nations Protocol Relating to the Status of Refugees, as they allowed and supported the dependency court, and DCFS in violating multiple domestic laws and international treaty laws, as the dependency court, per Judge Julie Blackshaw, without jurisdiction, ordered DCFS to purchase a plane ticket to escort and return my minor child back to Germany, before all administrative appellate and review options had been exhausted, violating the entire purpose of the asylum process.

30. Additionally, dependency court had no binding court order from Germany and no Hague convention return order, as the decision to return the child had already been taken out of the hands of the dependency court, at the time of the ruling based on the two pending asylum claims, and was unlawful.

31. J      . was snatched from school against his will and put on a plane right before Christmas, ripped away and completely alienated from his entire family and known surroundings, returned to a country (Germany) where he knew no one, also deprived from all of his personal belongings.

32. Upon arrival he was placed in a <u>crisis group in an orphanage</u>, from 12/14-08/15, among kids from broken homes suffering (psychological trauma), Therefore, exposing him to the type of harm from which his asylum- still pending- was meant to protect him. <u>The family was put in an unbearable emotional situation, not knowing the whereabouts and safety of J</u>

33. Numerous requests to the Jugendamt, ICE and DCFS to return the child to the country that has jurisdiction, the United States, were unsuccessful and escalated to the point where the family is not allowed to have any contact with the child, and the father who never had custody or any form of contact now retains sole custody of the child (revenge and retaliation from the Jugendamt for filing asylum claims against Germany).

34. ICE / DHS are also responsible for violating federal regulations protecting the confidentiality of asylum applicants (at 8 CFR 208.6) which have subjected the Albrecht's to retaliation from the German government , since

ICE / DHS  contacted Germany from the beginning, and the Albrecht's are now facing revenge and retaliation since the family was "repatriated".

35. J __   has suffered from parental alienation syndrome and psychological trauma, which turned him against his family, exposing him to the influence of DCFS and the Jugendamt, and ripped apart from his family for a long period (09/14- till present). To this day J     has not returned to his family, and the entire family is emotionally and mentally wrecked, and deals with anxiety and severe fear of loss.

36. The child's removal was also fatal to the defense of Nicole and Petra's asylum cases, and ICE/DHS and the immigration courts were fully informed before the extradition, that the child (himself) were a large part of the merits of their asylum cases, as to which they lost as a result of being unable to present their "unique relief options" as a nuclear family (J homeschooled, Illegal in Germany) to remain in the United States, like the German Romeike family in Tennessee.

37. Being in ICE custody Petra and Nicole were powerless to prevent this extradition, despite numerous requests to be released to testify on behalf of J     to protect him. Dependency court, DCFS and ICE agents exposed the child to great harm, when they blatantly handed him over to the authorities he feared persecution, the Jugendamt, while he was still protected under international and domestic law (Jugendamt lacks jurisdiction over the child, while his U.S. asylum application remains pending).

38. <u>Petra Albrecht and Nicole Albrecht Wheeler ( Detained- 9/4/14)</u>

After interrogations, and intakes under sub-standard conditions, Petra and

Nicole were placed in the James A. Musick facility, Irvine, CA. After an

initial six days together at James A. Musick, ICE deportation officer

Nelly McKenna , and James A. Musick Deputy Patricia Holliday

retaliated against the family, as Petra was purposefully separated

from Nicole, after they refused to sign deportation documents,

and made ICE officials aware of their misconduct, with the retaliation

violating 1st Amendment to exercise free speech.

Petra was supposedly brought to Santa Ana Jail (shackled up) for medical

reasons, but never saw a doctor, instead she was placed in a cell at the intake

facility in Orange County, CA for several hours without food. Then placed

alone into a freezing cold cell without windows and no blanket for the night.

The next morning she was interrogated without a translator and no attorney

by an ICE official. Later the day she was transferred 100 miles further

away from her child and family and legal counsel to the higher security, San

Diego, Otay facility, even though she only speaks German. On the way to

San Diego she didn't get anything to drink and it was very hot in the van and

she wasn't allowed to use the bathroom. When she asked for medical

attention she got completely ignored by ICE. She became so ill, that she

passed out in the van. Upon arrival she was placed in high level among

criminals with serious convictions, with whom she shared a cell, even

though she has no convictions.

39. Nicole also faced retaliation in form of a transfer to a higher security jail (SACJ), for filing numerous grievances with the jail and federal government regarding inhumane detention conditions. Further retaliation against Nicole, in form of classification with convicted criminals also occured at the Santa Ana City Jail.

40. <u>Nicole's Life threatened</u>- Further retaliation occurred just a few weeks within Nicole's detention at SACJ, in form of classification, when she was placed all of a sudden in the high level module with convicted detainees and federal inmates, even though she had no convictions and was the only detainee in the module without convictions and did not cause any trouble in the low level. Instead of living in a dorm setting she was then forced to spend most of the time in a 2-bed, ice-cold cell, especially due to the permanent lockdown situation at the facility (up to 21h a day). The mis-classification, against pleas from Nicole's attorney and family members put her life at tremendous risk.

41. <u>As a result an 11-year manslaughter detainee threatened her life on January 16, 2015,</u> only an initial week after she was placed in high level with convicted criminals with serious offenses (domestic violence, drug offenses, manslaughter). The incident was caught on video, and at the request of SACJ Sgt. Willard, filed a police report the following day, and was assured no retaliation for filing a report or complaint. Then, while still physically ill from lack of medical care throughout my detention, she was locked up in solitary confinement, or supposed "protective custody" for 23 hours per day, 14 days prior to her "already postponed" asylum hearing-

due to lack of medical care, and also locked up 24 hours prior to her bond hearing date, 3/9/15.

42. After filing more complaints with the federal government, citing neglect and mistreatment, including physical and verbal assaults as well as medical neglect and violations of federal guidelines, Nicole was subject to further retaliatory actions and excessive punishment by ICE agents, and SACJ contractors. AFOD, Arturo Trevino and others threw Nicole into administrative segregation, or solitary confinement on multiple occasions, which contributed to her declining health (food withdrawal as punishment).

43. Nicole was released from solitary confinement only, after signing an unconstitutional behavioral contract with the facility under duress, while forcing her to waive her rights, against more unwarranted future  solitary lockdowns.

44. Documented acts of targeted, retaliatory actions by AFOD's, Supervisors and deportation officers, and SACJ supervisors and jail staff against Nicole, especially after Nicole and other detainees filed complaints (signed detainee statements of neglect & abuse against LA ICE field office), which followed by AFOD, Arturo Trevino backtracking, in efforts to cover up the abuse with the Director of the SACJ, Christina Holland (documented by attorney).  SEE EXHIBIT B- Detainee Complaint.

45. As a result of the foregoing facts, and based on her declining health, Plaintiff,  Nicole Albrecht was denied access to the outside world and recourse to legal aid, and prevented from communicating with her attorney.

14

She spent 14 days leading up to her asylum hearing in solitary confinement as well as the 24h prior to her bond hearing, which prevented her from being able to prepare properly for her hearings, which she then lost. Pleas from attorney and family for Nicole's release to receive proper legal counsel were denied by ICE Supervisor, Andre Quinones, AFOD, Arturo Trevino, SACJ Supervisor Jaime Manriquez, and SACJ Director Christina Holland,

46. After humiliating strip searches without cause against Nicole and other women at SACJ, (14) detainees filed complaints against ICE for violating it's own guidelines and detention standards. After more strip searches, Nicole's personal accounts were part of the 1/25/16, <u>CIVIC/ End Isolation Federal Civil Rights Complaint filed against the Santa Ana City Jail for "illegal strip searches"</u>, violating Performance-based national detention standards and the prison rape elimination act, including <u>4th Amendment</u> violations. <u>SEE EXHIBIT C</u>- Federal Civil Rights Complaint.

47. <u>Egregious Medical neglect and abuse in Detention- harassment, abuse and discrimination by ICE agents and their contractors they oversee.</u>
Nicole, who was living a healthy and very active/sports oriented lifestyle before detention, continuously faced medical neglect and malnutrition, which included an early miscarriage, frequent chest pain, significant weight loss, a shoulder injury in van en-route to court, knee injury, all never attended to, and also suffered from severe emotional distress due to the loss of her brother.

48. Petra also had been subjected to mistreatment and mis-classification, being placed in high-level MOD's with convicted dangerous criminals,

(drug felons and other convicts), fearing for her life, enduring retaliatory actions, lockdowns and transfers.

49. Petra suffered "well-documented" <u>medical negligence and abuse</u> while in detention, <u>violations- against cruel and unusual punishment,</u> as her health declined to a near fatal level during her 16 1/2 months detained, and should have been released, as she was too ill to be detained with no convictions. Petra had <u>three ER visits</u> (shackled up and belly chained) for serious heart palpitations, severe back pain and other ailments, only after family members or attorney's hounded the facilities repeatedly. <u>Petra suffered symptoms rendering her unconscious</u>, at Adelanto Detention Facility on 9/10/2015, suffering what she believed to be a <u>heart attack</u>, yet the facility and ICE only checked her blood pressure, refusing to take her to the ER. The advocacy group/ attorneys, CIVIC/ End Isolation filed an emergency complaint with ICE & CRCL, only to receive a form letter weeks later. <u>SEE EXHIBIT D.</u>

50. <u>Due to the medical neglect at Otay Detention Center</u>, who tout their superior medical care, Petra developed serious health issues and was in excessive pain daily, after acquiring high blood pressure, accelerated heart rate, fluid on her heart, malnourishment, herniated discs, ovarian cysts, kidney stones, gastrointestinal perforation from pain killers, and suffering from chronic diarrhea, using 3-5 rolls of toilet paper daily, and defecating in the shower. Petra, who was also relatively healthy prior to the arrest, was now reduced sometimes to a cane, walker and wheelchair due to medical neglect. Also, since Petra was detained, unnecessarily, 100 miles South of court proceedings in Los Angeles, she was forced to endure bus

16

travel for 20-22 hours each trip to and from court, in excruciating pain with (3) herniated discs and other serious health conditions mentioned, arriving at court in a wheel chair / walker or cane. The Otay facility and ICE dismissed our complaints of cruel and unusual punishment.

51. All <u>written</u> and <u>verbal pleas</u> from attorney and family for proper medical care were ignored by the Otay facility Unit Manager, Billie Handsbur, and ICE AFOD, Arturo Trevino.

52. It should be noted that the Otay Detention Facility, which was previously located at 446 Alta Road, even though operated by CCA, was a Department of Homeland Security Detention facility, and had major day-to-day, in-house detention over-site at the facility, including medical, as it only housed ICE and the U.S. Marshal Service detainees.

53. Deportation officer Vennetta, who was supposedly Petra's deportation officer, but stationed out of the LA ICE office (which makes no sense) was <u>always negligently absent</u> and never at Otay, and never assisted Petra, as ICE successfully isolated her far from home, family, and legal counsel, cutting off her ability to communicate properly, speaking only German, without assigning a proper deportation officer stationed at Otay Detention Facility for an entire year.

54. Petra was also transferred from Otay, San Diego to Adelanto Detention facility for attempting to exercise her 1st Amendment free right to speak to the media about conditions at Otay. But immediately after the Western Regional ICE Spokesperson, Virginia Kice spoke to the German media

17

outlet RTL, who was scheduled to interview Petra, she was quickly
transferred to Adelanto facility, and unable to be interviewed.

55. Additionally, throughout most of the 16 ½ months Nicole and Petra were
detained, DHS attorneys, ICE deportation officers, supervisors, and FOD's
conspired to make it appear as though Nicole was properly detained
(convicted of a crime, restraining order violation), even though numerous
attempts by attorney, Joshua Effron explaining written and verbally
that Nicole had no convictions, and the restraining order / stalking
allegations have never gone to trial, due to ICE / DHS preventing her from
going to court. He also explained that Petra also had no convictions. In
letters, e-mails, and calls to ICE and DHS officials from Los Angeles to
Washington, Mr. Effron explained that ICE and the DHS have successfully
performed, and have continued a calculated stall in delivering justice against
the Albrecht family, as they continue to be tossed around from office
to office, while not mandatorily detained, with no convictions, and should
be released- also per the No Grounds To Continue Detention document.
Some of these DHS / ICE officials contacted, and who refused
to correct Nicole and Petra's incorrect case file information, preventing
their release,  include, Los Angeles Chief Counsel, Sandra D. Anderson
(who would not help the family, prior to minor J         A
illegal extradition out of the U.S. in Dec. 2014), DHS attorneys, Nathan
Aina, Sun Park,  FOD David Jennings, AFOD Arturo Trevino, Ruben Vela
Jr., Washington DHS / ICE legal- Nicole Guzman, Sandra Bruce and more.
Due to these egregious methods, Immigration judges and courts, and the

18

<u>BIA</u> used this against Nicole from the beginning, claiming she was a danger to the community and a flight risk, which helped to deny her bond release, twice, while we hypocritically watched (ineligible) convicted criminals (drug and gun convictions) released on bond!

56. Nicole and Petra have been traumatized and were placed into an extreme situation that completely affected their physical and mental well –being. The detention of Petra and Nicole, and J    A    s placement in a foster care, and extradited, also caused great hardship to Nicole's 79-year-old grandma, who relied on their care; she developed anxiety and cellulitis due to distress, and additionally she lost her home.

57. <u>Excessive force, abuse - battery, mental torture and humiliation, sexual harassment from ICE agents and AKAL Staff (Aircraft Detainee Flights)</u>
On 1/12/16, Seven ICE agents, (5 unknown named) and ICE agent Joanie Patterson and Roger (possible name- male) accosted Nicole and Petra at LA field office, by means of excessive force, causing injuries, one officer hurt her fingers as they pried the phone from her hands, touching her breast, another jumped on her back and then threw her down on the bench, injuring her knee, violently handcuffed her behind her back, then snatched her up so hard that she thought they were ripping her arms off, then threw her against the wall, and pulled out a wad of hair from her head. They also pushed Petra against the wall roughing her up as well. Agents then denied medical attention, drove to San Diego, and placed Nicole and Petra on a plane, shackled up, and belly chained, and dragged them to Arizona (18h total), with major bruising, and bleeding.

58. While per medical records, Petra was not supposed to fly due to life threatening health condition as a result of detention (high blood pressure, etc.), violating ICE Detention Standards. Also inappropriate touching by female AKAL staffer while patting down Nicole and Petra in front of male ICE officers, in what can only be described as watching a visual rape.

59. Nicole and Petra were terribly ill and in shock / emotional distress after being abused with excessive force, mentally tortured and sexually harassed by ICE agents and AKAL staff during and before the plane ride from CA to AZ. No medical attention or documentation was received regarding their injuries upon arrival in Mesa, Arizona.

60. After Nicole's husband, Plaintiff, Richard Wheeler's pleas to Mesa, AZ Police Department regarding their injuries, the police ignored the dispatchers orders twice to check on Petra and Nicole, after ICE talked them out of checking on both of them in the detention cell at the Mesa, AZ airport.

61. ICE, instead dragged both, weak and sick, almost fainting, on another plane ride to Louisiana. Upon arrival at LA facility, Petra, classified in high security level, exposed to convicted criminals, and separated from Nicole again (language barrier). The La Salle Facility, LA, after demands from Nicole's husband, Plaintiff Richard Wheeler, and Houston German Consulate, documented and photographed their injuries, but only after waiting another three days after their injuries occurred. Upon arrival in another facility in Buffalo, NY / Mayville, Plaintiff Nicole Albrecht and Plaintiff Petra Albrecht were strip-searched again, and locked up for 3 days, 23hours a day, and strip searched again when they were leaving the

facility on 01/26/16 .

62. <u>On 01/26/16,</u> Plaintiffs  Nicole and Petra Albrecht, while being treated like hardened criminals, were dragged onto an airplane in the form of a SWAT style commando raid, shackled up and belly chained for more than 18hours and deported without clothes or any personal belongings, and dumped homeless in the wrong city,  and released by ICE on 1/27/16.

63. It should also be known that, during the entire time the Albrecht's were detained, all of the above actions against them were heavily documented and recorded by separate organizations and agencies, such as, their federal immigration attorney, Joshua Effron, dependency attorney, Scott Clark, advocacy group- CIVIC / End Isolation- attorney, Christina Fialho, Detention Watch, Human Rights Watch, the ACLU of SOCAL, Homeschool Legal Defense Association, various media outlets- Huffington Post, Think Progress, OC Register, Radar On-Line, and the United Nations High Commission for Refugees.

64. <u>Last minute EXHIBIT E- note to court</u>- On 8/31/16, after Plaintiff, Richard Wheeler went to the ICE Field Office, Los Angeles, to inquire on where to submit <u>FTCA Administrative Claims,</u> an unidentified ICE employee (female) took Nicole's claim document, left the room, and did not return it to Mr. Wheeler unitl 45 minutes later, as supposedly, ICE SDDO Michael Nemec was examining the document. Mr. Wheeler complained immediately, and the entire time to the receptionist, Carman, demanding to meet Mr. Nemec, and to bring back the document

immediately, as this is highly, unethically wrong, and unlawful, but no one would help Mr. Wheeler, including the security guard. Upon receptionist Carman returning the document, Mr. Wheeler immediately mentioned and complained that his wife, Nicole Albrecht Wheeler's claim document, had been un-stapled, then re-staped, clearly signifying that ICE made an unauthorized copy of the claim. They also provided an address to mail the claim to in Washington, only, after they obtained claim information against their own Field Office.

<u>CAUSES OF ACTION</u>

COUNT 1: FOURTH AMENDMENT VIOLATIONS

(Against Defendants-8 unknown and named ICE agents)

65. Plaintiffs Petra Albrecht, and Nicole Albrecht Wheeler re-alleges the preceding paragraphs as though fully set forth herein.

66. In doing the acts complained of (Defendants- 8 unknown and named ICE agents) deprived the Plaintiffs, Petra Albrecht, and Nicole Albrecht Wheeler of certain constitutionally protected rights, including, but not limited to:

    a. The right to be free from unlawful entries to and searches and seizures of their home without a valid warrant or voluntary consent and in the absence of exigent circumstances, as guaranteed by the Fourth Amendment to the United States Constitution.

    b. The right to be free from detentions without lawful, probable cause, as guaranteed by the Fourth Amendment to the United States Constitution.

    c. Petra Albrecht, Nicole Albrecht Wheeler- The right to be free from illegal strip searches inside facilities, without reasonable suspicion of hiding weapons or contraband.

67. Because these Defendants acted in clear violation of well-settled law, of which a reasonable person would have been aware, with regards to standards for home entry, search, seizure, questioning, and detention, they are not entitled to a good faith defense or qualified immunity defense.

68. The actions of these Defendants were intentional, malicious, and reckless and showed a callous disregard of, or indifference to, the rights of the Plaintiffs.

## COUNT 2: FIFTH AMENDMENT VIOLATIONS

(Against Defendants- ICE FOD- David Jennings, ICE AFOD- Arturo Trevino, ICE Supervisor- Andre Quinones, SACJ- Jaime Manriquez, SACJ- Christina Holland.)

### DUE PROCESS

69. Plaintiffs Petra Albrecht, and Nicole Albrecht Wheeler re-alleges the preceding paragraphs as though fully set forth herein.

70. In doing the acts complained of, (Defendants mentioned above) deprived the Plaintiffs, Petra Albrecht, and Nicole Albrecht Wheeler of certain constitutionally protected rights, including, but not limited to:

a. The right to receive due process, which guarantees and allows Plaintiffs to prepare for, attend and receive a fundamentally fair, orderly, and just judicial proceeding, with the right to defend themselves, before the government can deprive them of life, liberty, or property.

71. Plaintiff, Petra Albrecht was denied the right by (Defendants- ICE FOD- David Jennings, ICE AFOD- Arturo Trevino) to attend her own CA. Dependency Court hearings, to protect losing the custody of her minor child, J      A.      ..

72. Minor child, J      A.      was denied the right by (Defendants- ICE FOD- David Jennings, ICE AFOD- Arturo Trevino) to adjudicate (two) applications for asylum, withholding of removal, and protection under the United Nations Convention Against Torture- (1) through USCIS- Receipt #- ZLA1400174260 (still pending today), and (1) under the protection of his mother, Plaintiff, Petra Albrecht's asylum application, violating domestic, and international laws and treaties, and Federal Preemption Doctrine.

73. Plaintiff, Nicole Albrecht Wheeler, was denied the right by (Defendants- ICE FOD- David Jennings, ICE AFOD- Arturo Trevino, ICE Supervisor- Andre Quinones, SACJ-Jaime Manriquez, SACJ- Christina Holland) to prepare with her attorney / legal counsel, Joshua Effron prior to her upcoming court hearings (asylum and bond).

74. Because these Defendants acted in clear violation of well-settled law, of which a reasonable person would have been aware, with regards to standards for due process rights, they are not entitled to a good faith defense or qualified immunity defense.

75. The actions of these Defendants were intentional, malicious, and reckless and showed a callous disregard of, or indifference to, the rights of the Plaintiffs.

## CRUEL AND UNUSUAL PUNISHMENT

(Against Defendants- ICE FOD- David Jennings, ICE AFOD- Arturo Trevino, ICE Supervisor- Andre Quinones, ICE- officer Nelly Mckenna, James A. Musick Deputy, Patricia Holliday, SACJ- Jaime Manriquez, SACJ- Christina Holland, Otay Unit Manager- Billie Handsbur,)

76. Plaintiffs Petra Albrecht, and Nicole Albrecht Wheeler re-alleges the preceding paragraphs as though fully set forth herein.

77. In doing the acts complained of, (Defendants mentioned above) deprived the Plaintiffs, Petra Albrecht, and Nicole Albrecht Wheeler of certain constitutionally protected rights, including, but not limited to:
a. The right against cruel and unusual punishment.

78. Plaintiff, Petra Albrecht was denied the right by (Defendants- ICE FOD- David Jennings, ICE AFOD- Arturo Trevino, Otay- Unit Manager, Billie Handsbur) to health care, as she was egregiously, medically neglected to almost fatal consequences while detained.

79. Petra also suffered acts of targeted retaliation, misclassification, unwarranted solitary confinement, and abuse by same Defendants, and additionally, Defendants (ICE- DO Nelly Mckenna, James A. Musick Deputy, Patricia Holliday).

25

80. Plaintiff, Nicole Albrecht Wheeler was denied the right by (Defendants-ICE FOD- David Jennings, ICE AFOD- Arturo Trevino, ICE Supervisor-Andre Quinones, SACJ- Jaime Manriquez, SACJ- Christina Holland) to health care, as she was egregiously, medically neglected and malnourished while detained.

81. Plaintiff, Nicole Albrecht Wheeler was also subject to, misclassification (life threatened), unwarranted solitary confinement, unconstitutional behavioral contract (signed under duress), and targeted retaliation.

82. Because these Defendants acted in clear violation of well-settled laws, of which a reasonable person would have been aware, with regards to standards for cruel and unusual punishment, and ICE Detention Standards, they are not entitled to a good faith defense or qualified immunity defense.

83. The actions of these Defendants were intentional, malicious, and reckless and showed a callous disregard of, or indifference to, the rights of the Plaintiffs.

## COUNT 3: FIRST AMENDMENT VIOLATIONS

(Against Defendants- ICE DO -Nelly Mckenna, Deputy Patricia Holliday, Otay Unit Manager-Billie Handsbur) & (ICE FOD- David Jennings, ICE AFOD- Arturo Trevino, ICE Supervisor- Andre Quinones, SACJ- Jaime Manriquez, SACJ-Christina Holland).

84. Plaintiff Petra Albrecht, and Plaintiff, Nicole Albrecht Wheeler re-alleges the preceding paragraphs as though fully set forth herein.

26

85. In doing the acts complained of (Defendants named above) deprived the Plaintiffs, Petra Albrecht and Nicole Albrecht Wheeler of certain constitutionally protected rights, including, but not limited to:

a. Exercising the right to free speech.

86. Plaintiff, Petra Albrecht was denied this right by (Defendants- ICE Officer Mckenna, JAMF-Deputy Patricia Holliday, Otay Unit Manager-Billie Handsbur); retaliated against for not signing deportation papers under duress-transfer. Also, for denied access to the media, and retaliatory transfer as a result.

87. Plaintiff, Nicole Albrecht Wheeler was denied this right by (Defendants- ICE AFOD- Arturo Trevino, ICE Supervisor- Andre Quinones, SACJ-Jaime Manriquez, SACJ- Christina Holland); retaliated against for filing multiple complaints, placed in administrative segregation (solitary).

## COUNT 4: LOSS OF CONSORTIUM
### (Against all Defendants)

88. Plaintiff, Richard Wheeler re-alleges the preceding paragraphs as though fully set forth herein.

89. In doing the acts complained of (ALL Defendants), Plaintiff, Richard Wheeler, (husband of Plaintiff, Nicole Albrecht Wheeler), was, and is currently, and will be in the future, subject to a Loss of Consortium, depriving Plaintiff, Richard Wheeler of, but not limited to:

a. The loss of love, companionship, comfort, care, assistance, protection, affection, society, sexual relations, and moral support each spouse gives the

27

other through the triumph and despair of life, and the deprivation of a
spouse's physical assistance in operating and maintaining the family
home, due to being separated by two continents, due to the actions of (ALL
Defendants).

90. Because these Defendants acted in clear violation of well-settled laws, of
which a reasonable person would have been aware, with regards to standards
for all mentioned violations, they are not entitled to a good faith defense or
qualified immunity defense.

91. The actions of these Defendants were intentional, malicious, and reckless
and showed a callous disregard of, or indifference to, the rights of the
Plaintiff.

<u>**Request for Relief**</u>

Wherefore, the Plaintiffs seeks damages as follows:

1.  Injuries caused by negligent and  Intentional Infliction of Emotional
    Distress—to all plaintiffs;

2.  Compensatory damages, including general and special damages relating
    to medical treatment and other losses associated with the allegations
    above—to plaintiffs Nicole Albrecht Wheeler, Petra, Albrecht, and
    Richard Wheeler.

3.  Punitive or exemplary  damages, as applicable against certain defendants,
    aimed at discouraging the kind of unlawful, arbitrary and wanton conduct
    displayed by defendants herein;

4.  Actual pecuniary losses, including legal and. Court Costs, attorneys' fees,
    phone service costs, commissary and other reasonable costs incurred

because of the unlawful conduct alleged herein-above;

5. Injunctive relief including but not limited to Administratively close immigration cases and granting adjustment of status to plaintiffs Nicole Albrecht Wheeler, Petra Albrecht, and minor child, (non-plaintiff) J          A          including, returning child, J          A          back to the United States immediately;

6. All other damages, whether at common law or statutory, to which plaintiffs may be entitled, which the court deems appropriate.

7. The Plaintiffs hereby request a jury trial on all issues raised in this complaint.

Dated this 1st day of September, 2016

_Nicole Albrecht Wheeler_    9/1/16

_[signature]_    9/1/16

_Petra Albrecht_    9/1/16

_____

[Plaintiffs-], Pro Se
Nicole Albrecht Wheeler
Petra Albrecht
Richard Wheeler
11064 Mississippi Ave
Los Angeles, CA 90025
310-293-1847

**YOU MUST SIGN YOUR COMPLAINT**

30



Immigrant Rep, Inc.
PO Box 4736
Rolling Hills Estates, CA  90274

✆ : (310) 427-7705
📠 : (310) 988-2886
✉ : info@immigrantrep.com
🌐 : www.immigrantrep.com

June 19, 2015

The Department of Homeland Security
The Honorable Jeh Johnson
Secretary of Homeland Security
Washington, D.C.  20528

RE: Illegal Extradition of J       . A'

Dear Secretary Johnson,

My name is Joshua Effron, and I represent Petra Albrecht, mother of J:       A'        a minor child.
(Please see the attached copy of my G-28.)

The purpose of this letter is to inform the Department of Homeland Security of the illegal extradition of
J     A          (United States Alien Registration Number **206-409-422**), and the urgent request to have
him brought back to the United States immediately, since he is protected under the United Nations
Protocol Relating to the Status of Refugees, which was signed in New York on January 31, 1967, to
which both the United States and Germany are parties, particularly in light of the fact that J        A'
is a minor child.

**Background**

On December 17, 2014, J.       A'        was extradited back to Germany, both against his will and
against the law, inasmuch as a final decision had not yet been reached on his application for Asylum,
Withholding of Removal, and protection under the United Nations Convention Against Torture, which
remains pending with United States Citizenship and Immigration Services (USCIS) to this day, Receipt
Number # **ZLA1400174260**.

Both international treaty law and domestic laws uphold the right of a refugee/asylum applicant to *non-
refoulement*. As a result of this asylum application, jurisdiction over J     . A          asylum application
had already been taken out of the hands of the California dependency court at the time of the ruling. As a
result, the decision against J'       , returning him to Germany against his will while he had a pending
asylum application, was unlawful, as federal law in the U.S. supersedes any extradition conducted by a
U.S. State court. It should also be mentioned that J         is a key witness to crimes committed against
him in California, and the matter remains pending in California State court; J        is expected to testify in
those court proceedings in the near future.

Jugendamt also provided false and assumed information per the letter between Jugendamt
representative, Julia Bania, and Child Protective Services, Ms. Mendoza (see attached) stating that
Jugendamt is the legal guardian of J       A'       ., and as of 10/15/2014, J        mother, Petra
Albrecht, will no longer reside in the United States. The letter went on to state that, assuming that Petra
Albrecht resumes her residence in Germany, then Jugendamt would decide if there would be mother and
son contact.

There was never any proof that Petra Albrecht was returning to Germany (as she has filed for asylum),
and she no longer owns a home in Germany. Regardless, J      A'.       is still protected because he
has his own individual asylum claim allowing him to remain in the United States while the application is
pending, notwithstanding his mother's status.

EXHIBIT     A



Conclusion

J.___ .. is still protected under both international and domestic law: he is a minor, and Jugendamt lacks jurisdiction over him while his U.S. asylum application remains pending.

We are advising you that J____ A____ must be sent back to the United States immediately, so his pending asylum application can be adjudicated in the country that has jurisdiction over the child, the United States of America.

Please see the provided contact information for Jugendamt, and as to whom you should contact to have the child immediately returned to the United States:

      Jugendamt
      Adolf-Dechert-Strasa 1
      16515 Oranienburg
      Attn: Mrs. Julia Bania
      Julia.Bania@oberhavel.de
      Tel- 3801/601-4841
      Fax- 3301/601-403
      RE: File Reference- 31.1.VO-Pf-11/A-1

Should you have any questions or concerns regarding this, please feel free to contact me at (310) 427-7705 (telephone), (310) 988-2886 (fax), or by e-mail at effron@immigrantrep.com .

Sincerely,

Joshua Effron, Esq.
President
Immigrant Rep, Inc.

EXHIBIT    A

32



**Notice of Entry of Appearance
as Attorney or Accredited Representative**
Department of Homeland Security

**DHS
Form G-28**
OMB No. 1615-0105
Expires 02/29/2016

**Part 1. Information About Attorney or Accredited Representative**

Name and Address of Attorney or Accredited Representative

**1.a.** Family Name *(Last Name)*  Effron

**1.b.** Given Name *(First Name)*  Joshua

**1.c.** Middle Name

**2.** Name of Law Firm or Recognized Organization
Immigrant Rep Inc

**3.** Name of Law Student or Law Graduate

**4.** State Bar Number  CA, 225247

**5.a.** Street Number  POB 4736

**5.b.** Street Name

**5.c.** Apt. ☐  Ste. ☐  Flr. ☐

**5.d.** City or Town  Rolling Hills Estate

**5.e.** State  CA   **5.f.** Zip Code  90274

**5.g.** Postal Code

**5.h.** Province

**5.i.** Country
United States

**6.** Daytime Phone Number ( 3 1 0 ) 4 2 7 - 7 7 0 5

**7.** E-Mail Address of Attorney or Accredited Representative
effron@immigrantrep.com

**Part 2. Eligibility Information for Attorney or Accredited Representative**

(Check applicable items(s) below)

**1.** ☒ I am an attorney eligible to practice law in, and a member in good standing of, the bar of the highest court(s) of the following State(s), possession(s), territory(ies), commonwealth(s), or the District of Columbia.

**1.a.** California

**1.b.** I *(choose one)* ☒ **am not** ☐ **am** subject to any order of any court or administrative agency disbarring, suspending, enjoining, restraining, or otherwise restricting me in the practice of law. (If you are subject to any order(s), explain fully in the space below.)

**1.b.1.**

**2.** ☐ I am an accredited representative of the following qualified nonprofit religious, charitable, social service, or similar organization established in the United States, so recognized by the Department of Justice, Board of Immigration Appeals pursuant to 8 CFR 292.2. Provide the name of the organization and the expiration date of accreditation.

**2.a.** Name of Recognized Organization

**2.b.** Date Accreditation expires
*(mm/dd/yyyy)* ▶

**3.** ☐ I am associated with

**3.a.**

the attorney or accredited representative of record who previously filed Form G-28 in this case, and my appearance as an attorney or accredited representative is at his or her request. If you check this item, also complete **number 1 (1.a. - 1.b.1.) or number 2 (2.a. - 2.b.)** in **Part 2** *(whichever is appropriate).*

**4.** ☐ I am a law student or law graduate working under the direct supervision of the attorney or accredited representative of record on this form in accordance with the requirements in 8 CFR 292.1(a)(2)(iv).



Form G-28 02/28/13 N

EXHIBIT A 

Page 1 of 2

**This appearance relates to Immigration matters before (select one):**

1. ☐ USCIS - List the form number(s)

1.a. [_____]

2. ☒ ICE - List the specific matter in which appearance is entered

2.a. [ All Immigration Matters ]

3. ☐ CBP - List the specific matter in which appearance is entered

3.a. [_____]

**I hereby enter my appearance as attorney or accredited representative at the request of:**

4. Select only one:   ☐ Applicant   ☐ Petitioner
☒ Respondent (ICE, CBP)

**Name of Applicant, Petitioner, or Respondent**

5.a. Family Name (Last Name) [ Albrecht ]

5.b. Given Name (First Name) [ Petra ]

5.c. Middle Name [_____]

5.d. Name of Company or Organization, if applicable [_____]

**NOTE:** Provide the mailing address of Petitioner, Applicant, or Respondent and not the address of the attorney or accredited representative, except when a safe mailing address is permitted on an application or petition filed with Form G-28.

6.a. Street Number and Name [ Ice Custody ]

6.b. Apt. ☐ Ste. ☐ Flr. ☐ [_____]

6.c. City or Town [ San Diego ]

6.d. State [ CA ]   6.e. Zip Code [_____]

7. Provide A-Number and/or Receipt Number

[ 206409411 ]

Pursuant to the Privacy Act of 1974 and DHS policy, I hereby consent to the disclosure to the named Attorney or Accredited Representative of any record pertaining to me that appears in any system of records of USCIS, ICE, or CBP.

8.a. Signature of Applicant, Petitioner, or Respondent

[signature]

8.b. Date   (mm/dd/yyyy) ▶ [ 1/22/15 ]

I have read and understand the regulations and conditions contained in 8 CFR 103.2 and 292 governing appearances and representation before the Department of Homeland Security. I declare under penalty of perjury under the laws of the United States that the information I have provided on this form is true and correct.

1. Signature of Attorney or Accredited Representative

[signature]

2. Signature of Law Student or Law Graduate

[_____]

3. Date   (mm/dd/yyyy) ▶ [ 09/28/2014 ]

1. [_____]

[blank lines]

Form G-28 02/28/13 N

Page 2 of 2

Exhibit A    (34)



Landkreis Oberhavel

Dezernat II – Bildung und Finanzen
FB Jugend
FD rechtliche Jugendbetreuung

Adolf-Dechert-Straße 1
16515 Oranienburg

Landkreis Oberhavel  PSF 10 01 45 • 16501 Oranienburg

**Attn.: Mrs. Mendoza**

**For submission at the appropriate court**

www.oberhavel.de

File Reference:
**31.1.VO-Pf-11/A-1**
Processed by:
**Mrs. Bania**
**Official Guardian**
Tel: +3301/601-4841
Fax: +3301/601-403
Julia.Bania@oberhavel.de

10/09/2014

Guardianship for J.         A        DOB 04/25/2003

Dear Sirs,

The Jugendamt [Youth Welfare Office] of the county of Oberhavel is the legal guardian for J.
A         Its sphere of influence among other things encompasses the custodial right to determine the place of residence.

On the part of the official guardian there is still a continued desire of J.       s return to Germany. This also takes into consideration the fact, that the child's mother, Mrs. Petra Albrecht, as of 10/15/14 will no longer reside in the United States and that there is the assumption that she will take up her usual residence in Germany. The responsible Youth Welfare Office must then review, whether the return of J      back to his mother is worth considering and/or in what way the boy can be brought into regular contact with her. Furthermore, J       i father lives in Germany. He too should be allowed the possibility of regular contact with his son. This, however, is rather difficult if J      remains in the United States.
Also, up to his September 2011 departure to the United States, J:       lived in Germany and attended school there. He thus could reestablish old contacts again.

With kind regards,

p.p. {signature}

Bania
Legal Guardian

Charged with the responsibilities pursuant to § 55 SGB VIII

Exhibit A

35



**Landkreis Oberhavel**
Der Landrat

Dezernat II – Bildung und Finanzen
FB Jugend
FD rechtliche Jugendbetreuung

Adolf-Dechert-Straße 1
16515 Oranienburg

www.oberhavel.de

Aktenzeichen:
31.1.VO-Pf-11/A-1

Bearbeiter:
Frau Banla
Amtsvormund

Telefon 0 33 01 / 601 –4841
Telefax 0 33 01 / 601 –403
Julia.Banla@oberhavel.de

Landkreis Oberhavel · PSF 10 01 45 · 16501 Oranienburg

z. H. Frau Mendoza

zur Vorlage beim zuständigen Gericht

09.10.2014

**Amtspflegschaft für J        A       , geboren am 25.04.2003**

Sehr geehrte Damen und Herren,

das Jugendamt des Landkreises Oberhavel ist Amtspfleger für J        A        Der Wirkungskreis umfasst unter anderem das Aufenthaltbestimmungsrecht.

Von Seiten des Amtspflegers besteht weiterhin der Wunsch, dass J        nach Deutschland zurück kehrt. Auch in Anbetracht der Tatsache, dass sich die Kindesmutter Frau Petra Albrecht ab dem 15.10.14 nicht mehr in den USA aufhalten und davon ausgegangen wird, dass sie ihren gewöhnlichen Aufenthalt wieder in Deutschland haben wird. Das zuständige Jugendamt hat dann zu prüfen, ob eine Rückführung von J        zu seiner Mutter in Frage kommt bzw. in welcher Form der Junge regelmäßigen Kontakt zu ihr haben kann. Des Weiteren lebt J        Vater in Deutschland. Auch zum ihm sollte es die Möglichkeit des regelmäßigen Kontaktes geben. Dies ist jedoch nur schwer möglich, wenn J        in den USA verbleibt. Auch lebte J        bis zu seiner Ausreise in die USA im September 2011 in Deutschland und besuchte hier die Schule. Er könnte somit wieder an alte Kontakte anknüpfen.

Mit freundlichen Grüßen
Im Auftrag

Banla
Amtsvormund

Mit der Ausübung der Aufgaben gemäß § 55 SGB VIII beauftragt

Hausadresse:
Landkreis Oberhavel
Adolf-Dechert-Straße 1
16515 Oranienburg

Eine angegebene E-Mail-Adresse dient nur dem Empfang einfacher Mitteilungen ohne Signatur.

Bankverbindungen:
Mittelbrandenburgische Sparkasse
Konto-Nr. 3740923090
BLZ 160 500 00
IBAN: DE07 1605 0000 3740 9230 90
BIC: WELA DE D1 PMB

Commerzbank Oranienburg
Konto-Nr. 150 608 000
BLZ 160 800 00
IBAN: DE71 1608 0000 0150 6080 00
BIC: DRES DE FF 160

EXHIBIT A
(36)

May 15, 2015

To whom it may concern,

The following detainees from the Santa Ana City Jail, 62 Civic Plaza, Santa Ana CA 92701 would like to file a formal complaint, regarding the neglect and mistreatment of our cases by the Los Angeles and Santa Ana, CA ICE field offices.

The type of neglect and mistreatment includes but are not limited to:

Ignoring our rights and cases, listing incorrect information about charges/ convictions, trying to deport detainees while their cases are on appeal, and try to deport them to the wrong country, and disregarding their own directive on facilitating parental rights, by ICE officers, supervisors, FOD's and others, despite numerous requests to such people (especially to ICE deportation Officer Debbie Leon).

We feel completely discriminated and targeted against. It is indefensible that this will be allowed to continue to this degree; therefore we are requesting that, these violations and stall tactics will be investigated extensively and end immediately.

We are requesting that you receive statements from all the detainees.

Sincerely,

| Name | A# | Signature |
|------|-----|-----------|
| Nicole Albrecht | 206-407-728 | Nicole Albrecht |
| Claudia Chavez | 072-060-752 | Claudia Chavez |
| Claudia Rodriguez | 090027652 | Claudia Rodri |
| Erica Llueso | A200-XXX157-001 | Erica Llueso |
| ARAKSI YOKAMOXHYGAN. | 028-137-853 | Tenan |
| MARIA Escobar | 094378625 | maria |
| DIAZ LORENA | 207424 9878 | Diaz Lorena |
| luz machado | 077-310-376 | LM. |

" additional Signatures in the back of this document"

Exhibit B

(37)

| Name | A# | Signature |
|------|-----|-----------|
| Martha Corona | A077-969-803 | Martica |
| Brenda Hernandez | A 205 711 99 | Brenda H |
| Alba J Brunty | 0920 2 3895 | Campbell |
| Luz MARINA CAMPOS Hernandez | 201687041 | |
| MARIA DELGADO Rodriguez | # A 034-571-934 | MDRgt |
| Lizbeth Tovar | 205 711 131 | |
| Asminda Verastegui | # A 088639160 | |
| Li, CAM DA | # A 058365334 | Caml |
| Osbel Nirez | # A 040-140-103 | |
| Margarida Eshan | # A 070-250-507 | |
| Patricia Ortiz | # A 093 66916 | Patricia Ortiz |
| Neelam Bhatia | # A040101600 | Neelam |
| Claudia Miranda | # A0 93336990 | |
| Brenda Villa | A094-292-982- | |

Exhibit B (38)

Trins To deport while on , peal,
Diabetic detainee, Life placed in danger
with Blood Sugar

Araksi Tokramadzhyan
A # 028137853                              May 22 2015

To whom it may concern,

I would like to acknowledge you about the
mistreatment in my case.
The Los Angeles field office tried to deport me
two times: First time, they tried to deport me
while my case was on appeal with the Board
of Immigration Appeals. I made the ICE officer
aware that they cannot deport me while my ca
is pending with the board, and a decision ha
not been reached. See filing receipt for the
appeal, date of notice: 4/7/15.
Then on may 5, I was taken again to Los
Angeles for deportation. At this time my attorne
already submitted additional documents for my
case. Both times I was taken to the airport,
and kept in a van for more than three hours
handcuffed, nothing to drink and no bathroom
while the ICE officers were eating right in front of
me. Before we left the office in Los Angeles I wa
not allowed to make a phone call, got physicall
pushed around and verbally humiliated.
I would like to mention that I am almost 66
years old, diabetic and take 15 medications.

Exhibit
B

ecause of the stress and torture, I was exposed as
nose days my sugar went up and I got even
nore sick. I was unnecessarily put in an extreme
ituation with my health condition!

so, I have experienced humiliation and discrimination
fore, when ICE officer heat or Tsatkov discussed
my case at the Santa Ana facility, in front of
ll the other detainees, and spread my confidential
formation with everybody.

Thank you for consideration     Tokremszuga,

A# 028 137 853

Exhibit   B


40

✱ Trys To Deport To
Wrong Country (

PAGE 1

Chavez- Martinez Claudia
A# 072-060-752
Santa Ana City Jail
62 Civic Center Plaza

5-15-15

Re: Statement about illegal actions
    and civil rights violations in my case,
    by the Los Angeles and Santa Ana field
    Office

To whom it may concern,

✱ On 04/23/15 ICE tried to have me deported
to the wrong country Mexico, even though
I am a citizen of Honduras. Before and
during the drive to the mexican border, I
informed the ICE officers numerous times
that I am not a citizen of Mexico but they
completely ignored me. The mexican border
patrol officers asked me, where am I from
and I stated from Honduras, the ICE officer
immediately intervened and lied and said,
she told us she is from Mexico. This is not true
The ICE officer clearly tried to paint over his
mistake, which would have been a violation of
international law. The next day, on 4/24/15 I
was told to roll-up again from the Santa Ana
City Jail. When they brought me to the Santa

Exhibit B          (41)

PAGE 2

na field office and forced me to speak to ne mexican consulate. On both days I got umiliated, targeted and discriminated against rom ICE which is acting with complete isregard regarding my case. As this is based n a removal order from February 20, 1995 I Judge Sitgraves in wherein I was ordered emoved to the wrong country, Mexico. On 05/05/15 had to roll-up once again and this time I os brought to the Los Angeles field office, where nong other ICE officers an asian ICE officer elled, screamed and threatened me to speak ith the hondurian consulate. I requested imerous times to make a legal phone call to y attorney, which were all denied, these violations my civil rights also occured on 04/23/15 and /24/15, therefore I refused to talk to the onsulate. The asian ICE officer barked at me, by ext week I am going to put you on the plane. 05/14/15 I was brought back to the Los Angeles eld office to talk to the hondurian consulate order to obtain travel documents for me. E officers again denied me to make a legal phone ll, I had no evidence that I was actually zaking to the hondurian consulate especially after got mistreated the whole time by ICE, therefore did not give any information. It also should be ited that the phones in the holding tanks ati e Los Angeles field office are only working with a n # and only people who are just taken into custody by ICE receive the Pin #. Everybody else

Exhibit B (42)

A# 072 - 060 - 752                    Page 3

is purposefully prevented from using them!
Additionally my deportation officer Debbie Leon
did not once reach out to me, regarding this
matter. She totally neglected my case. Instead
I got served with a letter on 05|15|15 by IEA
Janine Cosimini, to inform me that ICE will not
conduct a custody review at this time. ICE
is in possession of a travel document to effect
my removal and expects this to occur in the
near future.
How can that be true, if I was just asked
one day before on 05|14|15 to give them
information to be able to obtain a travel
document for me from the hondurian consulate
and I refused to do so! That means, ICE
once again is lying. They are not in possession
of a travel document at this time.
Therefore these actions from the ICE field
offices should be immediately investigated.

Sincerely,
Claudia Chavez


        Exhibit  B

               (43)

Death in the Family Ignored By

Officer Leon, Art Trevino,  FOD,

May 23, 20:

A# 058365334

LE, CAM DA

Regarding: Mistreatment and neglect in my ca

To whom it may concern,

On may 15, 2015 my beloved father passed
away in the hospital. My daughter
immediately contacted the Los Angeles
field office, phone # 213 830 7911 in order
to speak to District Director Mr. Jennings
or Deputy Mr. Vela, to address the urgent
humanitarian concern, the death of an
immediate relative, to be able to attend a
funeral on may 22 and may 23. My daught
was told by Ms. Rey that nobody with
these names works in this office. Instead
she was referred to ICE officer Leon.
Unfortunately nobody picked up and my
daughter was only able to leave a mess
for Ms. Leon. Additionally I submitted
a written request to ICE officer Tsarkov
on may 15, 2015, begging him to attend the
funeral. He replied five days later on m
20, 2015 and said we will speak in person.
my daughter continued to leave messages
with Ms. Leon. Despite numerous request
from my daughter and me, nobody has tol

(44)

Exhibit   R     Exhibit B

to me or done anything for me. even though I've been showed up at the Santa Ana City Jail on Monday may 18 and Wednesday may 20, 2015 and field Assistant Director Mr. Trevino on Tuesday may 19, 2015. This urgent matter should have been immediately addressed from the Los Angeles and Santa Ana field offices, instead me and my family got ignored and tossed around. Therefore I missed my father's funeral. This is unacceptable and emotionally unbearable.

sincerely,

Carm

Exhibit B





January 25, 2015

John Roth
Inspector General, Department of Homeland Security
245 Murray Lane SW
Washington, DC 20528-0305

Megan H. Mack
Officer for Civil Rights and Civil Liberties
U.S. Department of Homeland Security
Building 410, Mail Stop #0190
Washington, D.C. 20528

Sarah Saldaña
Director, U.S. Immigration and Customs Enforcement
500 12th St., SW
Washington, D.C. 20536

Andrew R. Lorenzen-Strait
Deputy Assistant Director, Custody Programs
U.S. Immigration and Customs Enforcement
500 12th St., SW
Washington, D.C. 20536

David Jennings
Field Office Director, U.S. Immigration and Customs Enforcement
300 North Los Angeles St., Room 7631A
Los Angeles, CA 90012

Mayor Miguel Pulido
Santa Ana City
20 Civic Center Plaza
Santa Ana, CA, 92701

Christina Holland
Police Administration Manager
Santa Ana City Jail
62 Civic Center Plaza
Santa Ana, CA 92701

Dear Inspector General Roth, Officer Mack, Director Saldaña, Deputy Director Lorenzen-Strait, Director Jennings, Mayor Pulido, and Administrator Holland:

Community Initiatives for Visiting Immigrants in Confinement (CIVIC) submits this complaint on behalf of 31 women in the custody of U.S. Immigration and Customs Enforcement (ICE) at the Santa Ana City



46                    1        EXHIBIT C



Jail in Santa Ana, California. This complaint details civil and human rights violations, particularly unlawful strip searches. We urge the Office for Civil Rights and Civil Liberties (CRCL) at the Department of Homeland Security (DHS), pursuant to its authority under 6 U.S.C § 345, to immediately investigate this complaint, to promptly develop policies to address the violation, and to provide ongoing oversight on the implementation of the changes. Moreover, we urge the Santa Ana City Jail to adopt a strip search policy that conforms to federal ICE standards as well as state and federal law, and we urge ICE to ensure that the City of Santa Ana meets its contractual obligations. We further request that the Santa Ana City Council require that Santa Ana City Jail's policy on and practice of strip searches comply with all relevant laws and standards prior to any further modifications of its contract with ICE. We ask that the City of Santa Ana, the Santa Ana City Jail, and ICE confirm in writing <u>by no later than February 25, 2016</u>, that they will cease and desist from conducting unlawful strip searches at the Santa Ana City Jail.

The Santa Ana City Jail has received $38,099,876.53 in taxpayer funding since 2009 for detaining immigrants for ICE.[1] Each day, the Santa Ana City Jail detains up to 200 individuals in ICE custody, receiving $105 per person per day.[2] Prior to 2015, the facility detained up to 64 transgender, gay, and bisexual individuals in a "dedicated protective custody" module for ICE.[3] However, when ICE and the Santa Ana City Jail renegotiated their contact in 2015, the guaranteed beds for this population were removed.[4] Currently, according to the jail administrator Christina Holland, it is the practice of the Santa Ana City Jail to keep transgender immigrants in a separate unit as well as gay and bisexual men in another separate unit "based on operational and safety concerns."[5] Between July and December 2015, these modules held between 84 and 95 GBT individuals.[6] ICE and the City of Santa Ana are in the process of negotiating the establishment of two dedicated modules for transgender women and for gay and bisexual men, which will require ICE to pay for all the beds in these two dedicated housing modules. Santa Ana City Council is scheduled to review this contract modification on February 2, 2016.[7]

CIVIC's mission is to end the isolation and abuse of people in U.S. immigration detention through visitation, independent monitoring, storytelling, and advocacy with the ultimate goal of eliminating immigration detention. We support a network of immigration detention visitation programs, including one operating at the Santa Ana City Jail. This letter summarizes complaints lodged directly with CIVIC by 31 cisgender and transgender women, under the custody of ICE at the Santa Ana City Jail. Six of these women are willing to state their claims publicly:

---

[1] Letter to Christina Fialho, response to CIVIC's California Public Record Act request, *available at* https://www.dropbox.com/s/iup66baxhyq00b3/PRA%20Request%20Response%20Letter%20for%20C.%20Fialho%20Dec%202015.pdf?dl=0.
[2] ICE Intergovernmental Service Agreement with the Santa Ana City Jail (2015), response to CIVIC's California Public Record Act request, *available at* https://www.dropbox.com/s/3bntdmq2khu3j1y/ICE_Contract_SACJ_2015.pdf?dl=0.
[3] ICE Intergovernmental Service Agreement with the Santa Ana City Jail' LGBT modification (2006), response to CIVIC's California Public Record Act request, *available at* http://blog.endisolation.org/wp-content/uploads/2012/12/ICE-Transgender-Attachement.pdf.
[4] Email to Christina Fialho, Co-Executive Director of CIVIC, from Christina Holland, Santa Ana City Jail Administrator, response to CIVIC's California Public Record Act request, *available at* https://www.dropbox.com/s/1wcgo3npd0iakmd/Public%20Records%20Act%20Request%20Letter%202.pdf?dl=0.
[5] *Ibid.*
[6] Letter to Christina Fialho, response to CIVIC's California Public Record Act request, *available at* https://www.dropbox.com/s/iup66baxhyq00b3/PRA%20Request%20Response%20Letter%20for%20C.%20Fialho%20Dec%202015.pdf?dl=0.
[7] Email to Christina Fialho, Co-Executive Director of CIVIC, from Christina Holland, Santa Ana City Jail Administrator, response to CIVIC's California Public Record Act request, *available at* https://www.dropbox.com/s/1wcgo3npd0iakmd/Public%20Records%20Act%20Request%20Letter%202.pdf?dl=0.



2       Exhibit C



1. Nicole Albrecht (206-407-728)
2. Sonia Marcias Esteves (091-028-855)
3. Fabiola Espinoza Delgado (205-711-889)
4. Maria Escobar (094-376-252)
5. Araksi Torkramadzhyan (028-137-853)
6. Gloria Hernandez (094-945-100)

We also are in touch with other individuals who agreed to be referred to by pseudonym because they fear retaliation:

7. SE
8. TF
9. XJ
10. YK
11. AM
12. BN
13. CO
14. DP
15. EQ
16. FR
17. GS
18. HT
19. IU
20. JV
21. KW
22. LX
23. MY
24. NZ
25. OA
26. PB
27. QC
28. KD
29. LM
30. NP
31. SD

**A.      Strip searches of people in immigration detention at the Santa Ana City Jail are conducted without reasonable suspicion, sometimes by members of the opposite gender, in view of other detainees, in unsanitary conditions, and have turned into sexual assaults; these strip searches re-traumatize victims of past sexual assault, deter attorney visits, and are inhumane.**

The Santa Ana City Jail has an 11-page policy on "periodic and routine strip searches" supposedly in line with California Penal Code section 4030.[8]  The policy defines strip searches as "the act of removal or

---

[8] Santa Ana City Jail Inmate Searches Policy, response to CIVIC's California Public Record Act request, *available at* https://www.dropbox.com/s/m4uh811mo8lacf0/SAJ_Inmate_Searches_Policy.pdf?dl=0.

Exhibit C 



rearrangement of some or all of an individual's clothes for the act of visually inspecting that individual's underclothing, breasts, buttocks, genitalia, or corresponding body cavities."[9]  The policy defines pat searches as "the act of frisking or running hands over, a person's body and clothing, including the removal of items contained within pockets, for the purpose of detecting and retrieving contraband."[10]  The policy explains that "pat searches will be conducted immediately when custodial responsibility is turned over to jail personnel" and "periodic pat searches of in-custody inmates" will occur in at least four situations: "1. Upon inmates' entry and exit of housing modules. 2. Following inmates' exit from multi-purpose rooms after program attendance. 3. After in-custody inmates dress out in their personal attire for transfer escort or transport. 4. Subsequent to any incident that requires the reinforcement of behavioral parameters or contraband detention."[11]

While the policy stipulates that officers must have "reasonable suspicion" to strip search "inmates booked solely for misdemeanor charges"[12] and that the "[c]ontractual requirements of the ICE contract and Federal standards must be applied to the ICE inmates,"[13] the policy also gives wide discretion to officers to strip search individuals.  For example, "[d]uring module or individual cell searches inmates will be subject to pat or strip searches at the discretion of Correctional staff."[14]  The only guidance the policy provides for the correctional staff in this situation is that the "[o]fficers shall base their decisions on the item or items for which the search is conducted."[15]  The policy also is vague and contradictory.  For example, the policy explains that "California Penal Code prohibits strip-searching of inmates booked solely on misdemeanor charges,"[16] but in the same subsection explains that "all persons booked in jail, regardless of the circumstances will fall under the same criteria for the purpose of strip searches."[17]  This language combined with the fact that the policy requires that "pat searches will be conducted immediately when custodial responsibility is turned over to jail personnel" would lead a reasonable person to believe that the policy allows for only pat searches of all persons booked into the jail.  However, in practice, as detailed below, all persons booked into the jail are actually strip searched.  The policy's contradictory language and vagueness combined and the overly broad discretion provided to officers has created an environment in which people in immigration detention are unlawfully strip searched and the officers conducting the search and their supervisors may be charged criminally and held civilly liable for violating California Penal Code section 4030.

The Complainants are 31 transgender and cisgender women who are or were in the custody of U.S. Immigration & Customs Enforcement (ICE) at the Santa Ana City Jail, pursuant to an agreement between ICE and the City of Santa Ana.  These individuals were strip searched by the Santa Ana Police Department without reasonable suspicion or probable cause to believe that they were in the possession of weapons or drugs, pursuant to a blanket policy, practice or custom of the Santa Ana City Jail of strip searching the following women: 1) women being booked into the Santa Ana City Jail; 2) women being transferred back from the Immigration Court in Los Angeles to the Santa Ana City Jail; and 3) women conducting in person (not behind plexi-glass) visits with their attorneys.

---

[9] *Ibid.*, section I.B.
[10] *Ibid.*, section I.A.
[11] *Ibid.*, section II.D.
[12] *Ibid.*, section IV.B.
[13] *Ibid.*, section IV.A.5.
[14] *Ibid.*, section V.B.
[15] *Ibid.*
[16] *Ibid.*, section IV.A.1.
[17] *Ibid.*, section IV.A.6.

4

Exhibit C (49)



It is our understanding that the strip searches conducted at the Santa Ana City Jail before women are booked into the jail and after women visit in person with their attorneys has been a policy, practice, or custom at the jail at least since the City began contracting with ICE. In the latter situation, women are not informed prior to the visit with their attorney that they will be forced to undergo a strip search and they are not told that they have the option to meet with their attorney behind plexi-glass. Strip searches under such circumstances are particularly unwarranted. Visits with attorneys pose extremely limited risks because attorneys are themselves screened prior to their admittance into the facility and because of the low probability that an attorney would agree to smuggle narcotics or weapons into the jail. Strip searches may even deter people in immigration detention from meeting with their attorneys, compromising legal representation.

It also is our understanding that the policy, practice, or custom of strip searching women who have been returned to the jail from the Immigration Court was institutionalized around March or April 2015. For example, AM who had been detained at the Santa Ana City Jail since 2013, was one of the first women to experience a strip search after returning to the Santa Ana City Jail from Immigration Court. AM's first strip search after court occurred in March or April 2015. These searches are conducted under a blanket policy, practice, or custom and without reasonable suspicion. For example, Ms. Sonia Marcias Esteves (091-028-855) explains that she has undergone approximately five strip searches at the jail in the last two months; she was first strip searched after being transferred from the Adelanto Detention Facility, another immigration detention facility in Southern California. She then experienced strip searches each time she was brought back from Immigration Court. Likewise, Ms. Fabiola Espinoza Delgado (205-711-889) believes she has experienced approximately 10 strip searches in just the last seven months at the Santa Ana City Jail.

Women being transferred back from the Immigration Court in Los Angeles to the Santa Ana City Jail now undergo at least one pat down by an ICE officer and/or jail officer, while the women remain clothed. Next, these women are taken to a holding cell and are forced to undergo a strip search before being transferred back into the general housing population or to the transgender module.[18] These searches occur even when the officers have no particularized reason to suspect concealment of contraband.

In all of these cases, the trans women are not allowed to choose the gender of the person performing the search. Most of the trans women complainants have been forced to undergo strip searches by male guards. Both the transgender and cisgender women are told to strip naked, and an officer performs a visual inspection of the breasts, armpits, buttocks, and genitalia of the woman. The women are told to lift up their breast, spread apart the sides of their labia and to pull back their clitoral hoods to prove that they are not hiding contraband in their vagina or vulva. They are told to bend at the waist, spread their buttocks, and cough three times. Women who did not bend to the officers' satisfaction are told to cough again.

---

[18] The transgender module used to be referred to as the LGBT pod or the GBT pod, but ICE has moved the gay men and bisexual individuals out of this pod.

Exhibit C  (50)



In some cases, these visual strip searches turned into physical body cavity searches by non-medical officers. One cisgender woman explained that a female officer[19] patted her down with her hands while naked after returning from Immigration Court. One transgender woman, OA, explained that during some of her strip searches, the officers have come very close to touching her, while making her feel humiliated about her body. For example, OW, KW, LM, NP, and SD explained that all the transgender women underwent a strip search on or around January 5, 2016, after a plate supposedly fell and broke. As the male officers were unable to locate one piece of the broken plate, the male officers put the entire transgender module on lockdown for approximately three hours and performed a strip search on all or at least most of the transgender women in the dedicated transgender module. There was no female officer present and the transgender women were not provided with the option to have a female officer perform this strip search. CIVIC received a handwritten letter in Spanish signed by an additional 18 transgender women not included in this complaint attesting to the fact they were strip searched as part of this module shakedown.[20]

OA explained that several male deputies performed a strip search on her at this time, although OA was never in possession of the plate fragment. They came very close to touching her body, and they looked with a flashlight in all orifices including her ears, mouth, and nose. They made her bend over and cough, as they looked with a flashlight into her buttocks. They made her lift her penis, while the officers pointed at her in a mocking manner. The officers then made OA physically lift her testicles and looked under them with a flashlight.[21] OA explains she felt completely humiliated.

Most women have not tried to resist the strip searches because the women believe that the officers have unquestioned authority to use force if necessary, and the women fear other forms of retaliation. For example, people in immigration detention fear they will be transferred to facilities farther away from their attorneys and networks of support or thrown into isolation or solitary confinement. This fear may explain why between January 1, 2012, and January 21, 2015, only two people submitted a formal grievance to the Santa Ana City Jail about strip searches, including one man.[22]

No special provisions are made for women who are menstruating. Some of the women complainants who were menstruating during a strip search bled directly onto the floor, which posed a health risk to the women and to any other person who may come into contact with that blood. Menstruating women also have to lift up their period pad in their underwear so that the officer can inspect underneath the pad. These women complainants are not provided with a new period pad or allowed to use the restroom before putting their underwear with the used pad back on.

---

[19] Although CIVIC has the names of officers whose actions are detailed in this complaint, we will not name them publicly. Instead we call for an independent investigation of all the accusations. If an independent investigative body requests the identities of the deputies to aid their investigation, CIVIC will provide the names at that time.

[20] This letter is on file with CIVIC and we will gladly provide a copy of it to appropriate parties upon request.

[21] This treatment of transgender women at the Santa Ana City Jail is consistent with a pattern of mistreatment, abuse, and discrimination by officers who are inadequately trained. *See Trapped in detention, transgender immigrants face new traumas*, MSNBC, August 29, 2015, *available at* http://www.msnbc.com/msnbc/trapped-detention-transgender-immigrants-face-new-traumas; *A model immigration detention facility for LGBTI?*, Forced Migration Review, 2013, *available at* http://www.fmreview.org/en/sogi/fialho.pdf; *Multi-individual complaint regarding mistreatment and abuse of sexual minorities in DHS Custody*, National Immigration Justice Center, April 13, 2011, *available at* https://www.immigrantjustice.org/sites/immigrantjustice.org/files/OCRCL%20Global%20Complaint%20Letter%20April%202011%20FINAL%20REDACTED.pdf.

[22] Strip Search Grievances for 2012 through 2016 submitted directly to Santa Ana City Jail, response to CIVIC's California Public Record Act request, *available at* https://www.dropbox.com/s/4349cew9wl6rlzl/Strip%20Search%20Grievances%202012%20to%202016%20for%20SAJ.pdf?dl=0.

 



No special provisions seem to be made for the elderly or women with chronic physical pain. For example, Araksi Torkramadzhyan (028-137-853) has undergone multiple strip searches at the Santa Ana City Jail, despite the fact that she is approximately 67 years old and suffers from hip dislocation and pain.

Many of the women complainants explained that the searches were not done in a private room. Instead, in some cases where multiple women were returning from court at the same time, the women were strip searched in front of one another. The only precaution the officers took to fain a degree of privacy was to tell the women not to look at one another as they were strip searched.

During the strip searches, women are exposed to blood and other unsanitary conditions. They stand and walk barefoot on dirty floors contaminated with bodily fluids and material tracked on shoes. Often, women are required to throw their clothing on these floors and re-dress in the same clothing after it has lain on the dirty floor. If women refuse to be searched, they are isolated, denied food, and pressured by threats of transfers and deportations until they comply with the search.

These searches are particularly traumatizing for asylum seekers who have survived sexual assault and rape, and the strip searches undermine the healing these women need. For example, Gloria Hernandez (094-945-100) identifies as lesbian and was a victim of sexual assault in Honduras because of her sexual identity. She takes medication for anxiety and depression. She explains that the approximately seven or eight times that she has been strip searched at the Santa Ana City Jail have re-traumatized her and resulted in suicide attempts. Studies have shown that humiliating treatment, such as strip searches, exacerbate mental illness and make reentry into society more difficult.[23] As psychiatrists who have extensive experience dealing with strip searches explained in an amicus curiae, strip searches cause psychological damage, such as sleep disturbance, recurrent and intrusive recollections of the event, inability to concentrate, anxiety, depression, and development of phobic reactions.[24] Some victims of strip searches have developed post-traumatic stress disorder (PTSD) and others, like Ms. Hernandez, have been moved to attempt suicide.[25]

Ms. Nicole Albrecht (206-407-728) describes her most recent strip search at the Santa Ana City Jail in detail:

On Monday, December 21, 2015, at 3:00 a.m., Ms. Albrecht was awoken to be transported to court. At approximately 4:30 a.m., she left the Santa Ana City Jail in handcuffs, and was the only person in the transportation vehicle going to court. The portion of the vehicle in which she was held was freezing cold.

At 5:15-5:20 a.m., she arrived at the immigration courthouse in Los Angeles. Officers patted her down, and then placed her in the holding cell.

At 8:00 a.m., she was patted down again, handcuffed at the feet and hands, and taken into court.

---

[23] Dr. Terry Kupers, *Prison Madness: The Mental Health Crisis Behind Bars and What We Must Do About It* 135 (1999).
[24] Brief for Psychiatrists as Amicus Curiae, *Florence v. Board of Chosen Freeholders*, 566 U.S. ___ (2012), *available at* http://www.americanbar.org/content/dam/aba/publishing/previewbriefs/Other_Brief_Updates/10-945_petitioneramcusychiatrists.authcheckdam.pdf.
[25] *Id.*

7



Exhibit C



After her court hearing, she was patted down again, then placed in the holding tank.

At 5:00 p.m. that evening, she was patted down again, handcuffed, and put into the transportation vehicle. Again, the heater was supposedly not working, and she remained freezing cold during the 1.5 hour journey back to the Santa Ana City Jail.

She arrived at the jail at approximately 6:30 p.m., and she was placed in a holding cell for 10 minutes. Then, a female officer[26] took her out of the cell, and took her to a separate room. The officer told Ms. Albrecht that she had to take off her clothes, but Ms. Albrecht refused and cited ICE's Performance-Based National Detention Standards. Ms. Albrecht offered to show the officer a copy of the Standards, but the officer did not want to review them.

Instead, Ms. Albrecht was put in a room and left alone for approximately three minutes. The same officer returned along with two other female officers and one male supervisor. The three female officers took Ms. Albrecht into another room and demanded that she take off her shoes and socks. Ms. Albrecht complied. Then, the three officers demanded that she take off her clothes, and Ms. Albrecht refused, once again appealing to the Standards. All three officers refused to consult the Standards.

The officers then grabbed Ms. Albrecht's arm and took her out of the room barefoot. The officers pulled Ms. Albrecht's arms behind her back and cuffed them and took her downstairs in an elevator to booking.. During this entire ordeal, Ms. Albrecht remained barefoot, walking on the jail floors.

The officers then placed Ms. Albrecht into a booking cell. They hurt her when removing handcuffs from her body, nearly pulling her arms from their sockets. Ms. Albrecht asked for her shoes and socks, but they refused. The holding cell was freezing cold.

Then, the male supervisor came to speak with Ms. Albrecht, and he tried to encourage her to consent to the strip search. She explained to him that he must have a justified reason, and she once again cited the Standards. He replied that he did not care, and that he only goes by his policy. Ms. Albrecht requested a copy of the jail policies, but he refused. Ms. Albrecht again stated that she was in the custody of ICE and that the Standards apply to her. According to Ms. Albrecht, the officer then said, "I don't care what they call you guys—detainees, inmates, refugees or arrestees—whatever you want to call that, we treat you the same, and that's why we house you together. Since I cannot send you back to housing, they [ICE] can send you to Arizona. This here [Santa Ana City Jail] is the best facility." He also told Ms. Albrecht that he knows about her case and that she should submit to the strip search and then file a grievance later. She continued to refuse the strip search, and he said that he would have to keep her in the holding cell until she consents.

He along with another female officer continued to come back to her cell every few minutes encouraging her to consent to the strip search. Around 7:30 p.m., the male officer came into the cell and said that Ms.

---

[26] Although CIVIC has the names of the officers whose actions are detailed in this complaint, we will not name them publicly. Instead we call for an independent investigation of all the accusations. If an independent investigative body requests the identities of the deputies to aid their investigation, CIVIC will provide the names at that time.

8

Exhibit C (53)



Albrecht was being put on "pre-discipline" for refusing the search and that they had spoken to ICE, who would be transferring Ms. Albrecht to the Otay Detention Facility in San Diego in the morning.

Ms. Albrecht asked to speak with her attorney. The officer refused her the ability to call her attorney, Josh Effron, and said she would be able to make the call from San Diego.

As Ms. Albrecht was afraid to be sent to San Diego or Arizona, further away from her attorney and her U.S. citizen husband who are both based in Los Angeles. As a result, she called the officer back into her cell about 10 minutes later and agreed to the strip search.

At about 8:00 p.m., the officer brought her back upstairs to her jail cell. She was locked in her cell without the opportunity to use the day room or have dinner. Her cellmate asked one of the guards if she could bring Ms. Albrecht some clean water, and the guards refused. She remained locked in her cell for the next 24 hours.

Ms. Albrecht's attorney, Josh Effron, emailed the Santa Ana City Jail Administrator, Christina Holland, on January 10, 2016, to ask for documentation about the strip search. Administrator Holland responded that although "strip searches are conducted and documented in accordance with CA penal code, Department policies and ICE standards," she would "not release strip search documents without a court order."[27] Less than 72 hours later, Ms. Albrecht was transported to the ICE office in Los Angeles, before a series of transfers to a holding cell in Arizona, the LaSalle Detention Facility in Louisiana, and finally the Chautauqua County Jail in New York where she is currently detained.

**B.      ICE and the Santa Ana City Jail are under notice of the disturbing blanket strip search policy, practice, or custom.**

Organizations, including the Transgender Law Center (TLC) and Familia, have raised the issue of strip searches with the Los Angeles ICE Field Office, ICE's National Office, and with the Santa Ana City Jail directly for years. As far back as April 2011, the National Immigrant Justice Center filed a multi-individual complaint regarding the mistreatment and abuse of sexual minorities in ICE custody, which included the singling out of a trans women for public searches in which officers mocked her breasts.[28] More recently, in August 2015, 22 LGBT individuals detained at the Santa Ana City Jail signed and submitted a complaint, explaining that "the LBGT community considers ourselves humiliated and demoralized. The majority of the officials lack professional etiquette. We consider the search of private parts … an unnecessary practice."[29]

On September 8, 2015, TLC sent an email to Andrew Lorenzen-Strait and Richard Rocha at ICE's National Office reiterating the concerns voiced in the complaint and attaching the petition. TLC sent another similar email to Christina Holland of the Santa Ana City Jail and Jorge Field, an Assistant Field Office Director (AFOD) in ICE's Los Angeles Office. Flor Bermudez, TLC's Managing Attorney and Detention Project Director, also raised the concerns regarding the strip search procedure at the last two

---

[27] Email from Christina Holland to Joshua Effron, January 10, 2016 (on file with CIVIC and with Joshua Effron).
[28] https://www.immigrantjustice.org/sites/immigrantjustice.org/files/OCRCL%20Global%20Complaint%20Letter%20April%202011%20FIN AL%20REDACTED.pdf (note this incident occurred at Theo Lacy Facility in Orange County, which used to house trans women in large numbers prior to the creation of Santa Ana City Jail's GBT module, which was created in response to NIJC's complaint)
[29] This letter is on file with CIVIC and we will gladly provide a copy of it to appropriate parties upon request.

9





Non-Governmental Organization meetings with ICE on October 1, 2015, and on January 7, 2016.  The recurring stories of re-traumatization that TLC has heard from the transgender women at the Santa Ana City Jail provides clear evidence that the strip search procedure is actively harming these women, as it is causing symptoms of post-traumatic stress and triggering feelings of isolation and powerlessness.

In the months following this correspondence, advocates have seen no significant improvement to Santa Ana City Jail's policy on strip searches, which is particularly concerning given the fact that ICE's Performance-Based National Detention Standards unequivocally prohibit these kind of blanket strip searches.

**C.      Strip searches require individualized reasonable suspicion under ICE's Standards, California law, and the U.S. Constitution.**

     **a.      ICE Standards expressly prohibit strip searches absent individualized reasonable suspicion.**

It should go without saying that officials at the Santa Ana City Jail are under an obligation to uphold California laws, while also abiding by the U.S. Constitution and federal standards.  Federal standards expressly prohibit strip searches in the immigration detention context, absent individualized reasonable suspicion of contraband possession.  Under ICE's 2011 Performance-Based National Detention Standards (PBNDS), to which the Santa Ana City Jail is contractually bound,[30] a "strip search shall be conducted only when properly authorized by a supervisor and only in the event that there is reasonable suspicion that contraband may be concealed on the person, or when an officer has reasonable suspicion that a good opportunity for concealment has occurred or as may be outlined in facility procedures for post contact visits."[31]  Moreover, in "accordance with standard '5.7 Visitation,' facilities may not adopt policies permitting strip searches after contact visits in the absence of reasonable suspicion unless detainees are provided the right to choose non-contact visitation instead of contact visitation and are fully informed of such right."[32]

Federal regulations under "Standards to Prevent, Detect, and Respond to Sexual Abuse and Assault in Confinement Facility," 79 Fed. Reg. 13,100 (Mar. 7, 2014),[33] herein after PREA, prohibit cross-gender pat downs and strip searches of females, except when there are exigent circumstances.[34]  PREA requires any cross-gender pat downs or strip searches to be documented and for all staff to be trained in proper procedures for conducting all pat down searches.[35]  ICE's June 19, 2015, memo provides further guidance regarding PREA regulations and ICE's Standards.  "All strip searches shall be performed by staff of the same gender as the detainee.  In the case of an emergency, a staff member of the same gender as the detainee shall be preset to observe a strip search performed by an officer of the opposite gender."[36]

---

[30] ICE Intergovernmental Service Agreement with the Santa Ana City Jail (2015), response to CIVIC's California Public Record Act request, *available at* https://www.dropbox.com/s/3bntdmq2khu3j1y/ICE_Contract_SACJ_2015.pdf?dl=0 (see Article 5).
[31] ICE PBNDS 2.10.II.7
[32] *Ibid.*
[33] ICE Intergovernmental Service Agreement with the Santa Ana City Jail (2015), response to CIVIC's California Public Record Act request, *available at* https://www.dropbox.com/s/3bntdmq2khu3j1y/ICE_Contract_SACJ_2015.pdf?dl=0 (see Article 5, explaining that the Santa Ana City Jail also is contractually bound by this federal regulation).
[34] PREA ("Limits to Cross-Gender Viewing and Searches," §§ 115.15, 115.115)
[35] *Ibid.*
[36] ICE PBNDS 2.11; ICE PBNDS 2.10.II.3 ("An officer of the same gender as the detainee shall perform the search.").





"Whenever possible, transgender detainees shall be permitted to choose the gender of the staff member conducting a body-cavity search"[37] in addition to when an officer is performing "any necessary pat-down and strip searches."[38] It is important to note that Santa Ana City Jail's practice of having men strip search transgender women seems to conflate gender identity and sex. Also, "[s]pecial care should be taken to ensure that transgender detainees are searched in private."[39] "All strip searches shall be documented."[40] The requirement for reasonable suspicion has been part of ICE's Standards since at least 2007.[41]

> **b. California Penal Code Section 4030 prohibits visual strip searches absent individualized reasonable suspicion, and prohibits physical body cavity searches by non-medical personnel.**

The Standards reflect state and federal law, which generally prohibit suspicion-less strip searches. In California, people in places of incarceration who are subjected to a strip search fall into one of three categories: (1) arrestees strip searched before being admitted to jail; (2) arrestees strip searched pursuant to California Penal Code section 4030; and (3) prisoners searched because jail officials have reasonable suspicion that the prisoner is concealing weapons or contraband. The U.S. Supreme Court has found that officials may strip-search people arrested for any offense, however minor, before admitting them to jails even if the officials have no reason to suspect the presence of contraband. *Florence v. Board of Chosen Freeholders*, 566 U.S. ___ (2012). Two years earlier, the Ninth Circuit held similarly, explaining that conducting a visual strip search for weapons and drugs before placing even new arrestees in the general jail population did not violate their Fourth Amendment rights. *Bull v. City and County of San Francisco*, 595 F.3d 964, 966 (9th Cir. 2010). However, once the person is admitted and placed into the general jail population, other standards apply.

California defines a strip search as "a search which requires a person to remove or arrange some or all of his or her clothing so as to permit a visual inspection of the underclothing, breasts, buttocks, or genitalia of such person." Cal. Pen. Code § 4030(c). "Persons conducting a strip search or a visual body cavity search shall not touch the breasts, buttocks, or genitalia of the person being searched." Cal. Pen. Code § 4030(j). Section 4030 requires that a misdemeanor or infraction arrestee not be strip searched absent reasonable suspicion that the arrestee is concealing weapons or contraband. Cal. Pen. Code § 4030(f). Moreover, no "strip search or visual body cavity search or both may be conducted without the prior written authorization of the supervising officer on duty. The authorization shall include the specific and articulable facts and circumstances upon which the reasonable suspicion determination was made by the supervisor." Cal. Pen. Code § 4030(f).

A physical body cavity search, as opposed to a strip search, "shall be conducted under sanitary conditions, and only by a physician, nurse practitioner, registered nurse, licensed vocational nurse or emergency medical technician Level II licensed to practice in this state." Cal. Pen. Code § 4030(k). No misdemeanor or infraction arrestee "shall be subjected to a physical body cavity search except under the

---

[37] ICE PBNDS 2.10.V.2.c.
[38] ICE Memo: Further Guidance Regarding the Care of Transgender Detainees, June 19, 2015.
[39] ICE PBNDS 2.10.V.3.g.
[40] ICE Memo: Further Guidance Regarding the Care of Transgender Detainees, June 19, 2015.
[41] *See* ICE Memo: Admission and Release – National Detention Standard Strip Search Policy, Oct. 15, 2007, *available here* http://iwp.legalmomentum.org/reference/additional-materials/immigration/enforcement-detention-and-criminal-justice/government-documents/ENF_%20National%20Detention%20Standard%20Strip%20Search%20Policy%202007.pdf

Exhibit C (56)



authority of a search warrant issued by a magistrate specifically authorizing the physical body cavity search." Cal. Pen. Code § 4030(h).[42]  The authorization under subsection (f) and subsection (h) must be "placed in the agency's records and made available, on request, to the person searched or his or her authorized representative." Cal. Pen. Code § 4030(i).

After *Bull*, California Penal Code section 4030 remains law, and even misdemeanor or infraction arrestees cannot be strip searched before being placed into the general jail population, unless all of the following are true: "(i) The person is not cited and released.  (ii) The person is not released on his or her own recognizance pursuant to Article 9 (commencing with Section 1318) of Chapter 1 of Title 10 of Part 2. (iii) The person is not able to post bail within a reasonable time not less than three hours." Cal. Pen. Code 4030(g).  After the Ninth Circuit ruling in *Bull*, a California court made it very clear that section 4030 could still have been violated.  *Bull v. City and County of San Francisco,* 758 F.Supp.2d 925 (N.D. Cal. 2010) (explaining that a section 4030 claim would have been available even after the Ninth Circuit ruling in *Bull* had the class contained a representative who was searched before being given a reasonable opportunity of at least three hours in which to post bail).

Although section 4030 does not explicitly apply to people in immigration detention, it is likely that a court would find that the section does apply to people in immigration detention in California because the intent of the legislature in enacting this section is to "protect the state and federal constitutional rights of the people of California by establishing a statewide policy strictly limiting strip and body cavity searches." Cal. Pen. Code § 4030(a).  People in ICE custody, like misdemeanor and infraction arrestees, are not in custody for the conviction of a crime.  In fact, people in ICE custody are not in custody for a criminal charge; they are civil detainees awaiting determination of a civil removal order.  The same policy purposes that led the legislature to adopt special protections for misdemeanor arrestees should apply to civil detainees.  Moreover, the Ninth Circuit has recognized that "[w]ith respect to an individual confined awaiting adjudication under civil process, a presumption of punitive conditions arises where the individual is detained under conditions identical to, similar to, or more restrictive than those under which pretrial criminal detainees are held . . ." *Jones v. Blanas*, 393 F.3d 918, 934 (9th Cir. 2004).  Accordingly, treating a civil ICE detainee any worse than a misdemeanor arrestee is treated creates a presumption that the treatment is unconstitutionally punitive.  Under California Penal Code section 4030, the Santa Ana City Jail would need reasonable suspicion to search a person in immigration detention.  And because people in immigration detention are not provided with the opportunity to seek, let alone post a bail within three hours, a strip search of an individual prior to being first placed in the general jail population may also violate California Penal Code section 4030(g).

In addition to violating California Penal Code section 4030 whenever it conducts a strip search of a person in immigration detention without reasonable suspicion, the Santa Ana City Jail also violated California Penal Code section 4030(i) by refusing to provide Ms. Albrecht and her authorized representative, Joshua Effron, with a copy of the authorization document for her strip search on December

---

[42] Note the Ninth Circuit also has held that physical cavity searches are generally not permissible without a search warrant. *United States v. Fowlkes*, 804 F.3d 954 (9th Cir. 2015) (holding that police officers violated Fourth Amendment when subjecting a man during the jail intake process to a physically invasive search and seizure from defendant's rectum.)

12





31, 2015.[43]  The Santa Ana City Jail also violated its own jail policy, which requires strip search documentation to be made available to the person searched and her authorized representative.[44]

Even if California Penal Code section 4030 does not apply to people in immigration detention, people in immigration detention would fall into the third category of people searched, and reasonable suspicion would be required prior to a strip search nonetheless.  Unlawful strip searches violate an individual's right to privacy under Article 1, Section 1 of the California Constitution.  *See White v. Davis*, 13 Cal. 3d. 757 (1975); *Hill v. NCAA*, 7 Cal.4th 1 (1994); *American Airlines, Inc. v. Superior Court*, 114 Cal. App. 4th 881 (2003).

> **c.  The U.S. Supreme Court, the Ninth Circuit, and California courts have interpreted the Fourth Amendment to prohibit strip searches absent individualized reasonable suspicion.**

Under the U.S. Constitution, the Fourth Amendment is the governing standard for carceral strip searches.  *Way v. County of Ventura*, 445 F.3d 1157, 1161-62 (9th Cir. 2006) (holding that a county jail's blanket strip search policy violated the Fourth Amendment); *Jordan v. Gardner*, 986 F.2d 1521, 1524 (9th Cir. 1993) (en banc) (the "Fourth Amendment guarantees the right of the people to be secure against unreasonable searches, and its protections are not extinguished upon incarceration"); *Thompson v. Souza*, 111 F.3d 694, 699 (9th Cir. 1997) (same).  In *Bell v. Wolfish*, 441 U.S. 520 (1979), the Supreme Court created a balancing test for determining if a person's Fourth Amendment right to be free from unreasonable searches in the carceral context has been violated.  Courts assess the constitutionality of a strip search by balancing "the need for the particular search against the invasion of personal rights that the search entails." *Id.* at 559.  This requires courts to weigh "the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted." *Id.*

Applying this balancing test, California courts have held that a blanket strip search policy for arrestees after returning from court is unconstitutional.  *Craft v. County of San Bernardino*, 468 F. Supp. 2d 1172, 1179 (C.D. Cal. 2006) (policy of strip searching all arrestees who are returned to a jail facility from court violates the Fourth Amendment).  These constitutional protections apply to people in the immigration detention context.  *Flores v. Meese*, 681 F. Supp. 665 (C.D. Cal. 1988) (holding unconstitutional routine strip search of juveniles at INS detention facilities stating that they have a reasonable expectation of constitutional protections it was "axiomatic that a strip search entails perhaps the most severe intrusion upon personal rights").

In alignment with California Penal Code section 4030, the U.S. Supreme Court and the Ninth Circuit have held that physical cavity searches are generally not permissible without a search warrant.  *United States v. Fowlkes*, 804 F.3d 954 (9th Cir. 2015) (holding that police officers violated Fourth Amendment when subjecting a man during the jail intake process to a physically invasive search and seizure from defendant's rectum).

---

[43] Email from Christina Holland to Joshua Effron, January 10, 2016 (on file with CIVIC and with Joshua Effron).
[44] Santa Ana City Jail Inmate Searches Policy, response to CIVIC's California Public Record Act request, *available at* https://www.dropbox.com/s/m4uh811mo8lacf0/SAJ_Inmate_Searches_Policy.pdf?dl=0.

Exhibit C (58)






Even if the strip search policy, practice, or custom at Santa Ana is constitutional on its face, if it is conducted in an unreasonable manner or goes too far in scope, it can still be considered unconstitutional as applied. Carceral strip searches that are "excessive, vindictive, harassing, or unrelated to any legitimate penological interest are not reasonable." *Michenfelder v. Sumner*, 860 F.2d 328, 332 (9th Cir. 1988). Moreover, California law specifically requires that all California prisoners be searched "in a professional manner."[45] California prohibits opposite-sex guards from performing unclothed body inspections "except under emergency conditions with life or death consequences.[46] Past sexual and physical abuse experienced by female prisoners may affect the way they react to searches by male prison guards. Thus, the Ninth Circuit has held that female prisoners have a greater privacy interest than males; random, non-emergency, clothed body searches on female prisoners were cruel and unusual punishment, violating the Eighth Amendment. *Jordan v. Gardner*, 986 F.2d 1521 (9th Cir. 1993). Other courts have found that searches performed on transgender women may also violate the Eighth Amendment, particularly when the woman believes the guards made her strip to harass her and to "view her unique physical characteristics." *Meriwether v. Faulkner*, 821 F.2d 408, 411 (7th Cir. 1987). And strip searches being conducted in an open setting is a form of gratuitous humiliation that raises constitutional questions. *See, e.g., Vaughan v. Ricketts*, 859 F.2d 736, 741-42 (9th Cir. 1988) (searched in an open hallway).

The Santa Ana City Jail cannot justify its policies on grounds of administrative convenience. *Rufo v. Inmates of Suffolk County Jail*, 502 U.S. 367, 392 (1992) ("financial constraints may not be used to justify the creation or perpetration of Constitutional violations."); *Stone v. City and County of San Francisco*, 968 F.2d 850, 858 (9th Cir. 1992) ("federal courts have repeatedly held that financial constraints do not allow states to deprive persons of their constitutional rights").

The Santa Ana City Jail and ICE's conduct concerning strip searches clearly violates California and federal law as well as ICE's standards. We look forward to your response by February 25, 2016. If you have any questions, please contact Christina Fialho at CFialho@endisolation.org or at 385-212-4842. You also may contact Flor Bermudez, Managing Attorney/Detention Project Director at the Transgender Law Center at Flor@transgenderlawcenter.org, or the other organizations listed below who urge the City of Santa Ana to adopt a sensible and humane strip search policy.

Sincerely,

*Christina Fialho*

Christina Fialho
Co-Executive Director/General Counsel
Community Initiatives for Visiting Immigrants in Confinement (CIVIC)
www.endisolation.org
P.O. Box 40677
San Francisco, CA 94140

---

[45] Cal. Code Regs. tit. 15, § 3287(b) (2006) (requiring that all searches of prisoners "be conducted in a professional manner which avoids embarrassment or indignity to the prisoner. Whenever possible, unclothed body inspections of prisoners shall be conducted outside the view of others.").
[46] Cal. Code Regs. tit. 15, § 3287(b)(1) (2006). The CDCR Department Operations Manual (the DOM) reflects the same policies. CDCR Department Operations Manual §§ 52050.18.2, 52050.18.3 (1989), available at http://www.cdcr.ca.gov/Regulations/Adult_Operations/docs/DOM/Ch_5_Printed_Final_DOM.pdf.

14

Exhibit C (59)



CC:

Mary Giovagnoli
Deputy Assistant Secretary for Immigration Policy
Department of Homeland Security
Mary.Giovagnoli@hq.dhs.gov

Moreen Murphy
Officer for Civil Rights and Civil Liberties
U.S. Department of Homeland Security
Moreen.Murphy@HQ.DHS.GOV

Richard Rocha
Communications Advisor
U.S. Immigration and Customs Enforcement (ICE)
Richard.A.Rocha@ice.dhs.gov

Lana Khoury
LGBT Liaison
U.S. Immigration and Customs Enforcement (ICE)
Lana.Khoury@ice.dhs.gov

Andre Quinones
Assistant Field Office Director
U.S. Immigration and Customs Enforcement (ICE), Los Angeles
Andre.G.Quinones@ice.dhs.gov

Art Trevino
Assistant Field Office Director
U.S. Immigration and Customs Enforcement (ICE), Los Angeles
Arturo.Trevino@ice.dhs.gov

Jorge Field
Assistant Field Office Director
U.S. Immigration and Customs Enforcement (ICE), Los Angeles
Jorge.Field@ice.dhs.gov

Sonia R. Carvalho
City Attorney, Santa Ana
City of Santa Ana
Sonia.Carvalho@bbklaw.com

15

Exhibit C 60



**Organizational Letter of Support**

We, the undersigned organizations, are deeply concerned about the strip searches of detained immigrants that are occurring at the Santa Ana City Jail.  We urge the Office for Civil Rights and Civil Liberties (CRCL) at the Department of Homeland Security (DHS), pursuant to its authority under 6 U.S.C § 345, to investigate the complaint filed on January 25, 2016, by Community Initiatives for Visiting Immigrants in Confinement (CIVIC).  Furthermore, we urge CRCL to develop policies to address any violations and to provide ongoing oversight on the implementation of any necessary changes.  Moreover, we urge the City of Santa Ana to adopt a sensible and humane strip search policy that conforms to federal ICE standards, to state and federal law, and to human decency.

American Civil Liberties Union of Southern California
Immigration Equality
LGBT Center Orange County
National Day Labor Organizing Network
National Immigrant Justice Center
Public Counsel
Public Law Center
Transgender Law Center
University of Southern California (USC) Gould School of Law Immigration Clinic

Exhibit C 16 61

# EMERGENCY MEDICAL COMPLAINT: Petra Albrecht (A 206 409 411) at Adelanto Detention Center

## Christina Fialho

Fri 9/11/2015 9:53 AM

To: crclcompliance <CRCLCompliance@hq.dhs.gov>;

Cc: Lorenzen-Strait, Andrew R <Andrew.R.Lorenzen.Strait@ice.dhs.gov>; Nicole Boehner <boehner@unhcr.org>; Lindsay Jenkins <jenkinsl@unhcr.org>; Emily Bender <BENDER@unhcr.org>; WeltzienAM@state.gov <WeltzienAM@state.gov>; Joshua Effron, Esq. <effron@immigrantrep.com>; Richard Wheeler <rochosbt@hotmail.com>;

Dear Office for Civil Rights and Civil Liberties,

Yesterday, we filed the below complaint with ICE's national office regarding Petra Albrecht (A 206 409 411) and her daughter Nicole Albrecht (A 206 407 728). We are filing a separate medical complaint today with CRCL, and we urge you to take immediate steps, as we believe Petra Albrecht's current medical situation could be fatal.

We are extremely concerned about Petra Albrecht. She had an upcoming specialists appointment scheduled regarding her heart and perforated abdomen at the Otay Detention Center. When she arrived at Adelanto, she asked to continue her medication and also that the Adelanto medical staff look at all of her medical records from Otay so they would know all of her serious health conditions. According to Petra, the nurses said, "You are in a new place now--we are going to start all over with tests and medical." We here at CIVIC are extremely confused. Did her medical records from Otay not get transferred to Adelanto? She has not received her medication now for 7 days, why is that?

I'm filing this complaint as an emergency complaint because Petra believes she suffered a heart attack yesterday afternoon. Richard Wheeler, Petra's son-in-law called Adelanto multiple times yesterday to get Petra medical attention, almost to no avail. Last night, Lieutenant Anderson came to visit Petra, but she was able to visit Petra, but she believes she had a heart attack at 2:30 pm yesterday. In response, the medical staff only checked her blood pressure, told her to calm down, and did nothing else. Lieutenant Anderson said he was going to e-mail Warden Janecka last night. Richard Wheeler also spoke to an Officer Cates, an Officer Masioor, and a third officer. He explained that Petra had been rushed to the ER from Otay for the same reason many months ago; he also explained that she had not had her medication now for 7 days. It is our understanding that the officers took all of this very lightly and said, "She's fine!"

This morning, Petra woke up with a rash, stomach issues, and swollen feet from what looks like water retention. The rash has spread from her face to her back, which is now red, swollen, and burning.

The rash and her severe heart problems need to be addressed today. I am cc-ing Richard Wheeler and Petra's attorney Josh Effron to ensure that you are able to take swift steps to address this issue today.

Sincerely,

Christina M. Fialho
Co-Founder/Executive Director
Community Initiatives for Visiting Immigrants in Confinement (CIVIC)
T: 385-21-CIVIC
www.endisolation.org
http://www.echoinggreen.org/fellows/christina-fialho

*Admitted to the California State Bar

On Wed, Sep 9, 2015 at 10:02 AM, Christina Fialho <cfialho@endisolation.org> wrote:
Dear Andrew,

Exhibit D

(62)

# Fwd: Follow-up to CRCL Number 15-12-ICE-06...

## Christina Fialho

Fri 10/2/2015 11:23 AM

To: Richard <rochosbt@hotmail.com>; Joshua Effron, Esq. <effron@immigrantrep.com>;

📎  1 attachments (198 KB)

09.11.2015 15-12-ICE-0630.pdf;

See attached—not super helpful.

---------- Forwarded message ----------
From: **CRCLCompliance** <CRCLCompliance@hq.dhs.gov>
Date: Fri, Oct 2, 2015 at 10:57 AM
Subject: Follow-up to CRCL Number 15-12-ICE-0630
To: "Cfialho@endisolation.org" <Cfialho@endisolation.org>

Dear Ms. Fialho,

Please see the attached correspondence from the U.S. Department of Homeland Security's Office for Civil Rights and Civil Liberties.  Thank you.

Sincerely,

Office for Civil Rights and Civil Liberties

U.S. Department of Homeland Security


## Homeland Security

*This message, along with any attachments, is covered by federal and state law governing electronic communications and may contain confidential and legally privileged information.  If the reader of this message is not the intended recipient, you are hereby*

Exhibit D    (63)

Fwd: Follow-up to CRCL Number 15-12-ICE-0630 - Richard

notified that any dissemination, distribution, use, or copying of this message is strictly prohibited. If you have received this message in error, please notify the sender immediately by reply e-mail, and delete the message.

(64)

Exhibit   D



Office for Civil Rights and Civil Liberties
**U.S. Department of Homeland Security**
Washington, DC 20528

## Homeland Security

October 2, 2015

*Via electronic mail*

Christina Fialho
Co-Founder/Executive Director
Community Initiatives for Visiting Immigrants in Confinement
Cfialho@endisolation.org

Re:   Complaint No. 15-12-ICE-0630
      Petra Albrecht (A206 409 411)

Dear Ms. Fialho:

On September 11, 2015, the Department of Homeland Security (DHS) Office for Civil Rights and Civil Liberties (CRCL) received your complaint on behalf of Petra Albrecht. Thank you for contacting us with your concerns. Under 6 U.S.C. § 345 and 42 U.S.C. § 2000ee-1, CRCL reviews and assesses information concerning abuses of civil rights, civil liberties, and profiling on the basis of race, ethnicity, or religion, by employees and officials of DHS.

The issues you raise are very important to us, and we would like to inform you how your complaint will be processed by CRCL. Initially, we will send your complaint to the DHS Office of Inspector General (OIG) for review. If OIG declines to accept the complaint, it will be returned to CRCL for an appropriate response. Once CRCL opens a formal complaint, either we or the appropriate DHS component will conduct an investigation into your concerns. CRCL may contact you during the course of investigation of your complaint. We will ultimately notify you of the outcome of the investigation.

Please be advised that our complaint process does not provide individuals with legal rights or remedies. Accordingly, CRCL is not able to obtain any legal remedies or damages on your behalf. Instead, we use complaints like yours to find and address problems in DHS policy and its implementation. If you believe your rights have been violated, you may wish to consult an attorney. There may be time limitations that govern how quickly you need to act to protect your interests.

If you have not already done so, please provide CRCL with your complete contact information, including a phone number, email address, and mailing address if available, and your alien number if applicable. You may contact CRCL by email at CRCLCompliance@hq.dhs.gov, by facsimile at 202-401-4708, or by mail at the following address:

(65)

Exhibit D

Department of Homeland Security
Office for Civil Rights and Civil Liberties
Compliance Branch
245 Murray Lane, SW
Building 410, Mail Stop 0190
Washington, DC 20528

For additional information about CRCL's roles and responsibilities, please visit our website at www.dhs.gov/crcl.

If you are filing a complaint on behalf of someone else, please provide CRCL with the express written consent of the individual if you would like to be informed about the resolution of this complaint, if you have not already done so.

When communicating with CRCL about this matter, please include the complaint number noted at the top of this letter.

Please note that Federal law forbids retaliation or reprisal by any Federal employee against a person who makes a complaint or discloses information to CRCL. 42 U.S.C. § 2000ee-1(e). If you believe that you or someone else is a victim of such a reprisal, please contact us immediately.

Thank you again for contacting CRCL. Communications like yours are essential to our ability to carry out our role of supporting the DHS's mission to secure the nation while preserving individual liberty, fairness, and equality under the law. We look forward to working with you to address your concerns. If you have questions, please contact us either in writing or by phone at 866-644-8360, 866-644-8361 (TTY).

Sincerely,

Compliance Branch
Office for Civil Rights and Civil Liberties
U.S. Department of Homeland Security



2

ErLibiT D

## Privacy Act Statement

**Authority:** 6 U.S.C. § 345 and 42 U.S.C. § 2000ee-1 authorizes the collection of this information.

**Purpose:** The Department of Homeland Security (DHS) will use this information to review and investigate complaints and information from the public about possible violations of civil rights and/or civil liberties relating to DHS employees, programs, or activities.

**Routine Uses:** This information may be disclosed to and used by personnel and contractors within DHS who have a need to know the information in order to review your complaint. The DHS Office for Civil Rights and Civil Liberties (CRCL) may also share your information, as necessary, with appropriate government agencies outside of DHS or with non-government entities to address your complaint, or pursuant to its published Department of Homeland Security/ALL-029 Civil Rights and Civil Liberties Records System of Records.

**Disclosure:** Furnishing this information to CRCL is voluntary; however, failure to furnish the requested information may delay or prevent CRCL from adequately reviewing and investigating your complaint. If necessary, CRCL may also request additional information from you in order to determine the appropriate manner to address your concerns.

To learn more about the Privacy Act, go to www.dhs.gov/privacy.



3

August 31st, 2016

Plaintiff:
Richard Wheeler
11064 Mississippi Ave
Los Angeles, CA 90025
RE: LA ICE Field Office / Unethical Practices

On August 31st, 2016, I, Plaintiff, Richard Wheeler went to the ICE Field Office, Los Angeles, to inquire on where to submit <u>FTCA Administrative Claims</u>, against the Los Angeles ICE Field Office. Upon arrival, receptionist, Carman had never seen the form SF-95, and went into the back to find someone who might know about where to submit the claims.

Then, an unidentified ICE employee (female) took Nicole's claim document out of my hand, stating she was going to show someone in reception, but left the room, and it was not returned to me unitl 45 minutes later.

I was told by Carman that ICE SDDO, Michael Nemec was examining the document, and would be right back. I complained immediately, and the entire time to the receptionist, Carman, demanding to meet Mr. Nemec right now, or another supervisor, and to bring back the document immediately, as this is highly, unethically wrong, and unlawful.

No one would help me, including the security guard. Upon receptionist Carman returning the document after 45 minutes, I immediately mentioned and complained that  his wife, Nicole Albrecht Wheeler's claim document, had been un-stapled, then re-staped; clearly signifying that ICE made an unauthorized copy of the claim.

They also provided an address to mail the claim to in Washington, only, after they obtained claim information against their own Field Office.

I swear the following is true and correct.

Richard Wheeler
Plaintiff

<u>EXHIBIT E</u>



**UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA**
**CIVIL COVER SHEET**

| I. (a) PLAINTIFFS ( Check box if you are representing yourself ☒ ) | DEFENDANTS ( Check box if you are representing yourself ☐ ) |
|---|---|
| Nicole Albrecht Wheeler | David Jennings |

| (b) County of Residence of First Listed Plaintiff  Los Angeles | County of Residence of First Listed Defendant  Los Angeles |
|---|---|
| *(EXCEPT IN U.S. PLAINTIFF CASES)* | *(IN U.S. PLAINTIFF CASES ONLY)* |

| (c) Attorneys (Firm Name, Address and Telephone Number) If you are representing yourself, provide the same information. | Attorneys (Firm Name, Address and Telephone Number) If you are representing yourself, provide the same information. |
|---|---|

**II. BASIS OF JURISDICTION** (Place an X in one box only.)

☐ 1. U.S. Government Plaintiff
☒ 3. Federal Question (U.S. Government Not a Party)
☐ 2. U.S. Government Defendant
☐ 4. Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES**-For Diversity Cases Only
(Place an X in one box for plaintiff and one for defendant)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in this State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. ORIGIN** (Place an X in one box only.)

☒ 1. Original Proceeding
☐ 2. Removed from State Court
☐ 3. Remanded from Appellate Court
☐ 4. Reinstated or Reopened
☐ 5. Transferred from Another District (Specify)
☐ 6. Multi-District Litigation

**V. REQUESTED IN COMPLAINT: JURY DEMAND:** ☒ Yes ☐ No  (Check "Yes" only if demanded in complaint.)

**CLASS ACTION under F.R.Cv.P. 23:** ☐ Yes ☒ No    ☐ **MONEY DEMANDED IN COMPLAINT: $**

**VI. CAUSE OF ACTION** (Cite the U.S. Civil Statute under which you are filing and write a brief statement of cause. Do not cite jurisdictional statutes unless diversity.)

Bivens vs Six Unknown named Agents 403 US 388 (1971)

**VII. NATURE OF SUIT** (Place an X in one box only).

| OTHER STATUTES | CONTRACT | REAL PROPERTY CONT. | IMMIGRATION | PRISONER PETITIONS | PROPERTY RIGHTS |
|---|---|---|---|---|---|
| ☐ 375 False Claims Act | ☐ 110 Insurance | ☐ 240 Torts to Land | ☐ 462 Naturalization Application | **Habeas Corpus:** | ☐ 820 Copyrights |
| ☐ 376 Qui Tam (31 USC 3729(a)) | ☐ 120 Marine | ☐ 245 Tort Product Liability | ☐ 465 Other Immigration Actions | ☐ 463 Alien Detainee | ☐ 830 Patent |
| ☐ 400 State Reapportionment | ☐ 130 Miller Act | ☐ 290 All Other Real Property | | ☐ 510 Motions to Vacate Sentence | ☐ 840 Trademark |
| ☐ 410 Antitrust | ☐ 140 Negotiable Instrument | **TORTS** | **TORTS** | ☐ 530 General | **SOCIAL SECURITY** |
| ☐ 430 Banks and Banking | ☐ 150 Recovery of Overpayment & Enforcement of Judgment | **PERSONAL INJURY** | **PERSONAL PROPERTY** | ☐ 535 Death Penalty | ☐ 861 HIA (1395ff) |
| ☐ 450 Commerce/ICC Rates/Etc. | | ☐ 310 Airplane | ☐ 370 Other Fraud | **Other:** | ☐ 862 Black Lung (923) |
| ☐ 460 Deportation | ☐ 151 Medicare Act | ☐ 315 Airplane Product Liability | ☐ 371 Truth in Lending | ☐ 540 Mandamus/Other | ☐ 863 DIWC/DIWW (405 (g)) |
| ☐ 470 Racketeer Influenced & Corrupt Org. | ☐ 152 Recovery of Defaulted Student Loan (Excl. Vet.) | ☐ 320 Assault, Libel & Slander | ☐ 380 Other Personal Property Damage | ☐ 550 Civil Rights | ☐ 864 SSID Title XVI |
| ☐ 480 Consumer Credit | | ☐ 330 Fed. Employers' Liability | ☐ 385 Property Damage Product Liability | ☐ 555 Prison Condition | ☐ 865 RSI (405 (g)) |
| ☐ 490 Cable/Sat TV | ☐ 153 Recovery of Overpayment of Vet. Benefits | ☐ 340 Marine | **BANKRUPTCY** | ☐ 560 Civil Detainee Conditions of Confinement | **FEDERAL TAX SUITS** |
| ☐ 850 Securities/Commodities/Exchange | ☐ 160 Stockholders' Suits | ☐ 345 Marine Product Liability | ☐ 422 Appeal 28 USC 158 | **FORFEITURE/PENALTY** | ☐ 870 Taxes (U.S. Plaintiff or Defendant) |
| ☐ 890 Other Statutory Actions | ☐ 190 Other Contract | ☐ 350 Motor Vehicle | ☐ 423 Withdrawal 28 USC 157 | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 871 IRS-Third Party 26 USC 7609 |
| ☐ 891 Agricultural Acts | ☐ 195 Contract Product Liability | ☐ 355 Motor Vehicle Product Liability | **CIVIL RIGHTS** | ☐ 690 Other | |
| ☐ 893 Environmental Matters | ☐ 196 Franchise | ☐ 360 Other Personal Injury | ☒ 440 Other Civil Rights | **LABOR** | |
| ☐ 895 Freedom of Info. Act | **REAL PROPERTY** | ☐ 362 Personal Injury-Med Malpractice | ☐ 441 Voting | ☐ 710 Fair Labor Standards Act | |
| ☐ 896 Arbitration | ☐ 210 Land Condemnation | ☐ 365 Personal Injury-Product Liability | ☐ 442 Employment | ☐ 720 Labor/Mgmt. Relations | |
| ☐ 899 Admin. Procedures Act/Review of Appeal of Agency Decision | ☐ 220 Foreclosure | ☐ 367 Health Care/ Pharmaceutical Personal Injury Product Liability | ☐ 443 Housing/ Accommodations | ☐ 740 Railway Labor Act | |
| | ☐ 230 Rent Lease & Ejectment | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 445 American with Disabilities-Employment | ☐ 751 Family and Medical Leave Act | |
| ☐ 950 Constitutionality of State Statutes | | | ☐ 446 American with Disabilities-Other | ☐ 790 Other Labor Litigation | |
| | | | ☐ 448 Education | ☐ 791 Employee Ret. Inc. Security Act | |

**FOR OFFICE USE ONLY:**  Case Number:  LA CV16 06655-DOC-ATM

CV-71 (05/16)    **CIVIL COVER SHEET**    Page 1 of 3

**UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA**
**CIVIL COVER SHEET**

**VIII.  VENUE:** Your answers to the questions below will determine the division of the Court to which this case will be initially assigned. This initial assignment is subject to change, in accordance with the Court's General Orders, upon review by the Court of your Complaint or Notice of Removal.

| QUESTION A:  Was this case removed from state court? | STATE CASE WAS PENDING IN THE COUNTY OF: | INITIAL DIVISION IN CACD IS: |
|---|---|---|
| ☐ Yes   ☑ No<br><br>If "no," skip to Question B. If "yes," check the box to the right that applies, enter the corresponding division in response to Question E, below, and continue from there. | ☐ Los Angeles, Ventura, Santa Barbara, or San Luis Obispo | Western |
| | ☐ Orange | Southern |
| | ☐ Riverside or San Bernardino | Eastern |

| QUESTION B:  Is the United States, or one of its agencies or employees, a PLAINTIFF in this action? | B.1. Do 50% or more of the defendants who reside in the district reside in Orange Co.?<br><br>*check one of the boxes to the right*  ➡ | ☐ YES. Your case will initially be assigned to the Southern Division. Enter "Southern" in response to Question E, below, and continue from there.<br><br>☑ NO. Continue to Question B.2. |
|---|---|---|
| ☐ Yes   ☑ No<br><br>If "no," skip to Question C. If "yes," answer Question B.1, at right. | B.2. Do 50% or more of the defendants who reside in the district reside in Riverside and/or San Bernardino Counties? (Consider the two counties together.)<br><br>*check one of the boxes to the right*  ➡ | ☐ YES. Your case will initially be assigned to the Eastern Division. Enter "Eastern" in response to Question E, below, and continue from there.<br><br>☑ NO. Your case will initially be assigned to the Western Division. Enter "Western" in response to Question E, below, and continue from there. |

| QUESTION C:  Is the United States, or one of its agencies or employees, a DEFENDANT in this action? | C.1. Do 50% or more of the plaintiffs who reside in the district reside in Orange Co.?<br><br>*check one of the boxes to the right*  ➡ | ☐ YES. Your case will initially be assigned to the Southern Division. Enter "Southern" in response to Question E, below, and continue from there.<br><br>☑ NO. Continue to Question C.2. |
|---|---|---|
| ☑ Yes   ☐ No<br><br>If "no," skip to Question D. If "yes," answer Question C.1, at right. | C.2. Do 50% or more of the plaintiffs who reside in the district reside in Riverside and/or San Bernardino Counties? (Consider the two counties together.)<br><br>*check one of the boxes to the right*  ➡ | ☐ YES. Your case will initially be assigned to the Eastern Division. Enter "Eastern" in response to Question E, below, and continue from there.<br><br>☑ NO. Your case will initially be assigned to the Western Division. Enter "Western" in response to Question E, below, and continue from there. |

| QUESTION D: Location of plaintiffs and defendants? | A.<br>Orange County | B.<br>Riverside or San Bernardino County | C.<br>Los Angeles, Ventura, Santa Barbara, or San Luis Obispo County |
|---|---|---|---|
| Indicate the location(s) in which 50% or more of *plaintiffs who reside in this district* reside. (Check up to two boxes, or leave blank if none of these choices apply.) | ☐ | ☐ | ☐ |
| Indicate the location(s) in which 50% or more of *defendants who reside in this district* reside. (Check up to two boxes, or leave blank if none of these choices apply.) | ☐ | ☐ | ☐ |

| D.1.  Is there at least one answer in Column A? | D.2.  Is there at least one answer in Column B? |
|---|---|
| ☐ Yes   ☑ No<br><br>If "yes," your case will initially be assigned to the<br>SOUTHERN DIVISION.<br><br>Enter "Southern" in response to Question E, below, and continue from there.<br><br>If "no," go to question D2 to the right.  ➡ | ☐ Yes   ☑ No<br><br>If "yes," your case will initially be assigned to the<br>EASTERN DIVISION.<br><br>Enter "Eastern" in response to Question E, below.<br><br>If "no," your case will be assigned to the WESTERN DIVISION.<br><br>Enter "Western" in response to Question E, below.  ⬇ |

| QUESTION E: Initial Division? | INITIAL DIVISION IN CACD |
|---|---|
| Enter the initial division determined by Question A, B, C, or D above:  ➡ | Western |

| QUESTION F: Northern Counties? |  |  |
|---|---|---|
| Do 50% or more of plaintiffs or defendants in this district reside in Ventura, Santa Barbara, or San Luis Obispo counties? | ☐ Yes | ☑ No |

**UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA**
**CIVIL COVER SHEET**

**IX(a). IDENTICAL CASES:** Has this action been previously filed **in this court?**   ☑ NO   ☐ YES

If yes, list case number(s): _____

**IX(b). RELATED CASES:** Is this case related (as defined below) to any civil or criminal case(s) previously filed **in this court?**   ☐ NO   ☑ YES

If yes, list case number(s):   _SACV 15- 00451 GW (ss)_

**Civil cases** are related when they (check all that apply):

☑ A. Arise from the same or a closely related transaction, happening, or event;

☐ B. Call for determination of the same or substantially related or similar questions of law and fact; or

☐ C. For other reasons would entail substantial duplication of labor if heard by different judges.

Note: That cases may involve the same patent, trademark, or copyright is not, in itself, sufficient to deem cases related.

**A civil forfeiture case and a criminal case** are related when they (check all that apply):

☐ A. Arise from the same or a closely related transaction, happening, or event;

☐ B. Call for determination of the same or substantially related or similar questions of law and fact; or

☐ C. Involve one or more defendants from the criminal case in common and would entail substantial duplication of
labor if heard by different judges.    _Petra Abbott_   8/30/16    _____   8/30/16

**X. SIGNATURE OF ATTORNEY**
**(OR SELF-REPRESENTED LITIGANT):**   _Carole Albrecht Wheeler_   DATE:   _8-30-16_

**Notice to Counsel/Parties:** The submission of this Civil Cover Sheet is required by Local Rule 3-1. This Form CV-71 and the information contained herein neither replaces nor supplements the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. For more detailed instructions, see separate instruction sheet (CV-071A).

Key to Statistical codes relating to Social Security Cases:

| Nature of Suit Code | Abbreviation | Substantive Statement of Cause of Action |
|---|---|---|
| 861 | HIA | All claims for health insurance benefits (Medicare) under Title 18, Part A, of the Social Security Act, as amended. Also, include claims by hospitals, skilled nursing facilities, etc., for certification as providers of services under the program. (42 U.S.C. 1935FF(b)) |
| 862 | BL | All claims for "Black Lung" benefits under Title 4, Part B, of the Federal Coal Mine Health and Safety Act of 1969. (30 U.S.C. 923) |
| 863 | DIWC | All claims filed by insured workers for disability insurance benefits under Title 2 of the Social Security Act, as amended; plus all claims filed for child's insurance benefits based on disability. (42 U.S.C. 405 (g)) |
| 863 | DIWW | All claims filed for widows or widowers insurance benefits based on disability under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405 (g)) |
| 864 | SSID | All claims for supplemental security income payments based upon disability filed under Title 16 of the Social Security Act, as amended. |
| 865 | RSI | All claims for retirement (old age) and survivors benefits under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405 (g)) |