1   Nicole Albrecht Wheeler
     Petra Albrecht
2   11064 Mississippi Avenue
     Los Angeles, CA 90025
3   Nicole.awheeler@yahoo.com
     310-948-5510
4
     Plaintiff In Pro Per
5

6

7

8              UNITED STATES DISTRICT COURT

9              CENTRAL DISTRICT OF CALIFORNIA

10



FILED
CLERK U.S DISTRICT COURT

SEP 2 9 2017

CENTRAL DISTRICT OF CALIFORNIA
BY                              DEPUTY

| | |
|---|---|
| 11  Nicole Albrecht Wheeler, Petra Albrecht | Case No.: 2:16-cv-06655-DOC_SS |
| 12          **Plaintiffs,** | |
| 13          **vs.** | **NOTICE OF ERRATA TO FIRST** |
| 14  U.S. Immigration and Customs | **AMENDED COMPLAINT** |
| 15  Enforcement Agents FOD David Jennings, | **SECOND AMENDED COMPLAINT** |
| 16  AFOD Arturo Trevino, Supervisor Andre | **FOR DAMAGES FOR:** |
| 17  Quinones, DO Nelly McKenna, SACJ | |
| 18  Director Christina Holland, Supervisor | 1. **Unlawful Strip Search (4th Amend.)** |
| 19  Jaime Manriquez, James Musick Deputy | 2. **Due Process Violation (5th Amend.)** **Deliberate Indifference Claim** **(5th Amend)** |
| 20  Patricia Holliday | 3. **Retaliation (1st Amend.)** |
| 21          **Defendant(s)** | |

22   Plaintiff's Nicole Albrecht Wheeler and Petra Albrecht bring this action against U.S.

23   Immigration and Customs Enforcement Agents, FOD David Jennings, AFOD Arturo

24   Trevino, AFOD Andre Quinones, Deportation Officer Nelly McKenna (collectively, the

25   " Federal Defendants"), Santa Ana City Jail Director Christina Holland and Supervisor

26   Jamie Manriquez (collectively, "the City Defendants), and Deputy Patricia Holliday of

27   the Orange County Sheriff's Department (The "County Defendant") in their individual

28   capacities, and alleges as follows:

TO THE HONORABLE COURT AND TO ALL PARTIES AND THEIR COUNSEL OF RECORD:

PLEASE TAKE NOTICE that as a result of a typographical error in previous filed complaints regarding the names of Defendants involved in, and responsible for the unlawful strip search claim (4th Amendment violation) First Claim of Relief, was incorrectly stated as 8 unknown and named ICE agents. The correct names of defendants are the Federal Defendants, Jennings, Trevino, Quinones and City Defendant Holland. Plaintiffs submit the corrected Second Amended Complaint for damages under Bivens *v. Six* Unknown Named Agents of Federal Bureau of Narcotics, 403 U. S. 388 (1971) as a NOTICE OF ERRATA to First Amended Complaint, correcting the typographical error by changing the Defendants names from 8 unknown and named ICE agents to the Federal Defendants, Jennings, Trevino, Quinones and City Defendant Holland.

The entire civil rights complaint by 31 detainees regarding the unlawful strip search started and was filed as a result of Plaintiff Wheeler's violations by Defendants. Plaintiffs respectfully submit this errata to correct the error.

# FACTUAL BACKGROUND

1. On 9/2/2011, the Jewish Albrecht Family, mother Petra, daughter Nicole and son, J. A. entered the U.S. in Los Angeles on the Visa Waiver Program, and lived in the U.S.without incident. The family fled Germany, after the Jugendamt (German government) threatened to separate the family and stayed in the U.S. out of fear of persecution, torture and retribution from Germany, due to their failure to abide by Germany's policies compelling attendance in government schools, as both, Petra and Nicole were involved with J. A.'s homeschooling- in violation of German law.

2. In 2013 the Albrecht's began to be systematically victimized by their Neighbors, Alexandra Paul and husband Ian Murray in Los Angeles. After Nicole turned down unwanted sexual advances from both, the neighbors leveled several unfounded accusations against Nicole, branding her a stalker, and had her arrested in May 2014, in retaliation for filing a police report and a restraining order, that she had sought against Mr. Murray for threating her life and. The neighbors prevented the adjudication of said restraining order (due to timed arrest and witness tampering) and initiated a court case against Nicole for alleged restraining order violation (date to appear in court September 4, 2014) to take the focus away from the crime Mr. Murray committed against Nicole. This enabled the neighbors to further harass and victimize Nicole and her family.

3. On August 27, 2014, the criminal behavior continued via an email from Alexandra Paul to ICE, stating the Albrecht's were illegal aliens, were stalking her, violating RO's over two dozen times (unfounded), one day after Ms. Paul was served a temporary restraining order for assault with a deadly weapon, attacking the Albrecht's via road rage (date to appear in court 09/16/14). Ms. Paul contacted ICE to have the entire family deported, as she may have faced criminal charges, and to misuse the immigration enforcement process ensuring the Albrecht's would be unavailable as witnesses against Ms. Paul and Mr. Murray, for both the September 4, 2014, and

September 16, 2014 hearings. In total (3) missed court hearings and (2) RO's would be dismissed as a result of their actions.

4. On September 4, 2014, at approximately 7:30 am, as the Albrecht's were on their way to court to testify in above mentioned pre-trial hearing, (8) Unknown, Named federal officers from (ICE) acting in their "individual capacities", in cooperation with LAPD (TMU) and DCFS acted on a tip from Alexandra Paul to conduct a warrantless, without consent or exigent circumstances, SWAT style commando "raid" and targeted non dangerous immigrants, at 17153 Palisades Circle, Pacific Palisades, CA 90272. ICE and LAPD used excessive display of force, when they forced their way into the Albrecht home, (by prying the garage door open), unlawfully with guns drawn, including against, a 78 yr old senior, and an 11 year old minor, who were terrified as agents forced their way into the home, and bathroom, as if apprehending wanted murderers, rather than potential administrative immigration law violators. The agents unnecessarily held them at gunpoint, as other agents conducted a warrantless, non-consensual sweep of the home.

5. Due to the tip launched by Alexandra Paul, 8 days prior to the arrest, the agents pre-planned the raid, and knew their whereabouts prior to the arrest, but failed to get a judicial warrant, which precludes a finding of exigent circumstances, justifying a warrantless search, using unreasonable force, threats and intimidation. Petra and Nicole were immediately handcuffed, taken into custody and placed in a van for several hours, without air, water, or to be able to use a bathroom.

6. Department of Children and Family Services separated 11-year-old J.A. (key witness) from his family, without a warrant, preventing him from residing with able relatives at home, and at a separate residence. J.A. was integrated in several community activities (most inspirational Jr. Lifeguard and successful karate student) and was placed into a Latino foster family for 3 months, far away from family and community ties.

7.  The child was dragged through dependency court proceedings, to which he was never the proper subject (no abuse & neglect), and was forbidden to communicate in his native language German with his family (only language mother speaks). Neither DCFS, nor ICE did arrange any form of contact/ visitation and isolated the child from the family. DCFS also fabricated negative evidence and fraudulent statements, which were detrimental to the child's health and mental well being (alienation).

8.  During the entire dependency court proceedings, Petra's parental and procedural rights were completely ignored and violated, in isolation at Otay, as FOD, David Jennings, and AFOD, Arturo Trevino, who have specific authority and responsibility to make lawful decisions for detainees court appearances, (a constitutional right), acting in their "individual capacities", prevented Petra from appearing in dependency court, violating her due process rights to defend, "be present" and represent herself to retain custody over her child. Petra was not informed about the hearings in the beginning, and received no information regarding her child, and the family became victims of discrimination and misconduct.

9.  Illegal extradition of minor, J A- On December 17th, 2014, Petra's minor child, J. A. was illegally extradited back to Germany, both against his will, and against the law, before a final decision had been reached on his application for asylum, withholding of removal, and protection under the United Nations Convention Against Torture, which remains pending with the United States Citizenship and Immigration Services (USCIS) to this day, receipt #ZLA1400174260. J. A. is protected under the 1967 United Nations Protocol Relating to the Status of Refugees, domestic laws and international treaty laws. These laws also uphold the right of a refugee / asylum applicant to *non-refoulement*, or, returning the child back to the country or authority he seeks asylum against (rogue agency- Jugendamt). As a result of this asylum application, jurisdiction over J A's asylum application had already been taken out of the hands of the California dependency court decision at the time of the ruling.

Therefore, returning him to Germany against his will while possessing a pending asylum application was unlawful, as federal law in U.S. supersedes any State court extradition, per "the Doctrine of Federal Preemption", from the Supremacy Clause of the U.S. Constitution. J. A. was also protected under a second asylum application, that of his mothers, since J. A. is a minor- SEE EXHIBIT A- Letter to DHS Secretary Jeh Johnson

10. After written and verbal pleas from attorneys and family were ignored, including to Sandra D. Anderson, ICE / DHS Chief Counsel of Los Angeles; ICE- FOD, David Jennings, and AFOD, Arturo Trevino, who have specific authority and responsibility to make lawful decisions for court appearances, (a constitutional right) , egregiously disregarded and knowingly violated the laws, treaties, and protections listed above, as they allowed (passing the buck) and supported the CA dependency court, and DCFS in violating multiple domestic laws and international treaty laws, as the dependency court, per Judge Julie Blackshaw, without jurisdiction, with no Hague convention return order, or binding court order from Germany, ordered DCFS to purchase a plane ticket to escort and return minor child back to Germany, before all administrative appellate and review options had been exhausted, violating the entire purpose of the asylum process. The FOD and AFOD are directly responsible for allowing these violations to occur.

11. J. A. was snatched from school against his will and put on a plane right before Christmas, ripped away and completely alienated from his entire family and known surroundings, returned to a country (Germany) where he knew no one, also deprived from all of his personal belongings.

12. Upon arrival he was placed in a crisis group in an orphanage, from 12/14-08/15, among kids from broken homes suffering (psychological trauma), therefore, exposing him to the type of harm from which his asylum- still pending- was meant to

protect him. <u>The family was put in an unbearable emotional situation, not knowing the</u> <u>whereabouts and safety of J. A.</u>

13. The child's removal was also fatal to the defense of Nicole and Petra's asylum cases, and ICE/DHS and the immigration courts were fully informed before the extradition, that the child (himself) were a large part of the merits of their asylum cases, as to which they lost as a result of being unable to present their "unique relief options" as a nuclear family (Jayson homeschooled, Illegal in Germany) to remain in the United States, like the German Romeike family in Tennessee. This completely destroyed any chances of appeal at the Board of Immigration Appeals. See <u>Romeike v. Holder (6th Cir 2013)</u> -Landmark case, allowing German homeschoolers to remain in the US, after lost asylum- awarded Indefinite Deferred Status by the Department of Homeland Security, and still  present in the US.

14. <u>Petra Albrecht and Nicole Albrecht Wheeler (Detained- 9/4/14)</u> After interrogations, Petra and Nicole were placed in the James A. Musick facility, Irvine, CA. After an initial six days together, ICE deportation office Nelly McKenna , and James A. Musick Deputy Patricia Holliday retaliated against the family, by threatening Nicole and Petra during the September 10th, 2014 conversation with them, specifically stating, If you both don't sign documents for your immediate deportation, we are going to separate you and make things very difficult. We will send one of you maybe out of the state to Arizona or worse if you do not sign the deportatiom documents". Nicole and Petra stated that they are filing for asylum, and that their brother / child J.A. is also protected under asylum, so it is their right to not be forced to sign deportation documents". A few hours after they refused to sign the documents, Petra was transfered from James Musick supposedly for medical reasons (complete fabrication by the two officers), therefore Nicole and Petra were retaliated against for excercising thier right to free speech. Petra never saw medical at the intake at Santa Ana, instead, the next morning she was interrogated by ICE without a translator and

no attorney and was transferred 100 miles further away from her child, family and legal counsel to the higher security, San Diego, Otay facility, even though she only speaks German. Upon arrival, and throughout the next year at Otay, she endured constant isolation, abuse and medical neglect, and routinely was placed in high level areas with criminals with serious convictions, even though she has no convictions.

15. Nicole also faced retaliation after 2 months at James A. Musick, in form of a transfer to a higher security jail (SACJ), for filing numerous grievances with the jail and federal government regarding inhumane detention conditions. Further retaliation against Nicole, in form of classification with convicted criminals also occured at the Santa Ana City Jail.

16. Nicole's Life threatened- by 11- year manslaughter detainee on January 16, 2015, only one week after she was placed in high level with convicted criminals with serious offenses. The incident was caught on video, and Nicole filed a police report the following day against the detainee, at the request of SACJ Sgt. Willard, after he assured Nicole no retaliation for filing a report, and assured her they would transfer the detainee to County Jail. But instead, Nicole was locked up in solitary confinement, or supposed "protective custody" for 23 hours per day, 14 days prior to her "already postponed" asylum hearing- and later, was also locked up 24 hours prior to her bond hearing date, 3/9/15. As a result, Nicole Albrecht was denied access to the outside world and recourse to legal aid, and prevented from communicating with her attorney, depriving her of her due process rights to prepare for her court hearings, which she then lost.

17. Pleas from attorney and family for Nicole's release to receive proper legal counsel were denied by ICE Supervisor, Andre Quinones, AFOD, Arturo Trevino, SACJ Supervisor Jaime Manriquez, and SACJ Director Christina Holland.

18. In a specific conversation between Nicole's husband, Richard Wheeler, and SACJ Supervisor Manriquez, Mr. Wheeler pleaded with Supervisor Manriquez in the lobby of the SACJ regarding his wife's right to legal counsel prior to her asylum hearing. Mr. Wheeler stated to Mr. Manriquez, "Sir, you cannot lock my wife up in solitary confinement for 14 days prior to her already rescheduled asylum hearing and deny her legal counsel, due to someone else threatening her life, after you and ICE put her life at risk in a Module with convicted criminals, and she needs to be free to speak with her attorney, Joshua Effron. Mr. Manriquez replied, "Sorry, but I'm not going to give your wife special treatment." Mr. Wheeler replied, "Special treatment, it's her constitutional right to have legal counsel, especially before her court hearings". Mr. Manriquez replied, "I don't know what to tell you Mr. Wheeler", then he stormed off into the jail complex leaving Mr. Wheeler in the lobby.

19. After filing more complaints with the federal government, citing neglect and mistreatment, including physical and verbal assaults, and medical neglect and violations of federal guidelines, Nicole was subject to further retaliatory actions and excessive punishment by ICE agents, and SACJ contractors. AFOD, Arturo Trevino and others threw Nicole into administrative segregation, or solitary confinement on multiple occasions, which contributed to her declining health (food withdrawal as punishment).

20. Documented acts of targeted, retaliatory actions by AFOD's, Supervisors and deportation officers, and SACJ supervisors and jail staff against Nicole, especially after Nicole and other detainees filed complaints (signed detainee statements of neglect & abuse against LA ICE field office), which followed by AFOD, Arturo Trevino backtracking, in efforts to cover up the abuse with the Director of the SACJ, Christina Holland (documented by attorney).

21. After humiliating strip searches without cause against Nicole and other women at SACJ, (14) detainees filed complaints against ICE for violating it's own guidelines and detention standards. After more strip searches, Nicole's personal accounts were part of the 1/25/16, CIVIC/ End Isolation Federal Civil Rights Complaint filed against the Santa Ana City Jail for "illegal strip searches", violating Performance-based national detention standards and the prison rape elimination act, including 4th Amendment violations.

22. Egregious Medical neglect and abuse in Detention- harassment, abuse and discrimination by ICE agents and their contractors they oversee. Nicole, who was living a healthy and very active/sports oriented lifestyle before detention continuously faced medical neglect and malnutrition, which included an early miscarriage, frequent chest pain, significant weight loss, a shoulder injury in van en-route to court, knee injury, all never attended to, and also suffered from severe emotional distress due to the loss of her brother.

23. Petra also had been subjected to mistreatment and miss-classification, being placed in high-level MOD's with convicted dangerous criminals, (drug felons and other convicts), fearing for her life, enduring retaliatory actions, lockdowns and transfers.

24. Petra suffered "well-documented" medical negligence and abuse while in detention, violations- against cruel and unusual punishment, as her health declined to a near fatal level during her 16 1/2 months detained, and should have been released, as she was too ill to be detained with no convictions. Petra had three ER visits (shackled up and belly chained) for serious heart palpitations, severe back pain and other ailments, only after family members or attorney's hounded the facilities repeatedly. Petra suffered symptoms rendering her unconscious, at Adelanto Detention Facility on 9/10/2015, suffering what she believed to be a heart attack, yet the facility and ICE only checked her blood pressure, refusing to take her to the ER. The advocacy

group/ attorneys, CIVIC/ End Isolation filed an emergency complaint with ICE & CRCL, only to receive a form letter weeks later.

25. Due to the medical neglect at Otay Detention Center, who tout their superior medical care, Petra developed serious health issues and was in excessive pain daily, after acquiring high blood pressure, accelerated heart rate, fluid on her heart, malnourishment, herniated discs, ovarian cysts, kidney stones, gastrointestinal perforation from pain killers, and suffering from chronic diarrhea, using 3-5 rolls of toilet paper daily, and defecating in the shower. Petra, who was also relatively healthy prior to the arrest, was now reduced sometimes to a cane, walker and wheelchair due to medical neglect. Also, since Petra was detained, unnecessarily, 100 miles South of court proceedings in Los Angeles, she was forced to endure bus travel for 20-22 hours each trip to and from court, in excruciating pain with (3) herniated discs and other serious health conditions mentioned, arriving at court in a wheel chair / walker or cane. The Otay facility and ICE dismissed our complaints of cruel and unusual punishment.

26. It is clear, that after dozens of written and verbal pleas from attorney and family for proper medical care were ignored by ICE AFOD, Arturo Trevino, and the Office of Inspector General, that the negligent medical care at the Otay Detention Facility are also systematic Constitutional violations from the medical staff, doctors and facility manager- ICE contractors and ICE itself.

27. It should be noted that the Otay Detention Facility, which was previously located at 446 Alta Road, even though operated by CCA, was a Department of Homeland Security Detention facility, and had major day-to-day, in-house detention over-site at the facility, including medical, as it only housed ICE and the U.S. Marshal Service detainees.

28. Petra was also transferred from Otay, San Diego to Adelanto Detention facility for attempting to exercise her 1st Amendment free right to speak to the media about conditions at Otay. But immediately after the Western Regional ICE Spokesperson, Virginia Kice spoke to the German media outlet RTL, who was scheduled to interview Petra, she was quickly transferred to Adelanto facility, and unable to be interviewed.

29. On 01/26/16, Plaintiffs Nicole and Petra Albrecht, while being treated like hardened criminals, were dragged onto an airplane in the form of a SWAT style commando raid, shackled up and belly chained for more than 18 hours and deported without clothes or any personal belongings, and dumped homeless in the wrong city, and released by ICE on 1/27/16.

## JURISDICTION AND VENUE

30. This court has jurisdiction over this case pursuant to 28 U.S.C.§§ 1331 because Plaintiff's claims arise under the U.S. Constitution and are authorized by *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics, 403 U. S. 388 (1971)*. Venue is proper in this district pursuant to 28 U.S.C. §§ 1391, because this is the judicial district in which events and omissions giving rise to the claims occurred and in which a defendants reside.

## PARTIES

### A. Plaintiffs

31. Plaintiff- Nicole Albrecht Wheeler, German citizen, the daughter of Plaintiff, Petra Albrecht, and sister of minor, J. A., was at all times material to this complaint a resident of Los Angeles County, until her unlawful physical removal from the United States.

32. Plaintiff- Petra Albrecht, German citizen, the mother of minor, J.A., and Plaintiff Nicole Albrecht Wheeler, until her unlawful was at all times material to this

complaint a resident of Los Angeles County, until her unlawful physical removal from the United States.

**B. " Federal Defendants"**

33. Defendant David Jennings was at all relevant times employed by the United States, DHS, and ICE as Field Office Director. At all times described in this Complaint, he was acting in his capacity as a sworn law enforcement or peace officer, agent, servant, or employee of the Federal Defendants, and under color of law and under color of legal authority. Plaintiffs sue Defendant Jennings in his individual capacity.

34. Defendant Arturo Trevino was at all relevant times employed by the United States, DHS, and ICE as Assistant Field Office Director. At all times described in this Complaint, he was acting in his capacity as a sworn law enforcement or peace officer, agent, servant, or employee of the Federal Defendants, and under color of law and under color of legal authority. Plaintiffs sue Defendant Trevino in his individual capacity.

35. Defendant Andre Quinones is and was at all relevant times employed by the United States, DHS, and ICE as Assistent Field Office Director. At all times described in this Complaint, he was acting in his capacity as a sworn law enforcement or peace officer, agent, servant, or employee of the Federal Defendants, and under color of law and under color of legal authority.
Plaintiffs sue Defendant Quinones in his individual capacity.

36. Defendant Nelly McKenna was at all relevant times employed by the United States, DHS, and ICE as Deportation Officer/Agent. At all times described in this Complaint, she was acting in her capacity as a sworn law enforcement peace officer, agent, servant, or employee of the Federal Defendants, and under color of law

and under color of legal authority. Plaintiffs sue Defendant McKenna in her individual capacity.

### C. " City Defendants"

37. Defendant Christina Holland was at all relevant times employed by the City of Santa Ana, California 92701. At all times described in this Complaint, she was acting in her capacity as Director of the Santa Ana City Jail (SACJ), under color of law and under color of legal authority. Plaintiffs sue Defendant Holland in her individual capacity.

38. Defendant Jaime Manriquez was at all relevant times employed by the City of Santa Ana, California 92701. At all times described in this Complaint, he was acting in his capacity as Supervisor at the Santa Ana City Jail (SACJ), under color of law and under color of legal authority. Plaintiffs sue Defendant Manriquez in his individual capacity.

### D. " County Defendant"

39. Defendant Patricia Holliday was at all relevant times employed by the Orange County Sheriff's in Irvine, California 92618. At all times described in this Complaint, she was acting in her capacity as Deputy at the James Musick facility, under color of law and under color of legal authority. Plaintiffs sue Defendant Holliday in her individual capacity.

## FACTUAL ALLEGATIONS
### Unlawful Strip Search (4th Amendment)

* Corrected factual allegation for Causes of Action First Claim of Relief

40. On December 21, 2015, at 3:00 a.m., Ms. Wheeler was transported to court, handcuffed and was the only person in the transportation vehicle going to court. The portion of the vehicle in which she was held was freezing cold and under video surveillance.

When she arrived at the immigration courthouse in Los Angeles Officers patted her down, and then placed her in the holding cell under video surveillance. At 8:00 a.m., she was patted down again, handcuffed at the feet and hands, and taken into court. After her court hearing, she was patted down again, then placed in the same holding tank. Prior to be taken to the Santa Ana Jail, she was patted down again, handcuffed, and put into the transportation vehicle. Again, the heater was supposedly not working, and she remained freezing cold during the 1.5 hour journey back to the Santa Ana City Jail under video surveillance.

41. Ms. Wheeler arrived at the jail at approximately 6:30 p.m., and she was placed in a holding cell for 10 minutes. Then, a female officer took her out of the cell, and took her to a separate room. The officer told Ms. Wheeler that she had to take off her clothes, but Ms. Wheeler refused and cited ICE's Performance-Based National Detention Standards (2011 ICE PBNDS) at § 2.10.
Ms. Wheeler offered to show the officer a copy of the Standards, but the officer did not want to review them. Instead, she was put in a room and left alone for approx. three minutes.

42. The same officer returned along with two other female officers and one male supervisor. The three female officers took her into another room ganged up on her and demanded that she take off her shoes and socks. Ms. Wheeler complied. Then, the three officers demanded that she take off her clothes, and Ms. Wheeler refused, once again appealing to the ICE PBNDS Standards.
All three officers refused to consult the Standards. The officers then grabbed Ms. Wheeler's arm and took her out of the room barefoot. The officers pulled Ms. Wheeler's arms behind her back and cuffed them and took her downstairs in an elevator to booking.

43. During this entire ordeal, Ms. Wheeler remained barefoot, walking on the jail floors. The officers then placed Ms. Wheeler into a booking cell. They hurt her when removing handcuffs from her body, nearly pulling her arms from their sockets, she

asked for her shoes and socks, but they refused. The holding cell was freezing cold. Then, the male supervisor came to speak with Ms. Wheeler, and he tried to encourage her to consent to the strip search. She explained to him that he must have a justified reason, and she once again cited the ICE Detention Standards. He replied that he did not care, and that he only goes by his policy.

44. Ms. Wheeler requested a copy of the jail policies, but he refused. She again stated that she was in the custody of ICE and that the ICE Standards apply to her. According to Ms. Wheeler, the officer then said, "I don't care what they call you guys—detainees, inmates, refugees or arrestees—whatever you want to call that, we treat you the same, and that's why we house you together. Since I cannot send you back to housing, they [ICE] can send you to Arizona. This here [Santa Ana City Jail] is the best facility." He also told Ms.Wheeler that he knows about her case, asking why she always makes trouble by filing complaints and that she should submit to the strip search and then file a grievance later.

45. She continued to refuse the strip search, and he said that he would have to keep her in the holding cell until she consents. He along with another female officer continued to come back to her cell every few minutes encouraging her to consent to the strip search. Around 7:30 p.m., the male officer came into the cell and said that Ms. Wheeler was being put on "pre-discipline" for refusing the search and that they had spoken to federal Defendants AFOD Andre Quinones and Trevino and FOD David Jennings as well, as SACJ Director Christina Holland, who all approved the procedure and who would be transferring Ms. Wheeler to the Otay Detention Facility in San Diego in the morning if she doesn't comply with the strip search.

46. Ms. Wheeler asked to speak with her attorney. The officer retaliated and refused her the ability to call her attorney, Josh Effron, and said she would be able to make the call from San Diego. As Ms. Wheeler was afraid to be sent to San Diego or Arizona, further away from her attorney and her U.S. citizen husband who are both based in Los Angeles. As a result, she called the officer back into her cell about 10 minutes later and agreed to the strip search, after being threatened and coerced into it.

47. After being forced to the strip search, she was told to strip naked and the officer performed a visual inspection of the breasts, armpits, buttocks, and genitalia of her. Ms. Wheeler was told to lift up their breast, spread apart the sides of their labia and to pull back her clitoral hoods to prove that she was not hiding contraband in the vagina or vulva. She was told to bend at the waist, spread her buttocks, and cough three times.

48. At about 8:00 p.m., the officer brought her back upstairs to her jail cell. She was locked in her cell without the opportunity to use the day room or have dinner, food withdrawal as punishment for 48h. Her cellmate asked one of the guards if she could bring her some clean water, and the guards refused. She remained locked in her cell for the next 24 hours.

49. On December 30, 2015 an unknown detainee returned from the same court as Ms. Wheeler and was not subjected to a strip search and was immediately processed to her Unit.

50. Ms. Wheeler's attorney, Josh Effron, emailed the Santa Ana City Jail Director, Christina Holland, on January 10, 2016, to ask for documentation about the strip Search. Defendant Administrator Christina Holland responded that although "strip searches are conducted and documented in accordance CA Penal Code, Department policies and ICE standards," she would "not release strip search documents without a court order.

51. Less than 72 hours later, Ms. Wheeler was transported to the ICE office in Los Angeles, before a series of transfers to a holding cell in Arizona, the LaSalle Detention Facility in Louisiana, and finally the Chautauqua County Jail in New York.

52. Less than 24 hours after Christina Fialho (attorney and coexecutive director of Communnity Initiatives for Visiting Immigrants in Conefinement (CIVIC) and board member of the ACLU) filed a **Federal Civil Rights Complaint** against ICE and the City of Santa Ana, documenting **Santa Ana City Jail's Illegal Strip Searches of Women**, on behalf of Ms. Wheeler and (30) other detainees, ICE deported Ms. Wheeler with no warning to her attorney or her husband, a U.S. citizen in a

1   Gulfstream private luxury jet, which cost the American taxpayer more than
2   $600,000.

3   53. The complaint explains that Santa Ana City Jail's strip search policy and practice
4   directly violates ICE's Performance-Based National Detention Standards and the
5   Prison Rape Elimination Act. The policy and practice also violates California Penal
6   Code section 4030, which prohibits strip searches without reasonable suspicion that
7   the person is concealing weapons or contraband. The strip searches also violate the
8   Fourth Amendment to the U.S. Constitution, and may amount to cruel and unusual
9   punishment under the Eighth Amendment. SEE EXHIBIT A
10  CIVIC's complaint ultimately resulted in the termination of the City of Santa Ana's
11  contract with ICE.

12  54. Plaintiff Wheeler is informed and believes, and therefore alleges, that defendants
13  SACJ Director Christina Holland, as well as federal defendants Jennings, Trevino and
14  Quinones routinely follow their policy, practice, and customs of subjecting
15  immigration detainees, including plaintiff, to strip and visual body cavity searches
16  without first having and recording in writing, a reasonable suspicion that the search
17  will be productive of contraband or weapons.

18  55. Strip search conducted against Ms. Wheeler at the Santa Ana City Jail was conducted
19  without reasonable suspicion, in unsanitary condition and unnecessary and turned into
20  blatant abuse of power by the conducting officer. The requirement for reasonable
21  suspicion has been part of ICE's Performance-Based National Detention Standards
22  since at least 2007.

23  56.  Immigration detainee's strip search is governed by section 2.10 of the
24      2011 (revised 2016) ICE Performance Based Detention Standards (PBNDS), at §
25      2.10.

26  57. **ICE and the Santa Ana City Jail are under notice of the disturbing blanket strip
27      search policy, practice, or custom.**
28      Organizations, including the Transgender Law Center (TLC) and Familia, have raised
        the issue of strip searches with the Los Angeles ICE Field Office, ICE's National

Office, and with the Santa Ana City Jail directly for years. As far back as April 2011, the National Immigrant Justice Center filed a multi- individual complaint regarding the mistreatment and abuse of sexual minorities in ICE custody, which included the singling out of a trans women for public searches in which officers mocked her breasts. More recently, in August 2015, 22 LGBT individuals detained at the Santa Ana City Jail signed and submitted a complaint, explaining that "the LBGT community considers ourselves humiliated and demoralized. The majority of the official's lack professional etiquette. We consider the search of private parts ... an unnecessary practice."

58. On September 8, 2015, TLC sent an email to Andrew Lorenzen-Strait and Richard Rocha at ICE's National Office reiterating the concerns voiced in the complaint and attaching the petition. TLC sent another similar email to Defendant Director Christina Holland of the Santa Ana City Jail and Jorge Field, an Assistant Field Office Director (AFOD) in ICE's Los Angeles Office. Flor Bermudez, TLC's Managing Attorney and Detention Project Director, also raised the concerns regarding the strip search procedure at the last two Non-Governmental Organization meetings with ICE on October 1, 2015, and on January 7, 2016. The recurring stories of re-traumatization that TLC has heard from the transgender women at the Santa Ana City Jail provides clear evidence that the strip search procedure is actively harming these women, as it is causing symptoms of post-traumatic stress and triggering feelings of isolation and powerlessness.

59. On November 18, 2015, Ms. Wheeler herself launched a complaint prior to her unlawful strip search ordeal on December 21, 2015 with (15) fellow detainees directly to the ICE Field Office and Federal Defendant Jennings, Trevino and Quinones, as well as a copy to City Defendant and SACJ Director Holland. Addressing the humiliating and unnecessary strip searches at the SACJ, and the effect to their mental well being. SEE EXHIBIT B

60. **Strip searches require individualized reasonable suspicion under ICE's Standards, California law, and the U.S. Constitution.**

**ICE Standards expressly prohibit strip searches absent individualized reasonable suspicion.**

It should go without saying that officials at the Santa Ana City Jail are under an obligation to uphold California laws, while also abiding by the U.S. Constitution and federal standards. Federal standards expressly prohibit strip searches in the immigration detention context, absent individualized reasonable suspicion of contraband possession. Under ICE's 2011 Performance-Based National Detention Standards (PBNDS), to which the Santa Ana City Jail is contractually bound, a "strip search shall be conducted only when properly authorized by a supervisor and only in the event that there is reasonable suspicion that contraband may be concealed on the person, or when an officer has reasonable suspicion that a good opportunity for concealment has occurred or as may be outlined in facility procedures for post contact visits."

61. Ms. Wheeler under went at least 4 pat down searches prior to her arrival back into the SACJ facility and was under permanent video surveillance the entire time at the federal building in Los Angeles and during her transport in the van forth and back from immigration court to SACJ, this precludes a reasonable suspicion and probable cause.

62. **California Penal Code Section 4030 prohibits visual strip searches absent individualized reasonable suspicion, and prohibits physical body cavity searches by non-medical personnel.**

The Standards reflect state and federal law, which generally prohibit suspicion-less strip searches. In California, people in places of incarceration who are subjected to a strip search fall into one of three categories: (1) arrestees strip searched before being admitted to jail; (2) arrestees strip searched pursuant to California Penal Code section 4030; and (3) prisoners searched because jail officials have reasonable suspicion that the prisoner is concealing weapons or contraband. The U.S. Supreme Court has found that officials may strip-search people arrested for any offense, however minor, before admitting them to jails even if the officials have no reason to suspect the presence of

contraband. *Florence v. Board of Chosen Freeholders*, 566 U.S. (2012). Two years earlier, the Ninth Circuit held similarly, explaining that conducting a visual strip search for weapons and drugs before placing even new arrestees in the general jail population did not violate their Fourth Amendment rights. However, once the person is admitted and placed into the general jail 595 F.3d 964, 966 (9th Cir. 2010). population, other standards apply. California defines a strip search as "a search which requires a person to remove or arrange some or all of his or her clothing so as to permit a visual inspection of the underclothing, breasts, buttocks, or genitalia of such person." Cal. Pen. Code § 4030(c). "Persons conducting a strip search or a visual body cavity search shall not touch the breasts, buttocks, or genitalia of the person being searched." Cal. Pen. Code § 4030(j). Section 4030 requires that a misdemeanor or infraction arrestee not be strip searched absent reasonable suspicion that the arrestee is concealing weapons or contraband. Cal. Pen. Code § 4030(f). Moreover, no "strip search or visual body cavity search or both may be conducted without the prior written authorization of the supervising officer on duty. The authorization shall include the specific and articulable facts and circumstances upon which the reasonable suspicion determination was made by the supervisor." Cal. Pen. Code § 4030(f). A physical body cavity search, as opposed to a strip search, "shall be conducted under sanitary conditions, and only by a physician, nurse practitioner, registered nurse, licensed vocational nurse or emergency medical technician Level II licensed to practice in this state." Cal. Pen. Code § 4030(k). No misdemeanor or infraction arrestee "shall be subjected to a physical body cavity search except under the authority of a search warrant issued by a magistrate specifically authorizing the physical body cavity search." Cal. Pen. Code § 4030(h). The authorization under subsection (f) and subsection (h) must be "placed in the agency's records and made available, on request, to the person searched or his or her authorized representative." Cal. Pen. Code § 4030(i).

After *Bull*, California Penal Code section 4030 remains law, and even misdemeanor or infraction arrestees cannot be strip searched before being placed into the general

jail population, unless all of the following are true: "(i) The person is not cited and released. (ii) The person is not released on his or her own recognizance pursuant to Article 9 (commencing with Section 1318) of Chapter 1 of Title 10 of Part 2. (iii) The person is not able to post bail within a reasonable time not less than three hours." Cal. Pen. Code 4030(g). After the Ninth Circuit ruling in *Bull*, a California court made it very clear that section 4030 could still have been violated. *Bull v. City and County of San Francisco*, 758 F.Supp.2d 925 (N.D. Cal. 2010) (explaining that a section 4030 claim would have been available even after the Ninth Circuit ruling in *Bull* had the class contained a representative who was searched before being given a reasonable opportunity of at least three hours in which to post bail).

Although section 4030 does not explicitly apply to people in immigration detention, it is likely that a court would find that the section does apply to people in immigration detention in California because the intent of the legislature in enacting this section is to "protect the state and federal constitutional rights of the people of California by establishing a statewide policy strictly limiting strip and body cavity searches." Cal. Pen. Code § 4030(a). People in ICE custody, like misdemeanor and infraction arrestees, are not in custody for the conviction of a crime. In fact, people in ICE custody are not in custody for a criminal charge; they are civil detainees awaiting determination of a civil removal order. The same policy purposes that led the legislature to adopt special protections for misdemeanor arrestees should apply to civil detainees. Moreover, the Ninth Circuit has recognized that "[w]ith respect to an individual confined awaiting adjudication under civil process, a presumption of punitive conditions arises where the individual is detained under conditions identical to, similar to, or more restrictive than those under which pretrial criminal detainees are held . . ." *Jones v. Blanas*, 393 F.3d 918, 934 (9th Cir. 2004). Accordingly, treating a civil ICE detainee any worse than a misdemeanor arrestee is treated creates a presumption that the treatment is unconstitutionally punitive. Under California Penal Code section 4030, the Santa Ana City Jail would need reasonable suspicion to search a person in immigration detention. And because people in

immigration detention are not provided with the opportunity to seek, let alone, post a bail within three hours, a strip search of an individual prior to being first placed in the general jail population may also violate California Penal Code section 4030(g).

63.  In addition to violating California Penal Code section 4030 whenever it conducts a strip search of a person in immigration detention without reasonable suspicion, the Santa Ana City Jail also violated California Penal Code section 4030(i) by refusing to provide Ms. Wheeler and her authorized representative, Joshua Effron, with a copy of the authorization document for her strip search on December 21, 2015. The Santa Ana City Jail also violated its own jail policy, which requires strip search documentation to be made available to the person searched and her authorized representative.

64.  Even if California Penal Code section 4030 does not apply to people in immigration detention, people in immigration detention would fall into the third category of people searched, and reasonable suspicion would be required prior to a strip search nonetheless. Unlawful strip searches violate an individual's right to privacy under Article 1, Section 1 of the California Constitution. *See White v. Davis*, 13 Cal. 3d. 757 (1975); *Hill v. NCAA*, 7 Cal.4th 1 (1994); *American Airlines, Inc. v. Superior Court*, 114 Cal. App. 4th 881 (2003).

65.  **The U.S. Supreme Court, the Ninth Circuit, and California courts have interpreted the Fourth Amendment to prohibit strip searches absent individualized reasonable suspicion.**

Under the U.S. Constitution, the Fourth Amendment is the governing standard for carceral strip searches. *Way v. County of Ventura*, 445 F.3d 1157, 1161-62 (9th Cir. 2006) (holding that a county jail's blanket strip search policy violated the Fourth Amendment); *Jordan v. Gardner*, 986 F.2d 1521, 1524 (9th Cir. 1993) (en banc) (the "Fourth Amendment guarantees the right of the people to be secure against unreasonable searches, and its protections are not extinguished upon incarceration"); *Thompson v. Souza*, 111 F.3d 694, 699 (9th Cir. 1997) (same). In *Bell v. Wolfish*, 441 U.S. 520 (1979), the Supreme Court created a balancing test for determining if a

person's Fourth Amendment right to be free from unreasonable searches in the carceral context has been violated. Courts assess the constitutionality of a strip search by balancing "the need for the particular search against the invasion of personal rights that the search entails." *Id*. at 559. This requires courts to weigh "the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted." *Id*.

Applying this balancing test, California courts have held that a blanket strip search policy for arrestees after returning from court is unconstitutional. *Craft v. County of San Bernardino*, 468 F. Supp. 2d 1172, 1179 (C.D. Cal. 2006) (policy of strip searching all arrestees who are returned to a jail facility from court violates the Fourth Amendment). These constitutional protections apply to people in the immigration detention context. *Flores v. Meese*, 681 F. Supp. 665 (C.D. Cal. 1988) (holding unconstitutional routine strip search of juveniles at INS detention facilities stating that they have a reasonable expectation of constitutional protections it was "axiomatic that a strip search entails perhaps the most severe intrusion upon personal rights").

In alignment with California Penal Code section 4030, the U.S. Supreme Court and the Ninth Circuit have held that physical cavity searches are generally not permissible without a search warrant. *United States v. Fowlkes*, 804 F.3d 954 (9th Cir. 2015) (holding that police officers violated Fourth Amendment when subjecting a man during the jail intake process to a physically invasive search and seizure from defendant's rectum).

Even if the strip search policy, practice, or custom at Santa Ana is constitutional on its face, if it is conducted in an unreasonable manner or goes too far in scope, it can still be considered unconstitutional as applied. Carceral strip searches that are "excessive, vindictive, harassing, or unrelated to any legitimate penological interest are not reasonable." *Michenfelder v. Sumner*, 860 F.2d 328, 332 (9th Cir. 1988). Moreover, California law specifically requires that all California prisoners be searched "in a professional manner."

The Santa Ana City Jail cannot justify its policies on grounds of administrative convenience. *Rufo v. Inmates of Suffolk County Jail*, 502 U.S. 367, 392 (1992) ("financial constraints may not be used to justify the creation or perpetuation of Constitutional violations."); *Stone v. City and County of San Francisco*, 968 F.2d 850, 858 (9th Cir. 1992) ("federal courts have repeatedly held that financial constraints do not allow states to deprive persons of their constitutional rights"). The Santa Ana City Jail and ICE's conduct concerning strip searches clearly violates California and federal law as well as ICE's standards.

66. As a result of the abuse during 12/21/15 unlawful strip search- barefoot torture under freezing cold condition Ms. Wheeler got sick a few days after that, which included severe ovary and stomach pain and abnormal bleeding, which never were attended to, even after repeated requests with ICE and the SACJ Defendants and others (see Second Claim for Relief).

67. Ms. Wheeler recently came to learn (NEW DISCOVERED EVIDENCE) that she is suffering from a huge abdominal mass, tumor that strongly suggest malignancy as a direct result of unconstitutional actions prior, during and after the unlawful strip search against her. Ms. Wheeler is currently awaiting further diagnosis and will submit all relevant evidence upon discovery.

68. Additionally since Ms. Wheeler was forced to expose vulnerable parts of her body to people who exercised power over her in nearly every way imaginable. Ms. Wheeler is still dealing with the humiliating and degrading search and suffers from Post Traumatic- Stress Disorder, causing her anxiety, inability to concentrate, and sleep Disturbance.

Studies have shown that strip searches exacerbate mental illness and make reentry into society more difficult. Strip searches cause psychological damage, such as sleep disturbance, recurrent and intrusive recollections of the event, inability to concentrate, anxiety, depression, and development of phobic reactions.

69. **Defendants' Failure and Refusal to Change the Disturbing Blanket Strip Search Policy Despite Repeated Pleas from National Human Rights Organizations:**

Each of the Defendants caused injury and damage to Plaintiff by acting jointly or conspiring with others to act; authorizing or allowing, explicitly or implicitly, policies, plans, customs, practices, actions, or omissions that led to the unlawful conduct; failing to take action to prevent the unlawful conduct; failing or refusing to initiate and maintain adequate training or supervision; being deliberately indifferent to Ms. Wheeler's rights; and ratifying the unlawful conduct that occurred by Defendants under their direction and control, including failing to take remedial or action.

70. The Federal Defendants Jennings, Trevino and Quinones, as well as City Defendant SACJ Director Christina Holland were all under notice of the disturbing blanket strip search policy, practice, or custom, since numerous organizations have raised the issue of strip searches with the Los Angeles ICE Field Office, ICE's National Office, and with the Santa Ana City Jail directly for years. As far back as April 2011, the National Immigrant Justice Center filed a multi- individual complaint regarding the mistreatment and abuse.

71. Before and after the unlawful strip search of Ms. Wheeler, national organizations condemned ICE's and SACJ routine use of the disturbing blanket strip search policy.

72. **Defendants' Knowledge of and Acquiescence in Numerous Prior Disturbing Strip Searches Under the Blanket Policy:**
Additionally Ms. Wheeler herself launched a complaint with (15) fellow detainees on November 18, 2015 directly prior to the incident involving the unlawful strip search Claim.

73. **Defendants' Knowledge of and Acquiescence that the Disturbing Blanket Strip Search Policy Was Appropriate:**
Despite this notice, the Federal Defendants and City Defendant Christina Holland failed to make any attempts to prevent further mistreatment and discrimination, promptly develop policies to address the violation, and to provide ongoing oversight on the implementation of changes. This inaction by all defendants indicates either tacit approval of or deliberate indifference to the disturbing strip search policy,

practice, or custom.

74. Federal Defendants and City Defendant failed to take any steps to reform the strip search policy, practice, or custom, despite complaints from numerous organizations for years.

75. Despite knowing or having reason to know of the use of the disturbing blanket strip search policy, practice, or customs, mistreatment and abuse, the Federal Defendants and City Defendant failed to take timely and effective measures to prohibit, prevent, these violations.

76. The Federal Defendants' and City Defendant' failures constituted a willful tolerance of and deliberate indifference to conditions that they knew and had reason to know would lead to the use of the disturbing blanket strip search policy, practice, or customs, mistreatment and abuse. All of the Defendants had an actual opportunity and a legal duty to prevent mistreatment, abuses by their subordinates before Ms. Wheeler went through her unlawful strip search ordeal, yet failed to take the necessary and required action. As a direct and foreseeable result of this failure, the SACJ Staff blatantly abused their authority and violated Ms. Wheeler's rights by conducting the strip search.

77. Despite actual knowledge of the disturbing blanket strip search policy and it's open and notorious conflict with fundamental human and civil rights, each of the Defendants failed and refused to modify the disturbing strip search policy in order to conform it to the requirements of law, ICE Performance Based National Detention Standards and the federal Prison Rape Elimination Act.

78. Despite each Defendant's actual knowledge, none of them objected to or demanded a stop to the systematic use of the unlawful strip search. Because of the lack of objection, intervention, or clarification by any Defendant, SACJ Staff considered the disturbing blanket strip search policy to be approved all the way up the chain of command. When the SACJ Staff conducted the unlawful strip search on Ms.Wheeler on of December 21, 2015, they did so knowing that the Defendants had for years known of, acquiesced in, and condoned other similar unlawful strip searches.

79. Defendant David Jennings served as the Field Office Director for ICE Los Angeles, and was the commanding officer of AFOD Trevino and Quinones, and was responsible by law for enforcing the United States Constitution, laws, and regulations and for ensuring that ICE agents are properly trained and obey the laws of the United States, policies and regulations of ICE National Detention Standards, as well as the contracted SACJ facility in charge of City Defendant Holland, in which Ms. Wheeler was housed for her immigration detention, since she was in ICE custody and the facility was under contract with ICE.

Upon information and belief, Defendant Jennings was personally responsible for approving and implementing the disturbing blanket strip search policy, practice, or custom, that resulted in Ms. Wheeler's unlawful strip search ordeal. Plaintiff sues Defendant Jennings in his individual capacity.

80. Defendant Quinones and Trevino served as the Assistant Field Office Director for ICE Los Angeles, and were responsible by law for enforcing the United States Constitution, laws, and for ensuring that the ICE contracted SACJ in charge by City Defendant Holland obeys the U.S. constitution and laws, and regulations and policies of the ICE National Detention Standards. Upon information and belief, Defendant Quinones and Trevino were personally responsible for approving and implementing the disturbing blanket strip search policy, practice, or  custom, that resulted in Ms. Wheeler's unlawful strip search ordeal. Plaintiff sues Defendant Quinones and Trevino in their individual capacity.

81. Defendant Holland served as the Director/ Administrator of the Santa Ana City Jail (SACJ), and was responsible by law for enforcing the United States Constitution and laws, and regulations and for ensuring that the SACJ Staff is properly trained and obey the laws of the United States, policies and regulations. Upon information and belief, Defendant Holland was personally responsible for approving and implementing the specific disturbing blanket strip search policy, that resulted in Wheeler's unlawful strip search ordeal. Defendant Holland also had direct responsibility for and oversight over the training of SACJ Staff at the SACJ.

1   Plaintiff sues Defendant Holland in her individual capacity.

2   82. Defendants were at all relevant times personally responsible for developing,
3   authorizing, supervising, and/or implementing the policies, patterns, or practices
4   governing the SACJ Staff's use of the unlawful strip search. Each Defendant in fact
5   knew of, approved, and implemented the unlawful Disturbing Blanket Strip Search
6   Policy.

7   <div align="center">Due Process Violation (5th Amendment)</div>

8   83. On September 4, 2014, Plaintiff Petra Albrecht's minor son J.A. was taken into
9   custody by the Los Angeles Department of Children and Family Services (DCFS)
10  without a warrant, after Ms. Albrecht (primary caretaker) herself was taken into ICE
11  custody. The DCFS failed to leave the child in the care of maternal grandmother or
12  son in law Richard Wheeler, and instead placed the child in foster care.

13  84. DCFS and ICE also failed to provide any information about the whereabouts of the
14  child for a couple of days and that DCFS had initiated a case and filed a petition at the
15  Edmund Edelman Dependency Court in Monterey Park, CA 91754, against Ms.
16  Albrecht.

    There were approx. 7 court hearings conducted regarding minor J.A.

    1.) 9/9/2014

    2.) 9/26/2014 (matter continued to 10/22 – reason failure to appear parent)

    3.) 10/10/2014

    4.) 10/22/2014

    5.) 10/29/2014

    6.) 10/30/2014 (private counsel Scott Clark appeared in court)

    7.) 12/03/2014 (represented by private counsel)

    85. In the beginning of the case, J.A. was represented by a court appointed
    attorney and Ms. Albrecht was also represented by a court appointed attorney, who
    never had any personal or other contact with Ms. Albrecht and never provided any
    information regarding the case to her, and which she only received through family
    members.

86. J.A. appointed counsel was fully aware of that Ms. Albrecht was not allowed to attend court hearings by Defendants, after son in law Mr. Wheeler emailed Ms. Shalew, on 10/15/14. On October 28, 2014 Immigration attorney Joshua Effron had communication with. J.A. court appointed attorney Shalew advising her about Ms. Albrecht's withholding or removal/asylum claim and that her minor child's immigration proceedings are to be consolidated with her proceedings. Additionally J.A. is currently applying for an affirmative asylum claim as well.

87. On September 10, 2014, shortly after the first hearing on September 9, 2014, Ms. Albrecht got transferred to San Diego, Otay facility, far away from her family, son and especially from the Edmund Edelman Dependency Court. This action came in retaliation by Defendants as set forth under causes of <u>Action Count 3- First Amendment Violation – Retaliation</u> and additionally resulted in Ms. Albrecht's inability to attend court regarding her minor son J.A., or even visits with her son (ordered by the Dependency Judge).

88. Throughout the entire time of the dependency proceedings Ms. Albrecht and family members (including daughter and Plaintiff Wheeler), and immigration attorney Joshua Effron made numerous requests to Defendants at no avail, so that Ms. Albrecht would be taken to the proceedings, in order to attend and receive fundamentally fair, orderly and just judicial proceedings, to protect her fundamental rights as a parent, to make decisions concerning the care, custody, and control of her minor child without regard to the child's citizenship, as provided for and limited by applicable law. And to defend herself and to not lose parental rights, custody of her son and to prevent the illegal extradition out of the U.S. And also requested Defendants to facilitate visits with her son (court ordered)

89. After already missing the first hearing on September 9, 2014, Ms. Albrecht's son in-law, Richard Wheeler called Defendant Trevino at the ICE LA Field Office on September 20, 2014 and left messages about Ms. Albrecht being taken from James Musick facility in Irvine, Orange County and transferred to Otay, San Diego, and

that Defendants Jennings and him are preventing Ms. Albrecht from attending her own court hearings regarding her minor son, and visitation by not addressing any of the requests submitted to them. Mr. Wheeler further explained and demanded, that they allow Ms. Albrecht to the next, and all court hearings- as it's her right, and they are violating their own ICE Directive on Facilitating Parental Rights (released 08/13)

90. Defendants Trevino, nor Jennings did return any of the phone calls and ignored all requests from Ms. Albrecht, or on behalf of Ms. Albrecht. On October 16, 2014 after being denied attending 3 Court hearings, Mr. Wheeler faxed a complaint to ICE National regarding these violations against Ms. Albrecht, after repeated attempts to get approval from Defendants and ICE deportation officers Fuentes, Garcia and Ortiz. All of them stalled this matter.

91. On 10/22/14 Ms. Albrecht's son in-law, Richard Wheeler again contacted Defendant Trevino, explaining again how she was taken from James Musick facility, and placed in San Diego, 100 miles and 2 hours further from her child and court location, still violating Ms. Albrecht's Parental Rights and their own Directive, by continuing to prevent her from attending her child's dependency hearings and not facilitating any court ordered visits with her son.

92. On October 30, 2014 Ms. Albrecht was represented by private counsel Scott Clark. Mr. Clark filed a Motion to Strike on 12/03/14 in which he stated to the court that it is proven that the child J.A. was never the proper subject to this court. No abuse no neglect, therefore no dependency matter. After the Judge denied the Motion, she stated to Mr. Clark at the December 3, 2014 (final) hearing, that the court appointed attorney for Ms. Albrecht should have stated it at the first hearing.

93. It should be noted again, that there was no contact between Ms. Albrecht's court appointed attorney and her, especially in light of the fact that Defendants deprived Ms. Albrecht of her due process right to attend court proceedings and meeting with the court appointed attorney.

94. On December 17, 2014 J.A. got illegally extradited back to Germany with 2

pending asylum claims (both against his will and against the law inasmuch as a final decision had not yet been reached on his application) and Ms. Albrecht was helpless to prevent this from happening as she wasn't able to attend court proceedings of her and her child's case, meaning she wasn't able to defend herself, make decisions, protect her fundamental rights as a parent, or act as a witness. This influenced the entire court proceedings beginning from September 9, 2014- December 3, 2014. Ms. Albrecht lost custody of her minor son and to this day has not seen or any contact with him. In fact after the illegal return of J.A. to Germany, the child and Ms. Albrecht and family were exposed to retaliation of the German Authorities, as a result of filing for asylum and withholding of removal, which was the harm J.A. and Plaintiff filed for protection for.

95. On August 23, 2013, U.S. Immigration and Customs Enforcement (ICE) issued the *Facilitating Parental Interests in the Course of Civil Immigration Enforcement Activities* Directive (Parental Interests Directive). This directive complements existing policy by helping ICE better manage and track cases involving detained alien parents or legal guardians who have minor children who are U.S. citizens or lawful permanent residents, or are primary caretakers of minor children without regard to the dependent's citizenship. The directive guides the agency to enforce immigration laws fairly and with respect for a parent's/guardian's rights and responsibilities. SEE EXHIBIT C

The Parental Interests Directive contains several elements related to the operations of ICE's Enforcement and Removal Operations (ERO) field offices' handling of cases involving primary caretakers, parents or legal guardians of minor children, and particularly focuses on aliens involved in family court or child welfare proceedings. These elements include, among others:

1. Designating a specific point of contact within each field office for parental-interests matters

2. Determining detention placement;

3. Facilitating court participation;

4.  Allowing parent-child visitation;

The Directive establishes ICE policy and procedures to address the placement, monitoring, accommodation, and removal of certain alien parents. The Directive is particularly concerned with non-citizen parents or legal guardians who are: 1) primary caretakers of minor children without regard to the dependent's citizenship; 2) parent and legal guardians who have a direct interest in family court proceeding involving a minor or child's welfare proceedings in the United States; and 3) parents or legal guardians whose minor children are U.S. citizens (USCs) or lawful permanent residents (LPRs).

The Directive instructs officers to refrain from initial placement in detention of certain qualifying parents or legal guardians, and, if detention is necessary, to place the detained parent or legal guardian as close as practicable to his or her children or to the location of pending family court proceedings. The Directive also instructs that ICE should arrange for the detained parent or legal guardian's attendance at family court proceedings, either in person or via video/teleconferencing.

96. ICE is also directed to allow visitation by family to the extent practicable. ICE is directed to facilitate the coordination of the care or travel of minor children, pending the removal of the parent or legal guardian. The Directive is intended to keep children from entering the child welfare system when a parent is detained or removed, and to ensure that detained and removed parents are able to participate in child welfare proceedings that impact their parental rights. It does not address visitation of detained children or parental participation in detained children's immigration proceedings. Implementation of the directive will be channeled through Parental Rights Coordinators, who will be designated by each ICE Executive Removals Operations office to serve as the primary point of contact and expert on the subject.

97. The Field Office Director (FOD shall refrain from making initial placement or from subsequently transferring the alien outside the AOR of apprehension unless necessary for the reasons 5.2 (3) of ICE policy 11022.1 Detainee Transfer, if the aliens child or family court or welfare proceedings are within the AOR of initial

apprehension. Further and subject to detention space availability, the FOD will initially place the detained alien parent as close as practicable to the aliens child or the location of the aliens family court or child welfare proceedings.

98. Enforcement and Removal Operations (ERO) and Field Office Directors (FODS) and their staff or designess have responsibilities under Section 5.1 through 5.7.

99. Defendant David Jennings served as the Field Office Director for ICE Los Angeles, and was the commanding officer of AFOD Trevino, and was personally responsible by law for enforcing the United States Constitution, laws, and regulations and for ensuring that ICE agents are properly trained and obey the laws of the United States, policies and regulations of the ICE Directive. Plaintiff sues Defendant Jennings in his individual capacity.

100. Defendant Trevino served as the Assistant Field Office Director for ICE Los Angeles and was personally responsible by law for enforcing the United States Constitution, laws and regulations and for ensuring that ICE agents are properly trained and obey the laws of the United States, policies and regulations of the ICE Directive. Plaintiff sues Defendant Trevino in his individual capacity.

101. Upon information and belief, the act was performed, at the instigation, under the control or authority of, with the knowledge, consent, direction or acquiescence of, the Defendants named in this action. By refusing to follow the law, Defendants have caused, and will continue to cause, Plaintiff Albrecht concrete and demonstrable injuries and irreparable harm.

102. Despite repeated notice to the Federal Defendants about Ms. Albrecht's need to attend court proceedings, and violating her Due Process Right, they blatantly failed to address the violation, and to provide ongoing oversight on the implementation of changes. This inaction by all defendants indicates tacit approval of said violation

103. Defendants were at all relevant times direct responsible for and oversight over developing, authorizing, supervising, and/or implementing the policies, patterns, or practices governing the Due Process violation.

104. Each Defendant in fact knew of, approved, and implemented the deprivation.

Cruel and Unusual Punishment (5[th]Amendment)

105. Plaintiff Wheeler and Albrecht were prior to detention in the Santa Ana City Jail, Otay and Adelanto Facility living a healthy and active lifestyle, Ms. Wheeler to the extend of an athlete.

106. Throughout Plaintiff Wheelers detention at the Santa Ana City Jail, Orange County from November 2014 – January 2016, Federal Defendants (Jenings, Trevino & Quinones) as well as City Defendants (Manriquez & Holland) purposefully neglected Ms. Wheeler's medical needs and failed to provide adequate nutrition as outlined below:

107. Ms. Wheeler, her husband Richard Wheeler and attorney Joshua Effron submitted numerous straightforward written and verbal inquiries to all Defendants regarding immediate medical attention for various health reason, including but not limited to, extreme ovary pain, abdominal pain, abnormal bleeding, significant weight loss, knee & shoulder injury, chest pain, who blatantly ignored these requests by not answering them and deprived Ms. Wheeler of proper medical care and nutrition and these inactions worsened her condition, since Defendants failed to provide care in form of treatment. Additionally the advocate group CIVIC submitted complaints on behalf of Ms. Wheeler citing the medical neglect. Even written complaints about medical care through facility grievance procedures went ignored. For both Plaintiff Wheeler and Albrecht.

108. Accordingly, the denial of food at regular intervals or inadequate nutrition is a form of punishment that is constitutionally impermissible. *See, e.g.*, *Pierce v. County of Orange*, 526 F.3d 1190, 1205 (9th Cir. 2008) ("if a restriction or condition is not reasonably related to a legitimate goal—if it is arbitrary or purposeless—a court permissibly may infer that the purpose of the governmental action is punishment that may not be inflicted upon detainees *qua* detainees"); *ee also, e.g.*, *United States v. Minero-Rojas*, No. 11-CR-3253-BTM, 2011 WL 5295220, at *11 (S.D. Cal. Nov. 3, 2011) ("The Court finds it difficult to see how there may be a 'legitimate governmental objective' in not providing pretrial

detainees with beds, hygiene products, and adequate food" (citing cases)). Therefore Defendants exposed Plaintiff to cruel and unusual punishment.

109. One of ICE's "core values" is defending and upholding the Constitution of the U.S. Additionally ICE maintains that the agency and it's federal employees (here namely Federal Defendants Jennings, Trevino and Quinones) are guided by the highest ethical and moral principals. Id. Starving and refusing medical care are entirely at odds with these basics precepts

110. Due to the insufficient nutrition, and denial of medical care, exposure to mistreatment during her unlawful strip search in December 2015 (First Claim for Relief) and extended retaliation (Third Claim For Relief), authorized by all Defendants, Ms. Wheeler recently came to learn (NEW EVIDENCE) that she is suffering from a huge abdominal mass, tumor that strongly suggest malignancy as a direct result of unconstitutional actions against her.

111. These actions and inactions from Defendants put and continue to put Ms. Wheeler's life and well being at risk and harm and resulted in unnecessary and wanton infliction of pain. Ms. Wheeler is currently awaiting further diagnosis and will submit all relevant evidence upon discovery.

112. Throughout Plaintiff Albrecht's detention at the Otay and Adelanto Facility from September 2014-January 2016 Federal Defendants Jennings and Trevino violated Ms. Albrecht's right to humane condition, while being in ICE custody at these facilities, which put Ms. Albrecht's life and well being at great risk and harm, and resulted in unnecessary and wanton infliction of pain.

113. Ms. Albrecht continues to suffer from health issues related to these severe violations against her.

114 Ms. Albrecht, her son in law Richard Wheeler and attorney Joshua Effron, as well as advocate group CIVIC, and fellow detainees submitted numerous straightforward written and verbal inquiries/COMPLAINTS and pleas to Defendants FOD Jennings and AFOD Trevino as well as deportation officers Fuentes and Garcia (who were under direct supervision of Defendants, but did not address any request and pushed

it off to the LA Field Office), regarding immediate medical attention for various health reason, including but not limited to, high blood pressure, extreme ovarian pain, abdominal pain, accelerated heart rate, herniated disc, water on her heart, hole in her abdominal wall/gastrointestinal perforation –constantly using the bathroom , Defendants blatantly ignored these requests by not answering them and deprived Ms. Albrecht of proper medical care and these inactions worsened her condition, since Defendants failed to provide care in form of treatment, which ultimately resulted in an Emergency Complaint and Ms. Albrecht was forced to use a wheelchair, walker or cane.

115. Immigration detainee's medical care is governed by section 2.10 of the 2011 (revised 2016) ICE Performance Based Detention Standards (PBNDS), at §4.3. All Defendants violated ICE Performance Based National Detention Standard (PBNDS) " Detainees shall have access to a continuum of health care services, including screening, prevention, health education, diagnosis and treatment. "Medical Facilities within the detention facility shall achieve and maintain current accreditation with the National Commission on Correctional Health Care, and shall maintain compliance with those standards"

116. Each and every line-level ICE officer and supervisory official should fully understand and consistently implement all basic protocols relevant to the humane treatment of individuals, who are detained.

117. Despite the voluminous amount of written and verbal requests, from both Plaintiffs Wheeler and Albrecht, Defendants failed to address their medical needs, therefore intentionally interfered with necessary medical treatment.

118. Defendant David Jennings served as the Field Office Director for ICE Los Angeles, and was the commanding officer of AFOD Trevino and AFOD Quinones, and was personally responsible by law for enforcing the United States Constitution, laws, and regulations and for ensuring that ICE agents/ subordinates are properly trained and obey the laws of the United States, policies and regulations of the ICE Detention Standards (PBNDS). Plaintiff Albrecht and Wheeler sue Defendant Jennings in

his individual capacity.

119. Defendant Trevino served as the Assistant Field Office Director for ICE Los Angeles and was personally responsible by law for enforcing the United States Constitution, laws and regulations and for ensuring that ICE agents are properly trained and obey the laws of the United States, policies and regulations of the ICE Directive. Plaintiffs sue Defendant Trevino in his individual capacity.

120. Defendant Quinones served as the Assistant Field Office Director for ICE Los Angeles and was personally responsible by law for enforcing the United States Constitution, laws and regulations and for ensuring that ICE agents are properly trained and obey the laws of the United States, and policies and regulations of the ICE Detention Standards (PBNDS) Plaintiff Wheeler sues Defendant Quinones in his individual capacity.

121. Defendant Holland served as the Director/ Administrator of the Santa Ana City Jail (SACJ), and was responsible by law for enforcing the United States Constitution and laws, and regulation, as well as the ICE Performance Based Detention Standards.

122. Defendant Manriquez served as supervisor of the Santa Ana City Jail (SACJ), and was responsible by law for enforcing the United States Constitution and laws, and regulations, as well as the ICE Performance Based Detention Standards. Plaintiff Wheeler sues Defendants Manriquez and Holland in their individual capacity.

123. Upon information and belief, the act was performed, at the instigation, under the control or authority of, with the knowledge, consent, direction or acquiescence of, the Defendants named in this action. By refusing to follow the law, and Detention Standards, Defendants have caused, and will continue to cause, Plaintiffs concrete and demonstrable injuries and irreparable harm.

124. Despite repeated notice to the Defendants about Plaintiffs need to medical care and proper nutrition they blatantly failed to address the violation, and to provide ongoing oversight on the implementation of changes. This inaction by all defendants indicates tacit approval of said violation.

125. Defendants were at all relevant times direct responsible for and oversight over developing, authorizing, supervising, and/or implementing the policies, patterns, or practices governing the violation.

Retaliation (1st Amendment)

Threats of Transfer

126. Plaintiffs were detained together at the James Musick Faciltiy, in Irvine, Orange County on September 4, 2014. A few days within their detention, Defendant McKenna tried to force Plaintiffs to sign deportation documents. Plaintiffs asserted their First Amendment right to free speech, and stated that they will not sign them, but instead file for asylum with an attorney.

Defendant McKenna, in retaliation threatened Plaintiffs and stated, "if they refuse to sign them, that ICE would send one of them to San Diego or Arizona to make things very difficult for them". This retaliatory threat by defendant McKenna came in response to Plaintiffs exercising their free speech right under the First Amendment.

127. It directly violated Plaintiffs 1st Amendment right to be free from unconstitutional retaliation for protected speech and the ICE Detention Standards /Policies. (2011 PBNDS at §2.15). Defendant Holliday who prior had spoken with Defendant McKenna regarding Plaintiffs refusal, engaged in this retaliatory practice on September 10, 2014, when she took Ms. Albrecht to medical purposefully without Plaintiff Wheeler (Plaintiff Wheeler always accompanied her mother and translated). Instead a phone translator was provided but Plaintiff could not understand the poor German translation, so she was confused. Defendant Holliday purposefully did the separation of Plaintiffs, in order for Defendant McKenna to interview Ms. Albrecht at medical without a witness.

Defendant McKenna was present and asked Ms. Albrecht immigration questions in English non-related to medical. The trip to medical was more about answering ICE questions, which Plaintiff refused. After an hour, Defendant Holliday called Ms.

Wheeler out to translate for Ms. Albrecht, who was then able to state her minor medical issue "headache". Defendant McKenna stated, that if Ms. Albrecht had been more cooperative she would have been back earlier. Then both Defendants alleged, that Plaintiff Albrecht was non-cooperative at medical (fabricated lies) Defendant McKenna restated her retaliatory threats of transfer for refusal to sign deportation documents.

128. Within a few hours after those repeated threats, Plaintiff Albrecht was handcuffed and forcibly removed and send to Otay, San Diego under false pretense, claiming she was transferred due to receiving better medical care. A complete fabrication by Defendant,s as there was no medical issue at this time. Additionally, Richard Wheeler spoke with deportation officer Bond, who also stated the fabricated medical excuse.

129. The unwarranted transfer to San Diego led to misclassification; Plaintiff was all of a sudden housed in high-level area with hardened criminals and subjected to civil rights abuses, solitary confinement and enduring lockdown. Plaintiff Albrecht was housed 100 miles away from her family, attorney, son and especially from the Edmund Edelman Dependency Court, where a case against her was pending.

130. Defendant's actions were purposefully done to cause harm to Plaintiffs. Detention Standards and policies indicate that staff shall not permit a detainee to be subjected to retaliation for seeking judicial or administrative relief or investigation of their conditions of confinement while in detention. In a long line of cases, the 9th Circuit has recognized that prison officials cannot transfer a prisoner to another prison in retaliation for the prisoner's exercise of his First Amendment rights (Rizzo v. Dawson, 778 F.2d 527,531-32 (9th Cir.1985); Silva v. Di Vittorio, 658 F.3d 1262, 1274 (9th Cir.2005).

131. Defendant McKenna served as Deportation officer, and was personally responsible by law for enforcing the United States Constitution, laws and ICE Detention Standards (PBNDS) and policies. Plaintiffs sue Defendant McKenna in her

1    individual capacity.

132. Defendant Holliday served as Deputy officer, and was personally responsible by law for enforcing the United States Constitution, laws and ICE detention Standards and policies. Plaintiffs sue Defendant Holliday in her individual capacity.

133. Defendant McKenna served as the deportation offcier for ICE and was personally responsible by law for enforcing the United States Constitution, laws and ICE Detention standards / policies.

Upon information and belief, the act was performed, at the instigation, under the control or authority of, with the knowledge, consent, direction or acquiescence of, the Defendants named in this action. By refusing to follow the law, and Detention Standards, Defendants have caused, and will continue to cause, Plaintiffs concrete and demonstrable injuries and irreparable harm.

Retaliation for filing complaints

134. Plaintiff Wheeler filed multiple complaints with her fellow detainees with the Santa Ana City Jail and ICE including but not limit to: violation against their own Detention Standards, 287g Complaint Process, discrimination against equal protection, illegal strip searches, neglect and mistreatment by the LA & Santa Ana Field Office, unnecessary lockdowns, civil right violations. Plaintiff Wheeler submitted (22 detainees) complaints and statements to LA and Santa Ana Field Office, on May 15, 2015 regarding neglect and mistreatment by these offices and their officers, FOD's and supervisors and others, and demanding an investigation into their violations.

135. Defendant Jennings (FOD), who was one of the people against whom Ms. Wheeler and her fellow detainees have been complaining contacted Defendant Trevino (AFOD), who was also one of the people against whom Ms. Wheeler and her fellow detainees specifically complained. Defendant Trevino, in turn, interviewed the detainees on May 28, 2015 at the Santa Ana Jail, except for Ms. Wheeler, regarding the accusations against the two field offices (LA and Santa Ana), including,

specifically accusations against himself.

136. Defendants Trevino and Jennings purposefully engaged in this retaliatory practice, violating Plaintiff's First Amendment right of free speech, by not allowing her to address her complaint.The one sided bias interview was obviously a huge conflict of interest, as anyone knows that detainees will not be forthcoming with damning information to an interviewer who is the very same person against whom they have leveled complaints.

137. Defendant Jennings was fully aware that allowing Defendant Trevino who is the subject of complaints to conduct an investigation is analogous to allowing an accused criminal to investigate his own crime and then make a judgment. This kind of practice has no place in law enforcement, and all parties involved are aware of this.

138. Defendant Trevino engaged Defendant Holland in his retaliation against Ms. Wheeler when Defendant Holland contacted Ms. Wheeler and threatened and retaliated against her with disciplinary actions for misleading detainees for what they have signed. Even though they all confirmed that they knew what they signed for.

139. Defendants Jennings, Trevino and Holland conduct intended to coerce Ms. Wheeler into stopping her complaints, such retaliatory threats chill Plaintiff's free speech in clear violation of her First Amendment right and also violated ICE's own detention standards/policies. Detention standard provide that Ms. Wheeler had the right to pursue a grievance without fear of retaliation. According to the standards, detention facility staff shall not harass, discipline, punish or otherwise retaliate against a detainee who files a complaint or grievance. Further they indicate that staff shall not permit a detainee to be subjected to retaliation for seeking judicial or administrative relief or investigation of their conditions of confinement.

140. Retaliation by all Defendants (excluding Holland and McKenna) in form of pre-discipline, food withdrawal and lockdown for 24h after Ms. Wheeler's unlawful strip search (First Claim for Relief), for exercising her First Amendment right of free

speech and citing the Detention standards.

141. Less than 72 hours after Ms. Wheeler's attorney emailed Defendant Holland, on January 10, 2016 to ask for documentation about the strip search, which Defendant Holland denied. Plaintiff Wheeler and Albrecht were transported to the ICE office in Los Angeles, before a series of retaliatory transfers to a holding cell in Arizona, the LaSalle Detention Facility in Louisiana, and finally the Chautauqua County Jail in New York.

142. In retaliation, ICE agents of the LA Field Office assaulted/battery against Plaintiffs at the La Field Office, while their attorney was asking for Plaintiffs release.

Less than 24 hours after Christina Fialho (attorney and coexecutive director of Communnity Initiatives for Visiting Immigrants in Conefinement (CIVIV) and board member of the ACLU) filed a **Federal Civil Rights Complaint** against ICE and the City of Santa Ana, documenting **Santa Ana City Jail's Illegal Strip Searches of Women**, on behalf of Ms. Wheeler and (30) other detainees, ICE deported Plaintiffs On 1/26/16 with no warning to her attorney or her husband, a U.S. citizen, in a Gulfstream private luxury jet, which cost the American taxpayer more than $600.000.

Defendant's actions were purposefully done to cause harm to Plaintiffs.

Detention Standards and policies indicate that staff shall not permit a detainee to be subjected to retaliation for seeking judicial or administrative relief or investigation of their conditions of confinement while in detention.

Defendant David Jennings served as the Field Office Director for ICE Los Angeles, and was the commanding officer of AFOD Trevino and Quinones, and was responsible by law for enforcing the United States Constitution, laws, and regulations and for ensuring that ICE agents are properly trained and obey the laws of the United States, policies and regulations of ICE National Detention Standards, as well as the contracted SACJ facility in charge of City Defendant Holland, Manriquez in which Ms. Wheeler was detained, since she was in ICE custody and the facility was under contract with ICE.

Defendant Holland served as the Director/ Administrator of the Santa Ana City Jail (SACJ), and was responsible by law for enforcing the United States Constitution and laws, and regulation, as well as the ICE Performance Based Detention Standards and was the supervisor of Defendant Manriquez, who was responsible by law for enforcing the United States Constitution and laws, and regulation, as well as the ICE Performance Based Detention Standards  Plaintiff Wheeler sues Defendants in their individual capacity.

Defendant Quinones & Trevino served as the Assistant Field Office Director for ICE Los Angeles and were personally responsible by law for enforcing the United States Constitution, laws and regulations and for ensuring that ICE agents are properly trained and obey the laws of the United States, and policies and regulations of the ICE  Detention Standards (PBNDS) Plaintiffs sue Defendants Trevino & Quinones in their individual capacity.

Defendants were at all relevant times direct responsible for and oversight over developing, authorizing, supervising, and/or implementing the policies, patterns, or practices governing the violation. Upon information and belief, the act was performed, at the instigation, under the control or authority of, with the knowledge, consent, direction or acquiescence of, the Defendants named in this action. By refusing to follow the law, and Detention Standards, Defendants have caused, and will continue to cause, Plaintiffs concrete  and demonstrable injuries and irreparable harm.

## CAUSES OF ACTION

### First Claim for Relief:

### 4th Amendment Violation – unlawful strip search

### * (Against the Federal Defendants, Jennings, Trevino, Quinones and City Defendant Holland)

143. Plaintiffs repeat and reallege, in each of their claims for relief, all of the allegations set forth above.

144. The disturbing blanket strip search policy and the Defendants' acts and omissions
described herein violate the 4th Amendment to the U.S. Constitution. The right to be
free from unlawful strip searches, without reasonable suspicion of hiding
contraband. Paragraph 40-82.

Under the U.S. Constitution, the Fourth Amendment is the governing standard for
carceral strip searches. *Way v. County of Ventura*, 445 F.3d 1157, 1161-62 (9th Cir.
2006) (holding that a county jail's blanket strip search policy violated the Fourth
Amendment); *Jordan v. Gardner*, 986 F.2d 1521, 1524 (9   Cir. 1993) (en banc) (the
"Fourth Amendment guarantees the right of the people to be secure against
unreasonable searches, and its protections are not extinguished upon incarceration");
*Thompson v. Souza*, 111 F.3d 694, 699 (9th Cir. 1997) (same). In *Bell v. Wolfish*, 441
U.S. 520 (1979), the Supreme Court created a balancing test for determining if a
person's Fourth Amendment right to be free from unreasonable searches in the
carceral context has been violated. Courts assess the constitutionality of a strip search
by balancing "the need for the particular search against the invasion of personal
rights that the search entails." *Id.* at 559. This requires courts to weigh "the scope of
the particular intrusion, the manner in which it is conducted, the justification for
initiating it, and the place in which it is conducted." *Id.*

Applying this balancing test, California courts have held that a blanket strip search
policy for arrestees after returning from court is unconstitutional. *Craft v. County of
San Bernardino*, 468 F. Supp. 2d 1172, 1179 (C.D. Cal. 2006) (policy of strip
searching all arrestees who are returned to a jail facility from court violates the
Fourth Amendment). These constitutional protections apply to people in the
immigration detention context. *Flores v. Meese*, 681 F. Supp. 665 (C.D. Cal. 1988)
(holding unconstitutional routine strip search of juveniles at INS detention facilities
stating that they have a reasonable expectation of constitutional protections it was
"axiomatic that a strip search entails perhaps the most severe intrusion upon
personal rights").

145. The Defendants had effective command and control of the SACJ Staff who

intentionally and knowingly used excessive, unlawful force to strip search Ms.
Wheeler without unreasonable and probable cause, which is prohibited by the
Fourth Amendment of the U.S. Constitution.

146. In addition to their liability for the unlawful use of excessive force and violations of
the Fourth Amendment, caused by their authorizations, the Defendants are also
liable on the independent ground that they violated their legal duty to prevent and
prohibit the use of excessive force, unreasonable search and violations by SACJ
Staff by conducting the strip search, when the Defendants knew and had reason to
know of it. Despite numerous credible complaints and reports of use of excessive
force, unreasonable search and constitutional violations without probable cause.
And despite incontrovertible evidence of such unlawful conduct—the Defendants
failed to take the reasonable, necessary, timely, or adequate measures against
subordinates to prohibit and prevent such excessive force, and unreasonable search
and violations as required by law. The Defendants have acted with deliberate
indifference to and in conscious disregard of the high likelihood that people such as
Ms. Wheeler would encounter and have to endure these violations, as a result of
SACJ Staff's violations and use of the disturbing blanket strip search policy.

147. The Defendants issued orders, adopted policies, and granted authorizations that
foreseeably led to the widespread use of excessive force and unreasonable search
including against Ms. Wheeler. In doing so, the Defendants authorized a deviation
from longstanding international and domestic law prohibiting the use of excessive
force and unreasonable search. The Defendants also failed to take action to stop and
prevent the use of excessive force, unreasonable search and violations, after they had
knowledge that their subordinates were committing or permitting such unlawful use
of force, unreasonable search and violations. Through their actions and derelictions,
the Defendants expressly permitted this conduct.

148. The search of Plaintiff's person violated clearly established rights under the Fourth
Amendment to the U.S.Constitution. It was unjustified as a search incident. It was
unjustified as a frisk for weapons because it exceeded the scope of a valid frisk and

Defendants lacked reasonable suspicion that Ms. Wheeler had contraband. Any Defendant who did not conduct the search unconstitutionally failed to prevent the strip search despite reasonable opportunity to do so.

149. The Defendants' conduct caused grave and foreseeable injury to Ms. Wheeler

150. The Defendants are liable for their conduct that led to the unlawful strip search

151. The Defendants are liable for the harm caused to Ms. Wheeler. She was forced to suffer—and continue to suffer—severe physical and psychological distress, abuse and agony as a result . All Defendants acted intentionally, knowingly, and/or with reckless disregard to the constitutional and legal rights of Plaintiffs.

**Second Claim for Relief:**
**Due Process - 5th Amendment Violation**
**(Against the Federal Defendants, Jennings and Trevino)**

152. Plaintiff Albrecht is entitled to procedural due process right under the Fifth Amendment to the U.S. Constitution.The Due Process Clause of the Fifth Amendment the U.S. Constitution prohibits the federal government and it's employee (Federal Agents) from depriving any person of life, liberty, or property, without due process of law. U.S. Const. Amend. V

153. The denial, ignorance and disregard of Plaintiff's repeated requests, by the Defendants, and Defendants failure to follow fair procedures, constituted a due process violation of clearly established rights under the Fifth Amendment to the U.S. Constitution. Paragraph 83-104

154. Defendants deprived Plaintiff Albrecht of the opportunity and fundamental right to be heard at these hearings, to receive a fair procedure before having her child removed from the country, by the intentional use of fraudulent evidence and violations against domestic and international treaty laws during the procedure.

155. Parent's interest in custody of their children is a liberty interest, which has received considerable constitutional protection. The Defendants culpable inactions granted

authorization that foreseeably led to the deprivation and violation of Due Process. A parent's right to the custody of his or her children is an element of "liberty" guaranteed by the 5th Amendment of the U.S. Constitution 369 NW 2d 889, MI App Div (1983).

156. The Defendants conduct shows an arbitrary, reckless and callous indifference of Ms. Albrecht's right.

157. The Defendants conduct caused and causes grievous loss; severe emotional distress therefore they are liable for the harm caused to Ms. Albrecht. All Defendants acted intentionally, knowingly, and/or with reckless disregard to the constitutional and legal rights of Plaintiffs.

## Cruel and Unusual Punishment - 5th Amendment Violation
### (Against the Federal Defendants, Jennings and Trevino & City Defendant Manriquez and Holland)

158. Through the actions described herein between September, 2014- January 2016, Defendants intentionally violated Plaintiffs Fifth Amendment right to humane Conditions and ignored their health care rights and needs. Paragraph 105-125

159 . Defendants were at all times deliberately indifferent to Plaintiffs serious medical needs.

160. Defendant Jennings, Trevino and Quinones knowing refused to terminate the series of culpable actions by City Defendants Holland and Manriquez.

161. The Defendants culpable inactions granted authorization that foreseeably led to the further significant injuries of Plaintiffs.

Defendants intentionally interfered with medical treatment, despite notice. The denial, ignorance and disregard of Plaintiff's repeated requests, by the Defendants, and Defendants failure to follow guidelines and laws of the U.S. Constitution is in violation of clearly established rights under the Fifth Amendment to the U.S. Constitution.

162. The Defendants' conduct caused grave and foreseeable injury to Plaintiff's. The

Defendants are liable as their conduct shows a reckless and callous indifference to the right of Plaintiffs . Each Defendant in fact knew of, approved, and implemented the deprivation.

The Defendants conduct caused and causes grievous loss; severe emotional distress therefore they are liable for the harm caused to Ms. Albrecht. All Defendants acted intentionally, knowingly, and/or with reckless disregard to the constitutional and legal rights of Plaintiffs.

Each of the Defendants caused injury and damage to Plaintiff by acting jointly or conspiring with others to act; authorizing or allowing, explicitly or implicitly, policies, plans, customs, practices, actions, or omissions that led to the unlawful conduct; failing to take action to prevent the unlawful conduct; failing or refusing to initiate and maintain adequate training or supervision; being deliberately indifferent to Plaintiffs rights; and ratifying the unlawful conduct that occurred by Defendants under their direction and control, including failing to take remedial or action.

The Federal Defendants' and City Defendant' failures constituted a willful tolerance of and deliberate indifference to conditions that they knew and had reason to know would lead to the use of mistreatment and abuse. All of the Defendants had an actual opportunity and a legal duty to prevent mistreatment.

## Third Claim for Relief:
## Retaliation - 1th Amendment Violation
## (Against the Federal Defendants, Jennings and Trevino, Quinones, McKenna, City Defendant Holland & Manriquez, County Defendant Holliday)

163. During her encounter with Defendant McKenna, Plaintiffs engaged in constitutionally protected speech. Specifically, when Defendant McKenna stated to Plaintiffs to "sign deportation documents or she and her daughter will be separated," Plaintiffs, replied "No, we will file for asylum with an attorney"

164. Plaintiffs constitutionally protected speech was a substantial motivating factor for

the Defendants' (Holliday and McKenna) subsequent transfer of Mr. Albrecht.

Defendants thus retaliated against Plaintiff because of their speech.

Defendants' actions would chill a person of ordinary firmness from engaging in such constitutionally protected speech, in violation of the First Amendment.

The Defendants (Holliday and McKenna) conduct shows an arbitrary, reckless and callous indifference of Plaintiffs right. Paragraph 126-133

Defendants McKenna and Holliday acted intentionally, knowingly, and/or with reckless disregard to the constitutional and legal rights of Plaintiffs.

165. Each of the Defendants caused injury and damage to Plaintiff by acting jointly or conspiring with others to act; authorizing or allowing, explicitly or implicitly, policies, plans, customs, practices, actions, or omissions that led to the unlawful conduct; failing to take action to prevent the unlawful conduct; failing or refusing to initiate and maintain adequate training or supervision; being deliberately indifferent to Plaintiffs rights; and ratifying the unlawful conduct that occurred by Defendants under their direction and control, including failing to take remedial or action.

The Federal Defendants' and City Defendant' failures constituted a willful tolerance of and deliberate indifference to conditions that they knew and had reason to know would lead to the use of mistreatment and abuse.

All of the Defendants had an actual opportunity and a legal duty to prevent mistreatment in form of retaliation. Paragraph 126-142

The Defendants' conduct caused grave and foreseeable injury to Plaintiff's. The Defendants are liable as their conduct shows a reckless and callous indifference to the right of Plaintiffs . Each Defendant in fact knew of, approved, and implemented the deprivation.

The Defendants are liable for the harm caused to Ms. Plaintiffs, they were forced to suffer and continue to suffer severe physical and psychological distress, abuse and agony as a result .

166. Plaintiff Wheeler's constitutionally protected speech was a substantial motivating

factor for the Defendants (except McKenna and Holliday) subsequent disciplined her and threw her in solitary confinement. Defendants thus retaliated against Plaintiff Wheeler because of her speech during the unlawful strip search and numerous submitted complaints.

<u>REQUEST FOR RELIEF</u>

Wherefore, the Plaintiffs seeks damages as follows:

1. Injuries caused by negligent and Intentional Infliction of Emotional Distress- to all Plaintiffs;

2. Compensatory damages, including general and special damages relating to medical treatment and other losses associated with the allegations above- to all Plaintiffs;

3. Punitive or exemplary damages, as applicable against certain defendants, aimed at discouraging the kind of unlawful, arbitrary and wanton conduct displayed by defendants herein;

4. Actual pecuniary losses, including legal and court costs, attorneys' fees, phone service costs, commissary and other reasonable costs incurred because of the unlawful conduct alleged herein-above;

5. All other damages, whether at common law or statutory, to which Plaintiffs may be entitled, which the court deems appropriate

6. The Plaintiffs hereby requests a jury trial on all issues raised in this complaint.

Dated this 26th day of September, 2017

_Nicole Albrecht Wheeler_
_Petra Albrecht_

_____

Nicole Albrecht Wheeler

Petra Albrecht

Plaintiff's in Pro Per



January 25, 2015

John Roth
Inspector General, Department of Homeland Security
245 Murray Lane SW
Washington, DC 20528-0305

Megan H. Mack
Officer for Civil Rights and Civil Liberties
U.S. Department of Homeland Security
Building 410, Mail Stop #0190
Washington, D.C. 20528

Sarah Saldaña
Director, U.S. Immigration and Customs Enforcement
500 12th St., SW
Washington, D.C. 20536

Andrew R. Lorenzen-Strait
Deputy Assistant Director, Custody Programs
U.S. Immigration and Customs Enforcement
500 12th St., SW
Washington, D.C. 20536

David Jennings
Field Office Director, U.S. Immigration and Customs Enforcement
300 North Los Angeles St., Room 7631A
Los Angeles, CA 90012

Mayor Miguel Pulido
Santa Ana City
20 Civic Center Plaza
Santa Ana, CA, 92701

Christina Holland
Police Administration Manager
Santa Ana City Jail
62 Civic Center Plaza
Santa Ana, CA 92701

Dear Inspector General Roth, Officer Mack, Director Saldaña, Deputy Director Lorenzen-Strait, Director Jennings, Mayor Pulido, and Administrator Holland:

Community Initiatives for Visiting Immigrants in Confinement (CIVIC) submits this complaint on behalf of 31 women in the custody of U.S. Immigration and Customs Enforcement (ICE) at the Santa Ana City

1



52



Jail in Santa Ana, California.  This complaint details civil and human rights violations, particularly unlawful strip searches.  We urge the Office for Civil Rights and Civil Liberties (CRCL) at the Department of Homeland Security (DHS), pursuant to its authority under 6 U.S.C § 345, to immediately investigate this complaint, to promptly develop policies to address the violation, and to provide ongoing oversight on the implementation of the changes.  Moreover, we urge the Santa Ana City Jail to adopt a strip search policy that conforms to federal ICE standards as well as state and federal law, and we urge ICE to ensure that the City of Santa Ana meets its contractual obligations.  We further request that the Santa Ana City Council require that Santa Ana City Jail's policy on and practice of strip searches comply with all relevant laws and standards prior to any further modifications of its contract with ICE.  We ask that the City of Santa Ana, the Santa Ana City Jail, and ICE confirm in writing <u>by no later than February 25, 2016,</u> that they will cease and desist from conducting unlawful strip searches at the Santa Ana City Jail.

The Santa Ana City Jail has received $38,099,876.53 in taxpayer funding since 2009 for detaining immigrants for ICE.[1]  Each day, the Santa Ana City Jail detains up to 200 individuals in ICE custody, receiving $105 per person per day.[2]  Prior to 2015, the facility detained up to 64 transgender, gay, and bisexual individuals in a "dedicated protective custody" module for ICE.[3]  However, when ICE and the Santa Ana City Jail renegotiated their contact in 2015, the guaranteed beds for this population were removed.[4]  Currently, according to the jail administrator Christina Holland, it is the practice of the Santa Ana City Jail to keep transgender immigrants in a separate unit as well as gay and bisexual men in another separate unit "based on operational and safety concerns."[5]  Between July and December 2015, these modules held between 84 and 95 GBT individuals.[6]  ICE and the City of Santa Ana are in the process of negotiating the establishment of two dedicated modules for transgender women and for gay and bisexual men, which will require ICE to pay for all the beds in these two dedicated housing modules.  Santa Ana City Council is scheduled to review this contract modification on February 2, 2016.[7]

CIVIC's mission is to end the isolation and abuse of people in U.S. immigration detention through visitation, independent monitoring, storytelling, and advocacy with the ultimate goal of eliminating immigration detention.  We support a network of immigration detention visitation programs, including one operating at the Santa Ana City Jail.  This letter summarizes complaints lodged directly with CIVIC by 31 cisgender and transgender women, under the custody of ICE at the Santa Ana City Jail.  Six of these women are willing to state their claims publicly:

---

[1] Letter to Christina Fialho, response to CIVIC's California Public Record Act request, *available at* https://www.dropbox.com/s/iup66baxhyq00b3/PRA%20Request%20Response%20Letter%20for%20C.%20Fialho%20Dec%202015.pdf?dl=0.

[2] ICE Intergovernmental Service Agreement with the Santa Ana City Jail (2015), response to CIVIC's California Public Record Act request, *available at* https://www.dropbox.com/s/3bntdmq2khu3j1y/ICE_Contract_SACJ_2015.pdf?dl=0.

[3] ICE Intergovernmental Service Agreement with the Santa Ana City Jail' LGBT modification (2006), response to CIVIC's California Public Record Act request, *available at* http://blog.endisolation.org/wp-content/uploads/2012/12/ICE-Transgender-Attachement.pdf.

[4] Email to Christina Fialho, Co-Executive Director of CIVIC, from Christina Holland, Santa Ana City Jail Administrator, response to CIVIC's California Public Record Act request, *available at* https://www.dropbox.com/s/1wcgo3npd0iakmd/Public%20Records%20Act%20Request%20Letter%202.pdf?dl=0.

[5] *Ibid.*

[6] Letter to Christina Fialho, response to CIVIC's California Public Record Act request, *available at* https://www.dropbox.com/s/iup66baxhyq00b3/PRA%20Request%20Response%20Letter%20for%20C.%20Fialho%20Dec%202015.pdf?dl=0.

[7] Email to Christina Fialho, Co-Executive Director of CIVIC, from Christina Holland, Santa Ana City Jail Administrator, response to CIVIC's California Public Record Act request, *available at* https://www.dropbox.com/s/1wcgo3npd0iakmd/Public%20Records%20Act%20Request%20Letter%202.pdf?dl=0.

S3





1. Nicole Albrecht (206-407-728)
2. Sonia Marcias Esteves (091-028-855)
3. Fabiola Espinoza Delgado (205-711-889)
4. Maria Escobar (094-376-252)
5. Araksi Torkramadzhyan (028-137-853)
6. Gloria Hernandez (094-945-100)

We also are in touch with other individuals who agreed to be referred to by pseudonym because they fear retaliation:

7. SE
8. TF
9. XJ
10. YK
11. AM
12. BN
13. CO
14. DP
15. EQ
16. FR
17. GS
18. HT
19. IU
20. JV
21. KW
22. LX
23. MY
24. NZ
25. OA
26. PB
27. QC
28. KD
29. LM
30. NP
31. SD

**A.      Strip searches of people in immigration detention at the Santa Ana City Jail are conducted without reasonable suspicion, sometimes by members of the opposite gender, in view of other detainees, in unsanitary conditions, and have turned into sexual assaults; these strip searches re-traumatize victims of past sexual assault, deter attorney visits, and are inhumane.**

The Santa Ana City Jail has an 11-page policy on "periodic and routine strip searches" supposedly in line with California Penal Code section 4030.[8]  The policy defines strip searches as "the act of removal or

---

[8] Santa Ana City Jail Inmate Searches Policy, response to CIVIC's California Public Record Act request, *available at* https://www.dropbox.com/s/m4uh811mo8lacf0/SAJ_Inmate_Searches_Policy.pdf?dl=0.

54                                    



rearrangement of some or all of an individual's clothes for the act of visually inspecting that individual's underclothing, breasts, buttocks, genitalia, or corresponding body cavities."[9]  The policy defines pat searches as "the act of frisking or running hands over, a person's body and clothing, including the removal of items contained within pockets, for the purpose of detecting and retrieving contraband."[10]  The policy explains that "pat searches will be conducted immediately when custodial responsibility is turned over to jail personnel" and "periodic pat searches of in-custody inmates" will occur in at least four situations: "1. Upon inmates' entry and exit of housing modules. 2. Following inmates' exit from multi-purpose rooms after program attendance. 3. After in-custody inmates dress out in their personal attire for transfer escort or transport. 4. Subsequent to any incident that requires the reinforcement of behavioral parameters or contraband detention."[11]

While the policy stipulates that officers must have "reasonable suspicion" to strip search "inmates booked solely for misdemeanor charges"[12] and that the "[c]ontractual requirements of the ICE contract and Federal standards must be applied to the ICE inmates,"[13] the policy also gives wide discretion to officers to strip search individuals.  For example, "[d]uring module or individual cell searches inmates will be subject to pat or strip searches at the discretion of Correctional staff."[14]  The only guidance the policy provides for the correctional staff in this situation is that the "[o]fficers shall base their decisions on the item or items for which the search is conducted."[15]  The policy also is vague and contradictory.  For example, the policy explains that "California Penal Code prohibits strip-searching of inmates booked solely on misdemeanor charges,"[16] but in the same subsection explains that "all persons booked in jail, regardless of the circumstances will fall under the same criteria for the purpose of strip searches."[17]  This language combined with the fact that the policy requires that "pat searches will be conducted immediately when custodial responsibility is turned over to jail personnel" would lead a reasonable person to believe that the policy allows for only pat searches of all persons booked into the jail.  However, in practice, as detailed below, all persons booked into the jail are actually strip searched.  The policy's contradictory language and vagueness combined and the overly broad discretion provided to officers has created an environment in which people in immigration detention are unlawfully strip searched and the officers conducting the search and their supervisors may be charged criminally and held civilly liable for violating California Penal Code section 4030.

The Complainants are 31 transgender and cisgender women who are or were in the custody of U.S. Immigration & Customs Enforcement (ICE) at the Santa Ana City Jail, pursuant to an agreement between ICE and the City of Santa Ana.  These individuals were strip searched by the Santa Ana Police Department without reasonable suspicion or probable cause to believe that they were in the possession of weapons or drugs, pursuant to a blanket policy, practice or custom of the Santa Ana City Jail of strip searching the following women: 1) women being booked into the Santa Ana City Jail; 2) women being transferred back from the Immigration Court in Los Angeles to the Santa Ana City Jail; and 3) women conducting in person (not behind plexi-glass) visits with their attorneys.

---

[9] *Ibid.*, section I.B.
[10] *Ibid.*, section I.A.
[11] *Ibid.*, section II.D.
[12] *Ibid.*, section IV.B.
[13] *Ibid.*, section IV.A.5.
[14] *Ibid.*, section V.B.
[15] *Ibid.*
[16] *Ibid.*, section IV.A.1.
[17] *Ibid.*, section IV.A.6.

4

5S                                      A



It is our understanding that the strip searches conducted at the Santa Ana City Jail before women are booked into the jail and after women visit in person with their attorneys has been a policy, practice, or custom at the jail at least since the City began contracting with ICE. In the latter situation, women are not informed prior to the visit with their attorney that they will be forced to undergo a strip search and they are not told that they have the option to meet with their attorney behind plexi-glass. Strip searches under such circumstances are particularly unwarranted. Visits with attorneys pose extremely limited risks because attorneys are themselves screened prior to their admittance into the facility and because of the low probability that an attorney would agree to smuggle narcotics or weapons into the jail. Strip searches may even deter people in immigration detention from meeting with their attorneys, compromising legal representation.

It also is our understanding that the policy, practice, or custom of strip searching women who have been returned to the jail from the Immigration Court was institutionalized around March or April 2015. For example, AM who had been detained at the Santa Ana City Jail since 2013, was one of the first women to experience a strip search after returning to the Santa Ana City Jail from Immigration Court. AM's first strip search after court occurred in March or April 2015. These searches are conducted under a blanket policy, practice, or custom and without reasonable suspicion. For example, Ms. Sonia Marcias Esteves (091-028-855) explains that she has undergone approximately five strip searches at the jail in the last two months; she was first strip searched after being transferred from the Adelanto Detention Facility, another immigration detention facility in Southern California. She then experienced strip searches each time she was brought back from Immigration Court. Likewise, Ms. Fabiola Espinoza Delgado (205-711-889) believes she has experienced approximately 10 strip searches in just the last seven months at the Santa Ana City Jail.

Women being transferred back from the Immigration Court in Los Angeles to the Santa Ana City Jail now undergo at least one pat down by an ICE officer and/or jail officer, while the women remain clothed. Next, these women are taken to a holding cell and are forced to undergo a strip search before being transferred back into the general housing population or to the transgender module.[18] These searches occur even when the officers have no particularized reason to suspect concealment of contraband.

In all of these cases, the trans women are not allowed to choose the gender of the person performing the search. Most of the trans women complainants have been forced to undergo strip searches by male guards. Both the transgender and cisgender women are told to strip naked, and an officer performs a visual inspection of the breasts, armpits, buttocks, and genitalia of the woman. The women are told to lift up their breast, spread apart the sides of their labia and to pull back their clitoral hoods to prove that they are not hiding contraband in their vagina or vulva. They are told to bend at the waist, spread their buttocks, and cough three times. Women who did not bend to the officers' satisfaction are told to cough again.

---

[18] The transgender module used to be referred to as the LGBT pod or the GBT pod, but ICE has moved the gay men and bisexual individuals out of this pod.

56          



In some cases, these visual strip searches turned into physical body cavity searches by non-medical officers. One cisgender woman explained that a female officer[19] patted her down with her hands while naked after returning from Immigration Court. One transgender woman, OA, explained that during some of her strip searches, the officers have come very close to touching her, while making her feel humiliated about her body. For example, OW, KW, LM, NP, and SD explained that all the transgender women underwent a strip search on or around January 5, 2016, after a plate supposedly fell and broke. As the male officers were unable to locate one piece of the broken plate, the male officers put the entire transgender module on lockdown for approximately three hours and performed a strip search on all or at least most of the transgender women in the dedicated transgender module. There was no female officer present and the transgender women were not provided with the option to have a female officer perform this strip search. CIVIC received a handwritten letter in Spanish signed by an additional 18 transgender women not included in this complaint attesting to the fact they were strip searched as part of this module shakedown.[20]

OA explained that several male deputies performed a strip search on her at this time, although OA was never in possession of the plate fragment. They came very close to touching her body, and they looked with a flashlight in all orifices including her ears, mouth, and nose. They made her bend over and cough, as they looked with a flashlight into her buttocks. They made her lift her penis, while the officers pointed at her in a mocking manner. The officers then made OA physically lift her testicles and looked under them with a flashlight.[21] OA explains she felt completely humiliated.

Most women have not tried to resist the strip searches because the women believe that the officers have unquestioned authority to use force if necessary, and the women fear other forms of retaliation. For example, people in immigration detention fear they will be transferred to facilities farther away from their attorneys and networks of support or thrown into isolation or solitary confinement. This fear may explain why between January 1, 2012, and January 21, 2015, only two people submitted a formal grievance to the Santa Ana City Jail about strip searches, including one man.[22]

No special provisions are made for women who are menstruating. Some of the women complainants who were menstruating during a strip search bled directly onto the floor, which posed a health risk to the women and to any other person who may come into contact with that blood. Menstruating women also have to lift up their period pad in their underwear so that the officer can inspect underneath the pad. These women complainants are not provided with a new period pad or allowed to use the restroom before putting their underwear with the used pad back on.

---

[19] Although CIVIC has the names of officers whose actions are detailed in this complaint, we will not name them publicly. Instead we call for an independent investigation of all the accusations. If an independent investigative body requests the identities of the deputies to aid their investigation, CIVIC will provide the names at that time.

[20] This letter is on file with CIVIC and we will gladly provide a copy of it to appropriate parties upon request.

[21] This treatment of transgender women at the Santa Ana City Jail is consistent with a pattern of mistreatment, abuse, and discrimination by officers who are inadequately trained. *See Trapped in detention, transgender immigrants face new traumas,* MSNBC, August 29, 2015, *available at* http://www.msnbc.com/msnbc/trapped-detention-transgender-immigrants-face-new-traumas; *A model immigration detention facility for LGBTI?,* Forced Migration Review, 2013, *available at* http://www.fmreview.org/en/sogi/fialho.pdf; *Multi-individual complaint regarding mistreatment and abuse of sexual minorities in DHS Custody,* National Immigration Justice Center, April 13, 2011, *available at* https://www.immigrantjustice.org/sites/immigrantjustice.org/files/OCRCL%20Global%20Complaint%20Letter%20April%202011%20FINAL%20REDACTED.pdf.

[22] Strip Search Grievances for 2012 through 2016 submitted directly to Santa Ana City Jail, response to CIVIC's California Public Record Act request, *available at* https://www.dropbox.com/s/4349cew9wl6rlzl/Strip%20Search%20Grievances%202012%20to%202016%20for%20SAJ.pdf?dl=0.





No special provisions seem to be made for the elderly or women with chronic physical pain. For example, Araksi Torkramadzhyan (028-137-853) has undergone multiple strip searches at the Santa Ana City Jail, despite the fact that she is approximately 67 years old and suffers from hip dislocation and pain.

Many of the women complainants explained that the searches were not done in a private room. Instead, in some cases where multiple women were returning from court at the same time, the women were strip searched in front of one another. The only precaution the officers took to fain a degree of privacy was to tell the women not to look at one another as they were strip searched.

During the strip searches, women are exposed to blood and other unsanitary conditions. They stand and walk barefoot on dirty floors contaminated with bodily fluids and material tracked on shoes. Often, women are required to throw their clothing on these floors and re-dress in the same clothing after it has lain on the dirty floor. If women refuse to be searched, they are isolated, denied food, and pressured by threats of transfers and deportations until they comply with the search.

These searches are particularly traumatizing for asylum seekers who have survived sexual assault and rape, and the strip searches undermine the healing these women need. For example, Gloria Hernandez (094-945-100) identifies as lesbian and was a victim of sexual assault in Honduras because of her sexual identity. She takes medication for anxiety and depression. She explains that the approximately seven or eight times that she has been strip searched at the Santa Ana City Jail have re-traumatized her and resulted in suicide attempts. Studies have shown that humiliating treatment, such as strip searches, exacerbate mental illness and make reentry into society more difficult.[23] As psychiatrists who have extensive experience dealing with strip searches explained in an amicus curiae, strip searches cause psychological damage, such as sleep disturbance, recurrent and intrusive recollections of the event, inability to concentrate, anxiety, depression, and development of phobic reactions.[24] Some victims of strip searches have developed post-traumatic stress disorder (PTSD) and others, like Ms. Hernandez, have been moved to attempt suicide.[25]

Ms. Nicole Albrecht (206-407-728) describes her most recent strip search at the Santa Ana City Jail in detail:

On Monday, December 21, 2015, at 3:00 a.m., Ms. Albrecht was awoken to be transported to court. At approximately 4:30 a.m., she left the Santa Ana City Jail in handcuffs, and was the only person in the transportation vehicle going to court. The portion of the vehicle in which she was held was freezing cold.

At 5:15-5:20 a.m., she arrived at the immigration courthouse in Los Angeles. Officers patted her down, and then placed her in the holding cell.

At 8:00 a.m., she was patted down again, handcuffed at the feet and hands, and taken into court.

---

[23] Dr. Terry Kupers, *Prison Madness: The Mental Health Crisis Behind Bars and What We Must Do About It* 135 (1999).
[24] Brief for Psychiatrists as Amicus Curiae, *Florence v. Board of Chosen Freeholders*, 566 U.S. ___ (2012), *available at* http://www.americanbar.org/content/dam/aba/publishing/previewbriefs/Other_Brief_Updates/10-945_petitioneramcusychiatrists.authcheckdam.pdf.
[25] *Id.*

7

58     A



After her court hearing, she was patted down again, then placed in the holding tank.

At 5:00 p.m. that evening, she was patted down again, handcuffed, and put into the transportation vehicle. Again, the heater was supposedly not working, and she remained freezing cold during the 1.5 hour journey back to the Santa Ana City Jail.

She arrived at the jail at approximately 6:30 p.m., and she was placed in a holding cell for 10 minutes. Then, a female officer[26] took her out of the cell, and took her to a separate room. The officer told Ms. Albrecht that she had to take off her clothes, but Ms. Albrecht refused and cited ICE's Performance-Based National Detention Standards. Ms. Albrecht offered to show the officer a copy of the Standards, but the officer did not want to review them.

Instead, Ms. Albrecht was put in a room and left alone for approximately three minutes. The same officer returned along with two other female officers and one male supervisor. The three female officers took Ms. Albrecht into another room and demanded that she take off her shoes and socks. Ms. Albrecht complied. Then, the three officers demanded that she take off her clothes, and Ms. Albrecht refused, once again appealing to the Standards. All three officers refused to consult the Standards.

The officers then grabbed Ms. Albrecht's arm and took her out of the room barefoot. The officers pulled Ms. Albrecht's arms behind her back and cuffed them and took her downstairs in an elevator to booking.. During this entire ordeal, Ms. Albrecht remained barefoot, walking on the jail floors.

The officers then placed Ms. Albrecht into a booking cell. They hurt her when removing handcuffs from her body, nearly pulling her arms from their sockets. Ms. Albrecht asked for her shoes and socks, but they refused. The holding cell was freezing cold.

Then, the male supervisor came to speak with Ms. Albrecht, and he tried to encourage her to consent to the strip search. She explained to him that he must have a justified reason, and she once again cited the Standards. He replied that he did not care, and that he only goes by his policy. Ms. Albrecht requested a copy of the jail policies, but he refused. Ms. Albrecht again stated that she was in the custody of ICE and that the Standards apply to her. According to Ms. Albrecht, the officer then said, "I don't care what they call you guys—detainees, inmates, refugees or arrestees—whatever you want to call that, we treat you the same, and that's why we house you together. Since I cannot send you back to housing, they [ICE] can send you to Arizona. This here [Santa Ana City Jail] is the best facility." He also told Ms. Albrecht that he knows about her case and that she should submit to the strip search and then file a grievance later. She continued to refuse the strip search, and he said that he would have to keep her in the holding cell until she consents.

He along with another female officer continued to come back to her cell every few minutes encouraging her to consent to the strip search. Around 7:30 p.m., the male officer came into the cell and said that Ms.

---

[26] Although CIVIC has the names of the officers whose actions are detailed in this complaint, we will not name them publicly. Instead we call for an independent investigation of all the accusations. If an independent investigative body requests the identities of the deputies to aid their investigation, CIVIC will provide the names at that time.

59   A



Albrecht was being put on "pre-discipline" for refusing the search and that they had spoken to ICE, who would be transferring Ms. Albrecht to the Otay Detention Facility in San Diego in the morning.

Ms. Albrecht asked to speak with her attorney. The officer refused her the ability to call her attorney, Josh Effron, and said she would be able to make the call from San Diego.

As Ms. Albrecht was afraid to be sent to San Diego or Arizona, further away from her attorney and her U.S. citizen husband who are both based in Los Angeles. As a result, she called the officer back into her cell about 10 minutes later and agreed to the strip search.

At about 8:00 p.m., the officer brought her back upstairs to her jail cell. She was locked in her cell without the opportunity to use the day room or have dinner. Her cellmate asked one of the guards if she could bring Ms. Albrecht some clean water, and the guards refused. She remained locked in her cell for the next 24 hours.

Ms. Albrecht's attorney, Josh Effron, emailed the Santa Ana City Jail Administrator, Christina Holland, on January 10, 2016, to ask for documentation about the strip search. Administrator Holland responded that although "strip searches are conducted and documented in accordance with CA penal code, Department policies and ICE standards," she would "not release strip search documents without a court order."[27] Less than 72 hours later, Ms. Albrecht was transported to the ICE office in Los Angeles, before a series of transfers to a holding cell in Arizona, the LaSalle Detention Facility in Louisiana, and finally the Chautauqua County Jail in New York where she is currently detained.

**B.      ICE and the Santa Ana City Jail are under notice of the disturbing blanket strip search policy, practice, or custom.**

Organizations, including the Transgender Law Center (TLC) and Familia, have raised the issue of strip searches with the Los Angeles ICE Field Office, ICE's National Office, and with the Santa Ana City Jail directly for years. As far back as April 2011, the National Immigrant Justice Center filed a multi-individual complaint regarding the mistreatment and abuse of sexual minorities in ICE custody, which included the singling out of a trans women for public searches in which officers mocked her breasts.[28] More recently, in August 2015, 22 LGBT individuals detained at the Santa Ana City Jail signed and submitted a complaint, explaining that "the LBGT community considers ourselves humiliated and demoralized. The majority of the officials lack professional etiquette. We consider the search of private parts … an unnecessary practice."[29]

On September 8, 2015, TLC sent an email to Andrew Lorenzen-Strait and Richard Rocha at ICE's National Office reiterating the concerns voiced in the complaint and attaching the petition. TLC sent another similar email to Christina Holland of the Santa Ana City Jail and Jorge Field, an Assistant Field Office Director (AFOD) in ICE's Los Angeles Office. Flor Bermudez, TLC's Managing Attorney and Detention Project Director, also raised the concerns regarding the strip search procedure at the last two

---

[27] Email from Christina Holland to Joshua Effron, January 10, 2016 (on file with CIVIC and with Joshua Effron).
[28] https://www.immigrantjustice.org/sites/immigrantjustice.org/files/OCRCL%20Global%20Complaint%20Letter%20April%202011%20FINAL%20REDACTED.pdf (note this incident occurred at Theo Lacy Facility in Orange County, which used to house trans women in large numbers prior to the creation of Santa Ana City Jail's GBT module, which was created in response to NIJC's complaint)
[29] This letter is on file with CIVIC and we will gladly provide a copy of it to appropriate parties upon request.

 



Non-Governmental Organization meetings with ICE on October 1, 2015, and on January 7, 2016. The recurring stories of re-traumatization that TLC has heard from the transgender women at the Santa Ana City Jail provides clear evidence that the strip search procedure is actively harming these women, as it is causing symptoms of post-traumatic stress and triggering feelings of isolation and powerlessness.

In the months following this correspondence, advocates have seen no significant improvement to Santa Ana City Jail's policy on strip searches, which is particularly concerning given the fact that ICE's Performance-Based National Detention Standards unequivocally prohibit these kind of blanket strip searches.

**C.    Strip searches require individualized reasonable suspicion under ICE's Standards, California law, and the U.S. Constitution.**

**a.    ICE Standards expressly prohibit strip searches absent individualized reasonable suspicion.**

It should go without saying that officials at the Santa Ana City Jail are under an obligation to uphold California laws, while also abiding by the U.S. Constitution and federal standards. Federal standards expressly prohibit strip searches in the immigration detention context, absent individualized reasonable suspicion of contraband possession. Under ICE's 2011 Performance-Based National Detention Standards (PBNDS), to which the Santa Ana City Jail is contractually bound,[30] a "strip search shall be conducted only when properly authorized by a supervisor and only in the event that there is reasonable suspicion that contraband may be concealed on the person, or when an officer has reasonable suspicion that a good opportunity for concealment has occurred or as may be outlined in facility procedures for post contact visits."[31] Moreover, in "accordance with standard '5.7 Visitation,' facilities may not adopt policies permitting strip searches after contact visits in the absence of reasonable suspicion unless detainees are provided the right to choose non-contact visitation instead of contact visitation and are fully informed of such right."[32]

Federal regulations under "Standards to Prevent, Detect, and Respond to Sexual Abuse and Assault in Confinement Facility," 79 Fed. Reg. 13,100 (Mar. 7, 2014),[33] herein after PREA, prohibit cross-gender pat downs and strip searches of females, except when there are exigent circumstances.[34] PREA requires any cross-gender pat downs or strip searches to be documented and for all staff to be trained in proper procedures for conducting all pat down searches.[35] ICE's June 19, 2015, memo provides further guidance regarding PREA regulations and ICE's Standards. "All strip searches shall be performed by staff of the same gender as the detainee. In the case of an emergency, a staff member of the same gender as the detainee shall be preset to observe a strip search performed by an officer of the opposite gender."[36]

---

[30] ICE Intergovernmental Service Agreement with the Santa Ana City Jail (2015), response to CIVIC's California Public Record Act request, *available at* https://www.dropbox.com/s/3bntdmq2khu3j1y/ICE_Contract_SACJ_2015.pdf?dl=0 (see Article 5).
[31] ICE PBNDS 2.10.II.7
[32] *Ibid.*
[33] ICE Intergovernmental Service Agreement with the Santa Ana City Jail (2015), response to CIVIC's California Public Record Act request, *available at* https://www.dropbox.com/s/3bntdmq2khu3j1y/ICE_Contract_SACJ_2015.pdf?dl=0 (see Article 5, explaining that the Santa Ana City Jail also is contractually bound by this federal regulation).
[34] PREA ("Limits to Cross-Gender Viewing and Searches," §§ 115.15, 115.115)
[35] *Ibid.*
[36] ICE PBNDS 2.11; ICE PBNDS 2.10.II.3 ("An officer of the same gender as the detainee shall perform the search.").





"Whenever possible, transgender detainees shall be permitted to choose the gender of the staff member conducting a body-cavity search"[37] in addition to when an officer is performing "any necessary pat-down and strip searches."[38]  It is important to note that Santa Ana City Jail's practice of having men strip search transgender women seems to conflate gender identity and sex.  Also, "[s]pecial care should be taken to ensure that transgender detainees are searched in private."[39]  "All strip searches shall be documented."[40]  The requirement for reasonable suspicion has been part of ICE's Standards since at least 2007.[41]

     **b.**     **California Penal Code Section 4030 prohibits visual strip searches absent individualized reasonable suspicion, and prohibits physical body cavity searches by non-medical personnel.**

The Standards reflect state and federal law, which generally prohibit suspicion-less strip searches.  In California, people in places of incarceration who are subjected to a strip search fall into one of three categories: (1) arrestees strip searched before being admitted to jail; (2) arrestees strip searched pursuant to California Penal Code section 4030; and (3) prisoners searched because jail officials have reasonable suspicion that the prisoner is concealing weapons or contraband.  The U.S. Supreme Court has found that officials may strip-search people arrested for any offense, however minor, before admitting them to jails even if the officials have no reason to suspect the presence of contraband.  *Florence v. Board of Chosen Freeholders*, 566 U.S. ___ (2012).  Two years earlier, the Ninth Circuit held similarly, explaining that conducting a visual strip search for weapons and drugs before placing even new arrestees in the general jail population did not violate their Fourth Amendment rights.  *Bull v. City and County of San Francisco*, 595 F.3d 964, 966 (9th Cir. 2010).  However, once the person is admitted and placed into the general jail population, other standards apply.

California defines a strip search as "a search which requires a person to remove or arrange some or all of his or her clothing so as to permit a visual inspection of the underclothing, breasts, buttocks, or genitalia of such person." Cal. Pen. Code § 4030(c).  "Persons conducting a strip search or a visual body cavity search shall not touch the breasts, buttocks, or genitalia of the person being searched." Cal. Pen. Code § 4030(j).  Section 4030 requires that a misdemeanor or infraction arrestee not be strip searched absent reasonable suspicion that the arrestee is concealing weapons or contraband. Cal. Pen. Code § 4030(f).  Moreover, no "strip search or visual body cavity search or both may be conducted without the prior written authorization of the supervising officer on duty.  The authorization shall include the specific and articulable facts and circumstances upon which the reasonable suspicion determination was made by the supervisor." Cal. Pen. Code § 4030(f).

A physical body cavity search, as opposed to a strip search, "shall be conducted under sanitary conditions, and only by a physician, nurse practitioner, registered nurse, licensed vocational nurse or emergency medical technician Level II licensed to practice in this state."  Cal. Pen. Code § 4030(k).  No misdemeanor or infraction arrestee "shall be subjected to a physical body cavity search except under the

---

[37] ICE PBNDS 2.10.V.2.c.
[38] ICE Memo: Further Guidance Regarding the Care of Transgender Detainees, June 19, 2015.
[39] ICE PBNDS 2.10.V.3.g.
[40] ICE Memo: Further Guidance Regarding the Care of Transgender Detainees, June 19, 2015.
[41] *See* ICE Memo: Admission and Release – National Detention Standard Strip Search Policy, Oct. 15, 2007, *available here* http://iwp.legalmomentum.org/reference/additional-materials/immigration/enforcement-detention-and-criminal-justice/government-documents/ENF_%20National%20Detention%20Standard%20Strip%20Search%20Policy%202007.pdf





authority of a search warrant issued by a magistrate specifically authorizing the physical body cavity search." Cal. Pen. Code § 4030(h).[42]  The authorization under subsection (f) and subsection (h) must be "placed in the agency's records and made available, on request, to the person searched or his or her authorized representative." Cal. Pen. Code § 4030(i).

After *Bull*, California Penal Code section 4030 remains law, and even misdemeanor or infraction arrestees cannot be strip searched before being placed into the general jail population, unless all of the following are true: "(i) The person is not cited and released.  (ii) The person is not released on his or her own recognizance pursuant to Article 9 (commencing with Section 1318) of Chapter 1 of Title 10 of Part 2. (iii) The person is not able to post bail within a reasonable time not less than three hours."  Cal. Pen. Code 4030(g).  After the Ninth Circuit ruling in *Bull*, a California court made it very clear that section 4030 could still have been violated. *Bull v. City and County of San Francisco*, 758 F.Supp.2d 925 (N.D. Cal. 2010) (explaining that a section 4030 claim would have been available even after the Ninth Circuit ruling in *Bull* had the class contained a representative who was searched before being given a reasonable opportunity of at least three hours in which to post bail).

Although section 4030 does not explicitly apply to people in immigration detention, it is likely that a court would find that the section does apply to people in immigration detention in California because the intent of the legislature in enacting this section is to "protect the state and federal constitutional rights of the people of California by establishing a statewide policy strictly limiting strip and body cavity searches." Cal. Pen. Code § 4030(a).  People in ICE custody, like misdemeanor and infraction arrestees, are not in custody for the conviction of a crime.  In fact, people in ICE custody are not in custody for a criminal charge; they are civil detainees awaiting determination of a civil removal order.  The same policy purposes that led the legislature to adopt special protections for misdemeanor arrestees should apply to civil detainees.  Moreover, the Ninth Circuit has recognized that "[w]ith respect to an individual confined awaiting adjudication under civil process, a presumption of punitive conditions arises where the individual is detained under conditions identical to, similar to, or more restrictive than those under which pretrial criminal detainees are held . . ." *Jones v. Blanas*, 393 F.3d 918, 934 (9th Cir. 2004).  Accordingly, treating a civil ICE detainee any worse than a misdemeanor arrestee is treated creates a presumption that the treatment is unconstitutionally punitive.  Under California Penal Code section 4030, the Santa Ana City Jail would need reasonable suspicion to search a person in immigration detention.  And because people in immigration detention are not provided with the opportunity to seek, let alone, post a bail within three hours, a strip search of an individual prior to being first placed in the general jail population may also violate California Penal Code section 4030(g).

In addition to violating California Penal Code section 4030 whenever it conducts a strip search of a person in immigration detention without reasonable suspicion, the Santa Ana City Jail also violated California Penal Code section 4030(i) by refusing to provide Ms. Albrecht and her authorized representative, Joshua Effron, with a copy of the authorization document for her strip search on December

---

[42] Note the Ninth Circuit also has held that physical cavity searches are generally not permissible without a search warrant. *United States v. Fowlkes*, 804 F.3d 954 (9th Cir. 2015) (holding that police officers violated Fourth Amendment when subjecting a man during the jail intake process to a physically invasive search and seizure from defendant's rectum.)





31, 2015.[43]  The Santa Ana City Jail also violated its own jail policy, which requires strip search documentation to be made available to the person searched and her authorized representative.[44]

Even if California Penal Code section 4030 does not apply to people in immigration detention, people in immigration detention would fall into the third category of people searched, and reasonable suspicion would be required prior to a strip search nonetheless.  Unlawful strip searches violate an individual's right to privacy under Article 1, Section 1 of the California Constitution.  *See White v. Davis*, 13 Cal. 3d. 757 (1975); *Hill v. NCAA*, 7 Cal.4th 1 (1994); *American Airlines, Inc. v. Superior Court*, 114 Cal. App. 4th 881 (2003).

      c.      **The U.S. Supreme Court, the Ninth Circuit, and California courts have interpreted the Fourth Amendment to prohibit strip searches absent individualized reasonable suspicion.**

Under the U.S. Constitution, the Fourth Amendment is the governing standard for carceral strip searches.  *Way v. County of Ventura*, 445 F.3d 1157, 1161-62 (9th Cir. 2006) (holding that a county jail's blanket strip search policy violated the Fourth Amendment); *Jordan v. Gardner*, 986 F.2d 1521, 1524 (9th Cir. 1993) (en banc) (the "Fourth Amendment guarantees the right of the people to be secure against unreasonable searches, and its protections are not extinguished upon incarceration"); *Thompson v. Souza*, 111 F.3d 694, 699 (9th Cir. 1997) (same).  In *Bell v. Wolfish*, 441 U.S. 520 (1979), the Supreme Court created a balancing test for determining if a person's Fourth Amendment right to be free from unreasonable searches in the carceral context has been violated.  Courts assess the constitutionality of a strip search by balancing "the need for the particular search against the invasion of personal rights that the search entails." *Id.* at 559.  This requires courts to weigh "the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted." *Id.*

Applying this balancing test, California courts have held that a blanket strip search policy for arrestees after returning from court is unconstitutional.  *Craft v. County of San Bernardino*, 468 F. Supp. 2d 1172, 1179 (C.D. Cal. 2006) (policy of strip searching all arrestees who are returned to a jail facility from court violates the Fourth Amendment).  These constitutional protections apply to people in the immigration detention context.  *Flores v. Meese*, 681 F. Supp. 665 (C.D. Cal. 1988) (holding unconstitutional routine strip search of juveniles at INS detention facilities stating that they have a reasonable expectation of constitutional protections it was "axiomatic that a strip search entails perhaps the most severe intrusion upon personal rights").

In alignment with California Penal Code section 4030, the U.S. Supreme Court and the Ninth Circuit have held that physical cavity searches are generally not permissible without a search warrant.  *United States v. Fowlkes*, 804 F.3d 954 (9th Cir. 2015) (holding that police officers violated Fourth Amendment when subjecting a man during the jail intake process to a physically invasive search and seizure from defendant's rectum).

---

[43] Email from Christina Holland to Joshua Effron, January 10, 2016 (on file with CIVIC and with Joshua Effron).
[44] Santa Ana City Jail Inmate Searches Policy, response to CIVIC's California Public Record Act request, *available at* https://www.dropbox.com/s/m4uh811mo8lacf0/SAJ_Inmate_Searches_Policy.pdf?dl=0.





Even if the strip search policy, practice, or custom at Santa Ana is constitutional on its face, if it is conducted in an unreasonable manner or goes too far in scope, it can still be considered unconstitutional as applied. Carceral strip searches that are "excessive, vindictive, harassing, or unrelated to any legitimate penological interest are not reasonable." *Michenfelder v. Sumner*, 860 F.2d 328, 332 (9th Cir. 1988). Moreover, California law specifically requires that all California prisoners be searched "in a professional manner."[45] California prohibits opposite-sex guards from performing unclothed body inspections "except under emergency conditions with life or death consequences.[46] Past sexual and physical abuse experienced by female prisoners may affect the way they react to searches by male prison guards. Thus, the Ninth Circuit has held that female prisoners have a greater privacy interest than males; random, non-emergency, clothed body searches on female prisoners were cruel and unusual punishment, violating the Eighth Amendment. *Jordan v. Gardner*, 986 F.2d 1521 (9th Cir. 1993). Other courts have found that searches performed on transgender women may also violate the Eighth Amendment, particularly when the woman believes the guards made her strip to harass her and to "view her unique physical characteristics." *Meriwether v. Faulkner*, 821 F.2d 408, 411 (7th Cir. 1987). And strip searches being conducted in an open setting is a form of gratuitous humiliation that raises constitutional questions. *See, e.g., Vaughan v. Ricketts*, 859 F.2d 736, 741-42 (9th Cir. 1988) (searched in an open hallway).

The Santa Ana City Jail cannot justify its policies on grounds of administrative convenience. *Rufo v. Inmates of Suffolk County Jail*, 502 U.S. 367, 392 (1992) ("financial constraints may not be used to justify the creation or perpetuation of Constitutional violations."); *Stone v. City and County of San Francisco*, 968 F.2d 850, 858 (9th Cir. 1992) ("federal courts have repeatedly held that financial constraints do not allow states to deprive persons of their constitutional rights").

The Santa Ana City Jail and ICE's conduct concerning strip searches clearly violates California and federal law as well as ICE's standards. We look forward to your response by February 25, 2016. If you have any questions, please contact Christina Fialho at CFialho@endisolation.org or at 385-212-4842. You also may contact Flor Bermudez, Managing Attorney/Detention Project Director at the Transgender Law Center at Flor@transgenderlawcenter.org, or the other organizations listed below who urge the City of Santa Ana to adopt a sensible and humane strip search policy.

Sincerely,

Christina Fialho
Co-Executive Director/General Counsel
Community Initiatives for Visiting Immigrants in Confinement (CIVIC)
www.endisolation.org
P.O. Box 40677
San Francisco, CA 94140

---

[45] Cal. Code Regs. tit. 15, § 3287(b) (2006) (requiring that all searches of prisoners "be conducted in a professional manner which avoids embarrassment or indignity to the prisoner. Whenever possible, unclothed body inspections of prisoners shall be conducted outside the view of others.").
[46] Cal. Code Regs. tit. 15, § 3287(b)(1) (2006). The CDCR Department Operations Manual (the DOM) reflects the same policies. CDCR Department Operations Manual §§ 52050.18.2, 52050.18.3 (1989), available at http://www.cdcr.ca.gov/Regulations/Adult_Operations/docs/DOM/Ch_5_Printed_Final_DOM.pdf.

14



CC:

Mary Giovagnoli
Deputy Assistant Secretary for Immigration Policy
Department of Homeland Security
Mary.Giovagnoli@hq.dhs.gov

Moreen Murphy
Officer for Civil Rights and Civil Liberties
U.S. Department of Homeland Security
Moreen.Murphy@HQ.DHS.GOV

Richard Rocha
Communications Advisor
U.S. Immigration and Customs Enforcement (ICE)
Richard.A.Rocha@ice.dhs.gov

Lana Khoury
LGBT Liaison
U.S. Immigration and Customs Enforcement (ICE)
Lana.Khoury@ice.dhs.gov

Andre Quinones
Assistant Field Office Director
U.S. Immigration and Customs Enforcement (ICE), Los Angeles
Andre.G.Quinones@ice.dhs.gov

Art Trevino
Assistant Field Office Director
U.S. Immigration and Customs Enforcement (ICE), Los Angeles
Arturo.Trevino@ice.dhs.gov

Jorge Field
Assistant Field Office Director
U.S. Immigration and Customs Enforcement (ICE), Los Angeles
Jorge.Field@ice.dhs.gov

Sonia R. Carvalho
City Attorney, Santa Ana
City of Santa Ana
Sonia.Carvalho@bbklaw.com

15





## Organizational Letter of Support

We, the undersigned organizations, are deeply concerned about the strip searches of detained immigrants that are occurring at the Santa Ana City Jail. We urge the Office for Civil Rights and Civil Liberties (CRCL) at the Department of Homeland Security (DHS), pursuant to its authority under 6 U.S.C § 345, to investigate the complaint filed on January 25, 2016, by Community Initiatives for Visiting Immigrants in Confinement (CIVIC). Furthermore, we urge CRCL to develop policies to address any violations and to provide ongoing oversight on the implementation of any necessary changes. Moreover, we urge the City of Santa Ana to adopt a sensible and humane strip search policy that conforms to federal ICE standards, to state and federal law, and to human decency.

American Civil Liberties Union of Southern California
Immigration Equality
LGBT Center Orange County
National Day Labor Organizing Network
National Immigrant Justice Center
Public Counsel
Public Law Center
Transgender Law Center
University of Southern California (USC) Gould School of Law Immigration Clinic

67



# BLANK PAGE

68        

| Santa Ana Jail *Policy and Procedure* | ORDER #. | 05.01 | | PAGES | 11 |
|---|---|---|---|---|---|
| | Date | 10-15-09 | | | |
| | CHAPTER | FACILITY SAFETY & SECURITY | | | |
| | SUBJECT | Inmate Searches | | | |

## PURPOSE

The establishment of a safe, secure and orderly environment, and the preservation of constitutional rights of the individual, are primary goals of jail administration. Implementation of periodic and routine searches to detect and retrieve weapons, drugs or unauthorized items is essential to the realization of these objectives.

## POLICY

All newly arrested and in-custody inmates will undergo periodic searches of their persons and personal belongings to promote security objectives instituted at the Santa Ana Jail facility.

## AUTHORITY

PC 4030

## PROCEDURE

All custodial staff, those individuals employed as Correctional Officers, Correctional Supervisors, Correctional Managers and the Jail Administrator, shall execute searches according to procedures established in this policy. Search definitions and guidelines for the various search procedures, along with the related statutory regulations, are outlined in this chapter.

I.      Search Defined

      A.      Pat Searches

              The authority to conduct pat searches (*also described as pat-downs*) is defined in Penal Code, 4030(e). A pat search is the act of frisking or running hands over, a person's body and clothing, including the removal of items contained within pockets, for the purpose of detecting and retrieving contraband.

              All persons arrested and placed in custody are subject to pat or frisk searches of their persons, clothing, and possessions at any time during their incarceration.



B.   Strip and Visual Cavity Searches

Penal Codes, 4030(c), and 4030(d) (2) describe the acts that constitute strip and visual cavity searches. Both, strip and visual cavity searches, consists of the act of removal or rearrangement of some or all of an individual's clothes for the act of visually inspecting that individual's underclothing, breasts, buttocks, genitalia, or corresponding body cavities.

For all operational considerations, the phrases strip search and visual cavity search are synonymous.

Specific restrictions govern when it is appropriate to conduct these searches. Those provisions are outlined in the strip search section of this policy.

C.   Cavity Searches

A cavity search, mentioned in Penal Code, 4030(d) (3), is the physical intrusion into the stomach, rectal or vagina cavity for the purpose of discovering or retrieving any concealed object.

Only qualified medical personnel can perform these searches, and only after, a warrant is issued specifically ordering the search.

The procurement of a warrant in these cases is the responsibility of the arresting officer. If an in-custody inmate is involved then the arresting or contract agency is required to obtain the order.

II.   Pat Search Guidelines

A.   Searches will only be conducted by custodial personnel. All other Correctional staff is prohibited from conducting searches.

B.   All arrested persons brought into the jail will be pat searched. These pat searches will be conducted immediately when custodial responsibility is turned over to jail personnel.

C.   To minimize the inherent liability associated with cross-gender searches for male officers, female officers will normally pat-down female inmates. If ever a situation develops wherein a male officer is required to pat search a female, that officer will first get supervisory approval before performing the search, and:

1.   The officer will have another employee present, as a witness, during the entire duration of the search.

2.   The authorizing supervisor will record the cross-gender search and related

**05.01 – Inmate Searches**                                              **Page 2 of 11**



particulars in the 24-hour shift activity log.

3.    The log entry will describe the special circumstances that necessitated the divergence from normal practice and will identify all persons involved in the incident.

D.    Periodical pat searches of in-custody inmates shall be accomplished during daily operations. These instances shall include, but are not limited to the following:

1.    Upon inmates' entry and exit of housing modules.

2.    Following inmates' exit from multi-purpose rooms after program attendance.

3.    After in-custody inmates dress out in their personal attire for transfer escort or transport.

4.    Subsequent to any incident that requires the reinforcement of behavioral parameters or contraband detection.

E.    All clothing and personal possessions removed during searches will be inventoried, stored in property bins and garment bags, or disposed of in accordance with the property disposal procedures outlined in this manual. The person who removes or receives the property is responsible for the proper disposition of that item(s).

F.    Officers will not attempt to conduct pat searches over layered clothing. Inmates will be directed to remove any top coverings such as coats, jackets and sweaters before being searched.   No individual's clothing shall be removed or rearranged for the visual inspection of that individual's underclothing, breasts, buttocks, or genitalia.

G.    To avoid potential misuse, abandonment, or theft of clothing Correctional staff will remove any item not actually worn by an inmate from that person's possession and properly store and account for that item.

H.    All Correctional staff will ensure all items removed from inmates are identified with the inmate's name and booking number in a manner that clearly distinguishes ownership.

I.    To eliminate incidents of unclaimed or abandoned property, staff shall not leave any clothes or property unattended, unidentified or unsecured.

J.    Articles such as hats, shoes, jackets, etc., shall not be left in or next to holding cells.

K.    Paragraphs I. and J. also applies to property collected from those inmates who are

**05.01 – Inmate Searches**                                          **Page 3 of 11**



temporarily housed pending P.C. 849(b) or citation release.

III.   Pat Search Procedures

A.   Custodial staff will remove, or will direct inmates to remove all layer top clothing, e.g., jackets and coats before starting a search.

B.   Officers will not attempt to conduct pat searches over layered clothing. Inmates will be directed to remove any top coverings such as coats, jackets, sweaters and second shirts before being searched. T-shirts or undershirts need not be removed.

C.   The potential for needle or sharp object injury is always present when conducting a search. Staff must use appropriate caution when they examine inmates, clothing or their possessions.

D.   Searches shall be conducted in a methodical manner, inclusive of a systematic check of the following areas:

1.   Scalp and hair.
2.   Mouth and under tongue areas.
3.   Ears.
4.   Necklines.
5.   Under and sides of arms.
6.   Upper and lower back.
7.   Chest area.
8.   Waistline.
9.   Groin area.
10.  Along the legs.
11.  Around the ankles.
12.  Feet / shoes / socks.
13.  All clothing (with special attention to collars and cuffs).
14.  Within all pockets (including examination of contents)

E.   Officers will list inmates' clothing and property on the Orange County Jail (OCJ) Property Inventory Record form after they conduct their searches. Officers will list clothing worn, as well as, all items removed during the search.

F.   When inmates remove items from their person, whether voluntarily or at an officer's directive, staff will ensure everything has been relinquished by conducting a physical verification after the surrender of the item(s).

72   A

G.   If, during a search, contraband is found, officers shall:

    1.   Notify the arresting officer of the discovery and, if the contraband is a weapon or controlled substance, turn it over to that officer for disposition.

    2.   If the contraband is a weapon or controlled substance, custodial staff will perform a strip search on the individual to ensure the inmate does not possess any additional concealed item(s).

H.   When an inmate is suspected of concealing contraband in a body cavity, the arresting officer is to be notified, and:

    1.   The Shift Supervisor is to be sought for instructions as to how to proceed.

    2.   If the Arresting Officer, or the Shift Supervisor, determines there is a need for a cavity search, the Arresting Officer is responsible for obtaining the search warrant.

    3.   Upon notification that a warrant is being issued, the Shift Supervisor will coordinate with police and medical personnel to accomplish the search.

    4.   To prevent the destruction or elimination of evidence, the suspected inmate will be secured solitarily in a dry cell. A dry cell is a cell without operating faucet or toilet capacities.

I.   When any contraband is discovered, the Correctional staff finding the item(s) will record the incident in a Santa Ana Jail incident report. The report shall include:

    1.   Police Case Incident number (CI#), when appropriate.

    2.   Comprehensive information regarding the incident, inclusive of:

        a.   All inmate identifiers.
        b.   A complete description of what was found.
        c.   The exaction location of concealment.
        d.   Any inmate statements regarding the discovery.
        e.   The disposition of the item(s).
        f.   Any additional charges and final inmate disposition.

IV.   Strip Searches Guidelines

    A.   Legal Background



1. California Penal Code prohibits the strip-searching of inmates booked solely on misdemeanor charges unless those charges involve violence, weapons or controlled substances.

2. There is both state and federal case law opposed to the strip-searching of individuals booked on weaponless, non-drug related and victimless felony charges solely due to the classification of the offense.

3. Persons that knowingly and willfully violate California Penal Code 4030 are guilty of a misdemeanor and can be civilly sued for damages. Both, the Correctional Officer conducting the search and the supervisor who approves it, are criminally and civilly liable.

4. Case law has evolved to the point that the distinctions between felony and misdemeanor, pre-arraignment and post-arraignment, and new booking and transfers between institutions have become irrelevant.

5. Contractual requirements of the ICE contract and Federal standards must be applied to the ICE inmates.

6. As a result, all persons booked into jail, regardless of the circumstances will fall under the same criteria for the purpose of strip searches.

B. Misdemeanor, Felony and Federal Offenses

1. A Peace Officer or Correctional Officer must have <u>reasonable suspicion</u>, supported by specific articulable facts, to believe that the arrestee is concealing a weapon or contraband, and that the strip search will result in the item(s) being found.

2. Prior to executing the search, the Correctional Officer must complete a Request and Authorization for Strip Search form with specific articulable facts and submit it to their shift supervisor or SCO for authorization to conduct a strip search.

3. The Shift Supervisor or SCO shall ensure strip search forms provide supporting facts and circumstance on which they base their authorization.

4. The Shift Supervisor or SCO must give written authorization for the strip search.



5.  In view of the punitive liability to both the executing custodial officer and approving custodial supervisor, the final determination as to when a strip search is conducted rest with the custodial personnel.

C.  Reasonable Suspicion Defined

1.  Reasonable suspicion is evaluated using the "reasonable person" or "reasonable officer" standard, in which a person in the same circumstances, presented with the same information could reasonably believe an inmate has contraband or weapons concealed upon them.

2.  Reasonable suspicion is more than a hunch but less than probable cause.

3.  A person who is arrested for current drug charges, weapons charges, or charges of violence would qualify for reasonable suspicion.

4.  Other examples of reasonable suspicion include:

    a.  Fresh needle marks.
    b.  Seen mixing in holding cells in other facilities unsupervised (i.e. Roybal Court Holding).
    c.  Found contraband during the pat search.
    d.  Odor of tobacco, marijuana or similar contraband.
    e.  Physical symptoms of recent drug use.
    f.  Level of nervousness.
    g.  Inmate went to a medical or professional appointment where the inmate was left unsupervised.
    h.  Inmate was involved in major disturbance or violent incident while in the previous facility.

V.  Strip Search Procedures

A.  Strip searches shall be conducted in an area of privacy with only those custodial staff required for searching and security present during the search.

1.  Custodial staff shall use the dress out area in booking to strip search all newly arrested whenever possible.

2.  Anytime an area, other than the dress-out room, is utilized to strip search an inmate, that place must be where the search cannot be observed, physically or electronically, by persons not participating in the search.

**05.01 – Inmate Searches**                                    **Page 7 of 11**



3.   Staff will take measures to ensure the individual privacy of each inmate when multiple strip searches are simultaneously executed. Whenever feasible, staff will use privacy obstructions, i.e. shower stalls, toilet stalls and privacy walls.

4.   When multiple individual strip searches are being conducted, a Correctional Officer not conducting strip searches shall supervise inmates waiting to be searched and those already searched. At no time shall an officer conduct a search and supervise other inmates simultaneously.

B.   All persons conducting, or otherwise present, during a strip search shall be of the same sex as the person searched. Medical personnel are excluded.

C.   Penal Code 4030(j) specially prohibits the touching of the breasts, buttocks, or genitalia of persons being searched. Custodial staff shall avoid touching an inmate during a search, except as what may be required to prevent that individual from harmful behavior towards self or others.

D.   Request and Authorization Strip Search forms will be completed each time a strip search is performed.

1.   The forms will be completed with the following information:

a.   Time, date, and place conducted.
b.   Name and badge number of the person(s) conducting search.
c.   Results of the search, including an inventory of any items removed.
d.   The approving Shift Supervisor signature.

2.   Strip search documentation must be kept in individual's permanent jail records, and upon request, must be made available to the persons searched, or that person's authorized representative as defined in P.C. 4030(i). The Request and Authorization for Strip Search forms will be used to comply with this requirement and will be filled in the inmates' jail folder.

E.   Custodial officers shall not act in a manner that a reasonable person would consider rude, degrading or humiliating, and shall professionally perform strip searches in compliance with the following:

1.   Staff will direct inmates to remove their clothing, one garment at a time.

2.   As garments are handed over, staff shall thoroughly inspect each article for contraband.



3.   After inmates have totally disrobed, staff shall visually inspect the subsequent areas:

    a.   Hair - Staff shall instruct inmates to run their fingers vigorously through their hair. As the inmates are performing this task, officers shall observe their actions and look for concealed contraband.

    b.   Ears & Nose - Personnel will look inside these orifices and behind the ears.

    c.   Mouth - Inmates will be instructed to remove any dentures or dental apparatus for inspection. Additionally, they will be instructed to open their mouths for a visual inspection of the areas underneath their tongues and around their gum lines.

    d.   Torso Area - Staff shall instruct inmates to stand with legs apart and arms lifted above their heads. Staff shall check underarms, and under breast areas. If necessary, to observe the chest area underneath, staff will direct inmates to lift their breasts.

    e.   Male Inmates - Male inmates shall be instructed to lift their penis and testicles, and pull back any foreskin for examination. Next, inmates will face away from officers, squat, spread their buttocks, cough forcefully, and straighten their legs while keeping their buttocks spread for a rectal inspection.

    f.   Female Inmates - Female inmates shall be instructed to squat and cough forcefully three times. Immediately after which, females will be directed to face away from officers, bend forward and spread their buttocks for inspection of both the rectal and vaginal areas.

    g.   Feet and Hands - Staff will inspect between toes and fingers, both sides of each hand and foot.

F.   After the search is conducted, staff will return all undergarments, i.e. wireless bras, underpants, T-shirts or undershirts.

G.   If the inmate is to be housed after the booking process, staff will have the inmate dress in a jail uniform. If the inmate is to be released after processing, staff will have them dress back into their own clothes. Staff shall ensure the clothes are thoroughly checked before they are returned to the inmates.

H.   When staff finds contraband, they will follow procedures outlined in Section III. Pat Search Procedures, paragraphs F. through I., when applicable.

I.   After an inmate has been searched and is properly attired, staff will escort the inmate back to the booking intake area for additional processing.



V.   Searches of Inmate Modules and Cells

    A.   Module and individual cell searches will be conducted routinely by Correctional Officers. These searches shall be conducted:

        1.   Whenever, staff has cause to believe inmates have within their possession any illegal substances, weapons or other unauthorized items.

        2.   As routine practice to detect and retrieve items that are:

            a.   Nuisance contraband, those items altered from their original intend.
            b.   Excess jail issue.
            c.   Unauthorized or excessive personal possessions.

        3.   To ensure compliance with facility fire safety and sanitation standards.

    B.   During module or individual cell searches inmates will be subject to pat or strip searches at the discretion of Correctional staff. Officers shall base their decisions on the item or items for which the search is conducted.

    C.   Officers will conduct strip searches in a manner that prevents the searched inmate from being observed by any one not participating in the search. Individual cells or showers will be utilized to ensure the inmates' privacy.

    D.   Any officer who performs a strip search shall ensure the Request for Strip Search Authorization forms is completed for the inmate searched.

    E.   Shakedowns are coordinated searches of multiple cells and areas. During these activities, custodial staff will secure affect inmates so as to safeguard against disorder or interference. Inmates will be lock-downed in module yards, multiple-purpose rooms, or unaffected cells during the inspection of their cells and personal possessions, excluding their legal paperwork.

    F.   In accordance with Title 15 regulations, officers shall only search inmates' legal paperwork in their presence. Legal paperwork is defined as:

        1.   Correspondence addressed to or from state and federal courts, any member of the State Bar or holder of public office, the State Board of Corrections, and the facility manager or administrator.

        2.   Any legal proceeding documentation of which an inmate is subject i.e. court order, minute entry, pleading, hearing, disposition or transcripts.



G.   The relocation of any legal paperwork does not constitute the searching of that paperwork. Whenever operationally feasible, inmates will be afforded the opportunity to keep their legal paperwork with them. However, when it is not operationally expedient or when the quantity of documentation does not lend to readily conveyance, officers shall require the inmates to leave their paperwork in the cells and only search such paperwork in the owner's presence.

H.   All module shakedowns will be recorded in the 24-hour log by the Shift Supervisor. The Shift Supervisor shall also ensure shakedown paperwork is completed. Such paperwork shall consists of:

   1.   A roster of cell occupants at time of shakedown.

   2.   A list that details:

      a.   Cells searched.
      b.   Who searched the cells.
      c.   The results of the searches.
      d.   An inventory of items seized and the disposition of those items.

   3.   Request for Strip Search Authorization forms for all inmates strip-searched.

79 A

# BLANK PAGE



**U.S. Immigration and Customs Enforcement (ICE)**

**Department of Homeland Security**

Housing location: Module 4B

Santa Ana City Jail 62 Civic Center Plaza, Santa Ana CA 92701

11-18-2015

**Complaint humiliating strip searches:**

Per the U.S. Immigration and Customs Detainee Handbook Page 18, strip searches will only be done if there is justified reason to suspect, that a weapon or other contraband is hidden. Nonetheless we are facing each time when we are transported back from immigration court/ federal building a humiliating and completely unnecessary strip search at the Santa Ana Jail, which was enacted after 03/2015. We demand ICE to immediately stop these procedures, it affects our mental well being and influences our court appearances.

Complaint was also translated into spanish.

| Name | A# |
|---|---|
| Klaudia Pely | A077 3 51 779 |
| Fabiola Espinoza | A205 711 389 |
| Sonia Maria | A910 8855 |
| Hernandez Brenda ← | A-205-711-199 |
| Martha Corona | A·077·969·803 |
| Maria R. | A·075 480·856 |
| Nicole Albrecht | A 206 407 728 |
| Diana Sarmiento | A 200153880 |
| Gloria Ramos | A-205-320-210 |
| Te kreem ap zaem Varia | A 028137853 |
| | A 072 443 076 |
| Sherrie Pascual | A 047 887 521 |
| Soraya Armendariz | A 018 362-627 |

81   Exhib. T 13

Aida Sandoval          A## 13846462

82      Exhibit B

(ICE)

Locación : Modulo 4B

Carcel Santa Ana City Jail 62 Civic Center Plaza, Santa Ana, CA. 92701

Noviembre 18·2015

Queja de registros desnudos y humillantes.

En el libro de los detenidos pagina 18 dice que solo debe ser hecho por una razón sospechoza justificada o que una arma o contrabando esta escondido. Sin embargo nosotros estamos enfrentando estos cheqeos cuando regresamos de la corte o de el edificio federal. Enfrentamos una humillacion que no es necesario el registro que sucede en la carcel de Santa Ana Jail. Que lo pusieron en accion en Marzo del 2015. Nosotros pedimos que I.C.E immediata- mente pare este processo. Nos afecta el bienestar mental y nuestra presentacion cuando vamos a la corte frente un juez.

NAME/NOMBRE                          A#
Diana C. Sarmiento                   200153880
Lourdes milla                        B#13-3118
                    (83)           Exhibit B

# BLANK PAGE



**U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT**

## 11064.1: Facilitating Parental Interests in the Course of Civil Immigration Enforcement Activities

|  |  |
|---|---|
| **Issue Date:** | August 23, 2013 |
| **Effective Date:** | August 23, 2013 |
| **Superseded:** | N/A |

**Federal Enterprise Architecture Number:** 306-112-002b

1. **Purpose/Background.** U.S. Immigration and Customs Enforcement (ICE) is committed to intelligent, effective, safe and humane enforcement of the nation's immigration laws. ICE seeks to enforce immigration laws fairly and with respect for a parent's rights and responsibilities. This directive supplements existing ICE enforcement priority memoranda. This Directive establishes ICE policy and procedures to address the placement, monitoring, accommodation, and removal of certain alien parents. The Directive is particularly concerned with the placement, monitoring, accommodation, and removal of alien parents or legal guardians who are: 1) primary caretakers of minor children without regard to the dependent's citizenship; 2) parent and legal guardians who have a direct interest in family court proceeding involving a minor or child welfare proceedings in the United States; and 3) parents or legal guardians whose minor children are U.S. citizens (USCs) or lawful permanent residents (LPRs).

    This Directive is intended to complement the immigration enforcement priorities and prosecutorial discretion memoranda, as well as other related detention standards and policies that govern the intake, detention, and removal of alien parents. The security and safety of any ICE employee, detainee, ICE detention staff or member of the public will be paramount in the exercise of the procedures and requirements of this Directive.

2. **Policy.** ICE personnel should ensure that the agency's immigration enforcement activities do not unnecessarily disrupt the parental rights of both alien parents or legal guardians of minor children Particular attention should be paid to immigration enforcement activities involving: 1) parents or legal guardians who are primary caretakers; 2) parents or legal guardians who have a direct interest in family court or child welfare proceedings; 3) parents or legal guardians whose minor children are physically present in the United States and are USCs or LPRs. ICE will maintain a comprehensive process for identifying, placing, monitoring, accommodating, and removing alien parents or legal guardians of minor children while safeguarding their parental rights.

3. **Definitions.** The following definitions apply for the purposes of this Directive only.

85   Exhibit C

2

**3.1.** **Custody.** The period of time during which a person has been arrested or detained by ICE under its civil immigration enforcement authorities, is physically present in an ICE-owned, -leased, or -contracted detention facility pursuant to such authorities, or is being transported by ICE or an ICE contractor (including for the purposes of removal from the United States) pursuant to such authorities. Custody ends when the person is released from ICE's physical confinement or restraint, including upon transfer to another agency.

**3.2.** **Initial Placement.** The first facility where an alien is detained by ICE.

**3.3.** **Parental Rights.** The fundamental rights of parents to make decisions concerning the care, custody, and control of their minor children without regard to the child's citizenship, as provided for and limited by applicable law. The rights of legal guardians of minor children to make decisions concerning those children as provided for and limited by applicable law.

**3.4.** **Family Court or Child Welfare Proceeding.** A proceeding in which a family or dependency court or child welfare agency adjudicates or enforces the rights of parents or minor children through determination or modification of parenting plans, child custody, visitation, or support, or the distribution of property or other legal obligations in the context of parental rights.

**4.** **Responsibilities.**

**4.1.** **Enforcement and Removal Operations (ERO) Field Office Directors (FODs)** and their staff or designees have responsibilities under Sections 5.1 through 5.7.

**4.2.** The **ERO Executive Associate Director (EAD)** has responsibilities under Section 5.8 and 5.9.

**4.3.** The **ERO Field Operations Division** has responsibilities under Section 5.7 (Facilitation of Return).

**4.4.** The **Parental Rights Coordinator** has responsibilities under Sections 5.1, 5.8, and 5.10 (Training).

**4.5.** The **Field Point of Contact (POC) for Parental Rights** in each ERO Field Office have responsibilities under Sections 5.1, 5.2, and 5.8 (Implementation through Collaboration and Information Sharing).

**4.6.** **ICE Office of Detention Policy and Planning (ODPP)** has responsibilities under Section 5.10 (Training).

**5.** **Procedures/Requirements.**

---



3

**5.1.  Field Points of Contact for Parental Rights ("Field POCs").**

1) Each ERO FOD shall designate a specially trained coordinator at the supervisory level in his or her Field Office to serve as the Field POC for Parental Rights for his/her area of responsibility (AOR).  These Field POCs will regularly communicate with the Parental Rights Coordinator (See 5.8) and report to ERO HQ on the progress of implementing this Directive.  The Field POCs will also participate in all relevant training offered by HQ ERO on the subject of this Directive.

2) Each Field POC shall receive and address public inquiries related to the parental rights or family ties of detained alien parents or legal guardians of minor children. Careful consideration should be given to cases involving parents or legal guardians who are primary caretakers, those who have a direct interest in family court or child welfare proceedings, and those whose minor children are USCs or LPRs. Inquiries may be received from detained or non-detained aliens, their family members, attorneys or representatives, advocacy groups, state and local family courts, and/or child welfare services, among others.

3) Information regarding how to contact the Field POCs shall be posted and publicized at detention facilities within each AOR and on the ICE website.  Information will be made available in multiple languages to the extent practicable.

**5.2.  Prosecutorial Discretion and Identification.**

1) *Prosecutorial Discretion*.  FODs shall continue to weigh whether an exercise of prosecutorial discretion may be warranted for a given alien and shall consider all relevant factors in this determination, including whether the alien is a parent or legal guardian of a USC or LPR minor, or is a primary caretaker of a minor.  While the FODs may exercise prosecutorial discretion at any stage of an enforcement proceeding, it is generally preferable to exercise such discretion as early in the case or proceeding as possible.

2) *Identification*.  ICE may receive information that identifies an alien as a parent or legal guardian of a USC or LPR minor, or as a primary caretaker of a minor at any time during the alien's arrest, processing or detention.

If such information is sufficiently credible to confirm the alien's status as a parent or legal guardian of a USC or LPR minor, or as a primary caretaker of a minor, FODs should reevaluate any custody determination for the alien to the extent permitted by law and in accordance with existing ICE policy.

Once a detained alien has been determined to be a parent or legal guardian of a USC or LPR minor, or as a primary caretaker of a minor, the FOD or Field POC should also enter this information into ENFORCE.



4

**5.3.   Initial Placement and Subsequent Transfers.**

1) If the alien's child, children, or family court or child welfare proceedings are within the AOR of initial apprehension, the FOD shall refrain from making an initial placement or from subsequently transferring the alien outside of the AOR of apprehension, unless deemed necessary by the FOD for the reasons outlined in Section 5.2(3) of ICE Policy 11022.1, Detainee Transfers (January 4, 2012) ("Detainee Transfer Directive"). FODs shall also note any transfers outside the AOR in the updated Detainee Transfer Checklist (attached).

2) Further, and subject to detention space availability, the FOD will initially place the detained alien parent as close as practicable to the alien's child(ren) and/or to the location of the alien's family court or child welfare proceedings (if any).

**5.4.   Nature of the Individual's Participation in Family Court or Child Welfare Proceedings.**

1) *In-person appearance* -- When a detained alien parent or legal guardian's presence is required to participate in family court or child welfare proceedings in order for him or her to maintain, or regain, custody of his or her child(ren) and:

   a) The detained alien parent or legal guardian or his or her attorney or other representative requests with reasonable notice an opportunity to participate in such hearings;

   b) The detained alien parent or legal guardian, or his or her attorney or other representative, has produced evidence of a family court or child welfare proceeding, including but not limited to, a notice of hearing, scheduling letter, court order, or other such documentation;

   c) The family court or child welfare proceedings are located within a reasonable driving distance of the detention facility where the detained alien parent or legal guardian is housed;

   d) Transportation and escort of the detained alien parent or legal guardian would not be unduly burdensome on Field Office operations; and

   e) Such transportation and/or escort of the detained alien parent or legal guardian to participate in family court or child welfare proceedings does not present security and/or public safety concerns,

The FOD shall arrange for the detained alien parent or legal guardian's in-person appearance at family court or child welfare proceedings, if practicable.

2) *Participation by video or standard teleconferencing* – If it is impracticable to transport the detained alien parent or legal guardian to appear in-person in a family



court or child welfare proceeding, due to distance or safety or security concerns, the FOD should work with both the detained alien parent or legal guardian and the family court or child welfare authority to identify alternative means for the detained alien parent or legal guardian to participate in the proceeding. For instance, if it is technologically feasible, and approved by the family court or child welfare authority, the FOD may facilitate a detained alien parent's or legal guardian's appearance or participation through video or standard teleconferencing from the detention facility or the Field Office.

In all cases, if the detained alien parent or legal guardian does not wish to attend and/or participate in a family court or child welfare proceeding, ICE will not interfere with the detained alien parent's or legal guardian's decision, which shall be documented in the detainee's A-File.

**5.5.  Visitation.**

1)  In some cases, parent-child visitation may be required by the family court or child welfare authority in order for a detained alien parent or legal guardian to maintain or regain custody of his or her minor child(ren).  If a detained alien parent or legal guardian, or his or her family member, attorney, or other representative produces documentation (e.g. a reunification plan, scheduling letter, court order, or other such documentation) of such a requirement, FODs shall facilitate, to the extent practicable, the required visitation between the detained alien parent or legal guardian and his or her minor child(ren).[1]

    a)  Such special visitation may include contact visitation, within the constraints of safety and security for both facility staff and detainees.

    b)  These special arrangements shall not limit or otherwise adversely affect the detained alien parent or legal guardian's normal visitation rights under the relevant detention standards, or the safe and efficient operation of the detention facility.

2)  While in-person visitation is preferred and should be made available whenever practicable, if it is technologically feasible and approved by the family court or child welfare authority, FODs may permit parent-child visitation through video or standard teleconferencing from the detention facility or the Field Office.

---

[1]  Pursuant to ICE detention standards, at facilities where there is no provision for visits by minors, upon request, FODs shall arrange for a visit by children, stepchildren, and/or foster children within the first 30 days.  After that time, upon request, ICE shall consider a request for transfer, when possible, to a facility that will allow such visitation.  Upon request, FODs shall continue monthly visits, if transfer is not approved, or until an approved transfer can be effected.  *See* NDS 2000 (Section H.2.d); PBNDS 2008 (Section H.2.d); PBNDS 2011 (Section I.2.b).

---



6

### 5.6. Coordinating Care or Travel of Minor Children Pending Removal of a Parent or Legal Guardian.

1)  Where detained alien parents or legal guardians who maintain their parental rights are subject to a final order of removal and ICE is effectuating their removal, FODs or their appropriate designees should accommodate, to the extent practicable, the detained parent or legal guardian's individual efforts to make provisions for their minor children.  Such provisions may include the parent or legal guardian's attempt to arrange guardianship for his/her minor children to remain in the United States, or to obtain travel documents for their child(ren) to accompany them to their country of removal.

2)  FODs will coordinate, to the extent practicable, within their local detention facilities and within the Field Office to afford detained alien parents or legal guardians access to counsel, consulates and consular officials, courts and/or family members in the weeks preceding removal in order to execute signed documents (e.g., powers of attorney, passport applications, appointments of guardians or other permissions), purchase airline tickets, and make other necessary preparations prior to removal.

3)  In addition, the FOD may, subject to security considerations, provide sufficient notice of the removal itinerary to the detainee or through the detained alien's attorney or other representative, so that coordinated travel arrangements may be made for the alien's minor child(ren).

### 5.7. Facilitation of Return.

1)  If a lawfully removed alien (or his or her attorney, family member, consular official or other representative) provides to ICE verifiable evidence indicating that he or she has a hearing or hearings related to his or her termination of parental or legal guardianship rights before a family court or child welfare authority in the United States, and the court or child welfare authority has determined that the removed parent or legal guardian must be physically present, rather than participating via other means, ICE may, on a case-by-case basis, while taking into account security and public safety considerations, facilitate the return of the alien to the United States by grant of parole for the sole purpose of participation in the termination of parental rights proceedings.

2)  ICE shall consider facilitating the return of a removed parent or legal guardian in compelling humanitarian cases.  Aliens who are allowed to return must acknowledge in writing that they may be subject to additional safeguards, including but not limited to, detention, electronic monitoring or routine reporting requirements.   Prior to being paroled back into the United States, alien parents or legal guardians must confirm, in writing: (i) that their sole purpose in traveling to the United States is to attend their termination of parental rights hearings; (ii) that the grant of parole can be terminated at any time; (iii) that they are not traveling to the United States in order to pursue immigration benefits or relief or protection from removal, or to otherwise circumvent

---



orderly visa and immigration processing; (iv) that they will depart the United States without delay following the conclusion of the final parental rights termination hearing for which they traveled to the United States; and (v) that they understand that if they do not depart the United States promptly upon the completion of such hearing, they may be subject to removal from the United States without further hearing as an arriving alien.  Additionally, facilitation of return under this Directive will not relieve an alien of any ground of inadmissibility, deportability, or ineligibility for immigration benefits or relief or protection from removal.

3)  The alien will be responsible for incurring all costs associated with returning to United States to participate in the termination of parental rights hearings; the alien will also incur all costs for departing the United States at the conclusion of the hearing.

4)  Requests to facilitate return will be considered and accommodated on a case-by-case basis, taking into account security and public safety considerations and other relevant factors, such as whether  the family court or relevant child welfare authority will permit the removed alien to participate through alternative means, e.g., through video or standard teleconferencing.

## 5.8.    Implementation through Collaboration and Information Sharing.

1)  The ERO EAD shall designate a Parental Rights Coordinator.

2)  The Parental Rights Coordinator shall be responsible for:

a)  Serving as the primary point of contact and subject matter expert for all FODs and Field POCs, regarding the parental rights of detained aliens.

b)  With the assistance of relevant ERO divisions responsible for data collection and analysis, evaluating on an ongoing basis information collected from ENFORCE, Risk Classification Assessment (RCA) and other relevant ICE information technology systems regarding detained alien parents or legal guardians and sharing with FODs and Field POCs, on an ongoing basis, relevant information about detained alien parents and legal guardians within each AOR.

c)  Assisting FODs and Field POCs in utilizing information about detained alien parents and legal guardians to help ensure compliance with this directive, including:

i.   the appropriate exercise of prosecutorial discretion with respect to detained aliens who are determined to be the primary caretaker of a minor child, or who are determined to be the parent or legal guardian of a USC or LPR child;
ii.  appropriate initial placement decisions and transfer decisions for detained alien parents or legal guardians;

---



iii. the appropriate provision of escorted trips to family court or child welfare proceedings for detained alien parents or legal guardians;
iv. appropriate visitation within ICE facilities; and
v. appropriate efforts, to the extent practicable, to allow a detained alien parent or legal guardian to make provisions for their minor children, including through increased access to counsel, consular officials, family and dependency courts, child welfare authorities personnel, and/or family members or friends in order to arrange guardianship, or to obtain travel documents or otherwise make necessary travel arrangements, for his or her children.

d) Coordinating as necessary with other relevant ERO program offices, FODs, state or local family court or child welfare authority personnel, consular officials and others to facilitate the timely response to issues or complaints relating to the parental rights of detained aliens received by ICE.

e) Working as necessary with relevant ICE program offices and consular officials to facilitate the return to the United States of certain lawfully removed aliens by grant of parole for the sole purpose of participation in the termination of parental rights proceedings.

3) To the extent practicable, the FODs and the Field POCs shall utilize information collected from ENFORCE, RCA, and other relevant ICE information technology systems regarding detained alien parents and legal guardians to perform the functions described in Section 5.8(2)(c) of this Directive.

**5.9. Outreach.**

1) With support from other relevant ICE program offices and in coordination with U.S. Department of Homeland Security (DHS) entities and the U.S. Department of Health and Human Services' Administration for Children and Families, the ERO EAD or his or her designee shall work with representatives of family and dependency courts and child welfare authorities to develop methods for improving communication and cooperation between the immigration enforcement, family or dependency court, and child welfare systems.

2) In cooperation with non-governmental organization stakeholders, the ERO EAD or his or her designee shall ensure the dissemination to all over-72-hour facility law libraries relevant resource guides, including materials prepared by non-governmental organizations and reviewed by ICE, regarding dependency proceedings and the intersection of these proceedings with immigration enforcement and detention.

**5.10. Training.**

1) The Parental Rights Coordinator, in consultation with relevant ICE and DHS program offices – to include other relevant ERO program offices, the ICE Office of Training

92 C

and Development, Office of Detention Policy and Planning, and the DHS Office for Civil Rights and Civil Liberties – shall develop training materials to assist FODs, Field POCs, and other relevant Field Office personnel in the implementation of this Directive.

2) Training shall cover, at a minimum, the means by which ICE officers and personnel will safeguard the parental rights of aliens they encounter – through identification, placement, monitoring, accommodation, and removal – while fulfilling their obligation to enforce the immigration laws.

**6.     Recordkeeping.**  None.

**7.     Authorities/References.**

**7.1.**  INA § 212(d)(5), 8 U.S.C. § 1182(d)(5).

**7.2.**  8 Code of Federal Regulations (CFR) §212.5

**7.3.**  ICE Policy 10075.1, Exercising Prosecutorial Discretion Consistent with the Civil Immigration Enforcement Priorities of the Agency for the Apprehension, Detention, and Removal of Aliens (June 17, 2011).

**7.4.**  ICE Policy 10072.1, Civil Immigration Enforcement: Priorities for the Apprehension, Detention, and Removal of Aliens (March 2, 2011).

**7.5.**  2011 Performance-Based National Detention Standard, "5.2 Trips for Non-medical Emergencies."

**7.6.**  ICE Policy 11022.1, Detainee Transfers (January 4, 2012).

**8.     Attachments.**

**8.1.**  Detainee Transfer Checklist (updated).

**9.     No Private Right.**  Notwithstanding the provisions of this Directive, ICE retains its discretion to remove or detain any alien to the extent permitted by law, irrespective of an alien's pending family court or child welfare proceeding.  These guidelines and priorities are not intended to, do not, and may not be relied upon to create any right or benefit, substantive or procedural, enforceable at law by any party in any administrative, civil, or criminal matter.



John Sandweg
Acting Director
U.S. Immigration and Customs Enforcement

SERVICE LIST / SENT BY MAIL w/ TRACKING #

U.S. Department of Justice
United States Attorney
Geoffrey D. Wilson
Central District of California
300 North Los Angeles Street
Room- 7516
Los Angeles, CA 90012

Extremely Urgent

**Visit ups.com® or call 1-800-PICK-UPS® (1-800-742-5877) to schedule a pickup or find a drop off location near you.**

**Domestic Shipments**

- To qualify for the Letter rate, UPS Express Envelopes may only contain correspondence, urgent documents, and/or electronic media, and must weigh 8 oz. or less. UPS Express Envelopes containing items other than those listed or weighing more than 8 oz. will be billed by weight.

**International Shipments**

- The UPS Express Envelope may be used only for documents of no commercial value. Certain countries consider electronic media as documents. Visit ups.com/importexport to verify if your shipment is classified as a document.
- To qualify for the Letter rate, the UPS Express Envelope must weigh 8 oz. or less. UPS Express Envelopes weighing more than 8 oz. will be billed by weight.

Note: Express Envelopes are not recommended for shipments of electronic media containing sensitive personal information or breakable items. Do not send cash or cash equivalent.

# Reusable Express Envelope

## Legal Size

Reduce paper waste by using this envelope a second time — either to return to sender or to ship to another recipient. See reuse instructions on flap above.

## Decision Green℠

Decision Green is UPS's environmental platform, reflecting our pursuit of sustainable business practices worldwide. For example, this envelope is made from 100% recycled material and is both reusable and recyclable.

100% Recycled fiber
80% Post-Consumer

HONORABLE SUZANNE H SEGAL
255 E TEMPLE ST
LOS ANGELES CA 90012-1581
:ORANGE S:4 1:1
113-1003
1Z1A1R38011203 2286 1030

**This envelope is for use with the following services:**

**UPS Next Day Air®**
**UPS Worldwide Express®**
**UPS 2nd Day Air®**

**Do not use this envelope for:**

**UPS Ground**
**UPS Standard**
**UPS 3 Day Select®**
**UPS Worldwide Expedited®**

**Apply shipping documents on this side.**

PETRA ALBRECHT & NICOLE A WHEELER
(310) 283-1047
THE UPS STORE #6684
1048 IRVINE AVE
NEWPORT BEACH CA 92660-4602

2.2 LBS LTR 1 OF 1
SHP WT: 3 LBS
DATE: 28 SEP 2017

SHIP TO: ROYBAL FEDERAL BLDG & US COURTHOUSE
HONORABLE SUZANNE H SEGAL
ATTN DEPUTY MARLENE RAMIREZ
COURTROOM 590 5TH FLOOR
255 E TEMPLE ST
LOS ANGELES CA 90012-3332

CA 901 9-12

UPS NEXT DAY AIR 1
TRACKING #: 1Z 1A1 R38 01 1203 2286

BILLING: P/P

REF #1: UPSD
REF #2: 1



